UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Civil Case No:
-----------------------------------------------------------------X        1:15-cv-06284-DAB

KATHARINA ROELCKE,                               Plaintiff Demands a
                                                 Trial by Jury
                          Plaintiff,

        -against-                                **SECOND AMENDED
                                                    COMPLAINT**


ZIP AVIATION, LLC
MANHATTAN HELICOPTERS LLC,
and ITAI SHOSHANI, individually

                          Defendants.

-----------------------------------------------------------------X


        Plaintiff, KATHARINA ROELCKE, by her attorneys, DEREK SMITH LAW GROUP

PLLC, hereby complains of Defendants upon information and belief as follows:


                          **NATURE OF THE CASE**

1.  Plaintiff complains pursuant to remedy violations of the FLSA, Administrative Code of the

    City of New York and the laws of the State of New York, based upon the supplemental

    jurisdiction of this Court pursuant to *Gibb*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367

    seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff has

    suffered as a result of, *inter alia*, sex/gender discrimination, sexual assault, sexual

    harassment, retaliation, breach of contract, constructive discharge against Defendants and

    all other causes of action set forth herein.

## JURISDICTION AND VENUE

2.  Jurisdiction of this action is conferred upon the Court as this action involves Diversity of Citizenship under 28 U.S.C. §1332. Plaintiff is a citizen of the State of Florida and Defendant is a domestic limited liability company doing business in the State of New York with its principal place of business in the State of New York.

3.  The matter in controversy exceeds $75,000.

4.  Plaintiff also alleges violation of Federal Law, namely, the FLSA as set forth herein.

5.  Venue is proper in that the events occurred in New York City within the Southern District.

## PARTIES

6.  Plaintiff KATHARINA ROELCKE (hereinafter also referred to as Plaintiff) is an individual woman who is a resident of the County of Dade, State of Florida.

7.  At all times material, Defendant ZIP AVIATION, LLC (hereinafter referred to as Defendant or "ZIP") is a domestic limited liability company doing business in the State of New York.

8.  At all times material, Defendant ZIP AVIATION, LLC operates a New York City helicopter tour and charter company located at 6 East River Piers, New York, New York 10004.

9.  At all times material, Defendant ITAI SHOSHANI (hereinafter also referred to as Defendant or "SHOSHANI") was the president and owner of Defendant ZIP AVIATION, LLC.

10. At all times material, Plaintiff was an employee of Defendant ZIP AVIATION, LLC.

11. At all times material, Defendant MANHATTAN HELICOPTERS LLC (hereinafter referred to as Defendant or "MH") is a domestic limited liability company doing business in the State of New York.

12. At all times material, Defendant MANHATTAN HELICOPTERS LLC operates a New York City helicopter tour and charter company located at 6 East River Piers, New York, New York 10004.

13. At all times material, Defendant SHOSHANI was the Chief Operating Officer, or other officer and Chief Pilot of Defendant MANHATTAN HELICOPTERS LLC.

14. At all times material, Defendant SHOSHANI was and is an owner of Defendant MANHATTAN HELICOPTERS LLC.

15. At all times material, Defendants were acting in concert and on behalf of one another.

## BACKGROUND AND MATERIAL FACTS

### 2007

16. In or around June 2007, Plaintiff met Defendant SHOSHANI when she was greeted by a ZIP pilot at the West 30th Street Heliport. The pilot conveyed to Plaintiff he wanted her to meet Defendant SHOSHANI and "not to leave." When Defendant SHOSHANI arrived at the heliport, Plaintiff and Defendant sat and talked. There, they began to discuss plans for Plaintiff to begin working for Defendant and ZIP as soon as possible.

17. Plaintiff had previously co-owned and operated a full service helicopter company in Canada. Plaintiff's helicopter company handled firefighting support, mining and exploration, government contracts, and various aerial character works.

18. Plaintiff was well qualified for employment with Defendants, having worked as an aviation

consultant and assisting in business building strategies, business mainstreaming, crew support, systems development, safety standards, and pilot conversion.

19. Around July 2007, Plaintiff was suffering from an undiagnosed illness and returned to Canada to seek medical attention.

20. In or around October 2007, Defendant SHOSHANI asked Plaintiff to meet at a hotel in White Plains to discuss business.

21. Plaintiff continuously conveyed that she wanted a starting salary of $150,000.00 in exchange for one year of service. Plaintiff's title was Chief and/or Vice President of Operations for Defendant ZIP.

22. At that time, Defendant SHOSHANI and Defendant ZIP agreed to pay Plaintiff a salary of $150,000.00 in exchange for her services. As part of her employment for Defendants, Plaintiff was expected to work in an executive role, handling the daily operational needs of the business.

23. Furthermore, Plaintiff informed Defendant ZIP and Defendant SHOSHANI that she was a Canadian citizen. Plaintiff was in the United States on a working visa and informed Defendant SHOSHANI and Defendant ZIP that she was only permitted to work with them for one year. However, Defendants offered to assist Plaintiff with her citizenship status, and promised that they would make her a legal citizen. This would allow Plaintiff to legally remain in the United States and continue working with Defendant ZIP and Defendant SHOSHANI. Plaintiff, Defendant ZIP and Defendant SHOSHANI agreed to the above terms and Plaintiff began working for Defendant ZIP immediately.

24. The following morning, Defendant SHOSHANI instructed Plaintiff to meet him at the heliport to start her employment with Defendant ZIP.

25. The aviation industry is highly regulated and a large component of Plaintiff's job was to continually monitor and assure compliance with the applicable state and federal laws and regulations. Plaintiff's job required her to deal with the Federal Aviation Administration ("FAA") on a frequent basis.

26. Initially, Defendant SHOSHANI did not spend any time helping Plaintiff get acclimated with her new position so it was difficult for Plaintiff to work without any direction from Defendant SHOSHANI.

27. After about a week of working at Defendant ZIP with no guidance from Defendant SHOSHANI, Plaintiff returned to Canada.

28. Plaintiff texted Defendant SHOSHANI and told him that it was impossible for her to work without any tools or input from Defendant.

29. Defendant SHOSHANI told Plaintiff that it was just his way of letting Plaintiff settle in.

30. About a week later, Defendant SHOSHANI insisted that Plaintiff return to New York and continue her employment with Defendant ZIP.

31. In November 2007, Plaintiff returned to New York City and resumed her employment with Defendant ZIP.

32. Again, Plaintiff, Defendant ZIP, and Defendant SHOSHANI, agreed that she would be paid a salary of $150,000.00 and would resume work immediately. Plaintiff would assume the same duties and responsibilities as previously agreed upon.

33. Defendant SHOSHANI apologized to Plaintiff for not giving her the appropriate tools needed to conduct her duties.

34. At the same time, Plaintiff asked Defendant SHOSHANI if he had figured out how to make Plaintiff a citizen as promised. Defendant SHOSHANI said he was "looking into it."

35. Furthermore, Defendant SHOSHANI fraudulently misrepresented to Plaintiff that, "The keys to the kingdom are on their way."

36. Plaintiff began working immediately and focused on investigating the business models of other successful helicopter companies in New York City. Plaintiff then began to put a plan into place to mirror these successful companies.

37. Around November 2007, Plaintiff, Defendant SHOSHANI, and Defendant ZIP started hiring staff. After hiring two pilots, Plaintiff began to build Defendant ZIP's company and brand.

38. In December 2007, Defendant ZIP issued a press release stating, "Zip Aviation LLC is growing again. Happy to announce the addition of the new V.P. of Operations, Ms. Katharina Roelcke, bringing with her several years' experience in the Helicopter Charter/Tourism Industry." Furthermore, the release listed Plaintiff as the "Media Contact."

39. In or around December 2007, Defendant SHOSHANI invited Plaintiff to have dinner with a friend and client of his.

40. After dinner, Defendant SHOSHANI escorted Plaintiff to his private social club, "The Soho House" for a drink, and after several moments there, Defendant SHOSHANI began kissing Plaintiff. As a result, Plaintiff and Defendant SHOSHANI were escorted out of the club for Defendant SHOSHANI being overly physical with Plaintiff.

41. After being escorted out of the club, Plaintiff drove to her hotel in White Plains. Defendant SHOSHANI followed Plaintiff there. Upon returning to the hotel, Defendant SHOSHANI proceeded to make sexual advances towards Plaintiff. Plaintiff felt compelled to play along for fear that Defendant SHOSHANI would terminate her employment and refuse to obtain her legal citizenship. Defendant SHOSHANI overpowered Plaintiff and forced Plaintiff to

have sex with him.

42. This occasion marked a precedent. Defendant SHOSHANI began to pressure Plaintiff to have sex with him as part of her job.

43. Defendant SHOSHANI had a key made for himself to enter Plaintiff's hotel room. Defendant SHOSHANI began to enter Plaintiff's room every morning, forcing sex on Plaintiff.

44. As mentioned above - a reoccurring theme in this case - Plaintiff felt compelled to submit in fear that Defendant SHOSHANI would terminate her employment and refuse to obtain her legal immigration status.

45. Around December 2007, Plaintiff had still not been paid in accordance with their agreement. Plaintiff informed Defendant ZIP and Defendant SHOSHANI that if they did not pay her, she would have to return to Canada. Defendant SHOSHANI told Plaintiff, "Believe in me. Trust in me. I will never let you down."

46. Plaintiff had prior experience starting, and building a successful helicopter company. As a result, Plaintiff was well aware and accepted the fact that it would take time for the company to become profitable. However, as Plaintiff had learned from experience, the time and efforts that were invested in the beginning would be greatly rewarded when the company began to succeed. Thus, Plaintiff continued working for Defendant ZIP and Defendant SHOSHANI, on the promise and reasonable belief that she would be compensated in the future.

47. In or around December 2007, Plaintiff returned to Canada for the holidays. Defendant SHOSHANI insisted that Plaintiff return to New York City for New Year's Eve.

48. On or about December 31, 2007, Plaintiff arrived back in New York. That night, Defendant

SHOSHANI met Plaintiff at her hotel room where Defendant SHOSHANI forced rough and unusual sex on Plaintiff.

**2008**

49. In or around January 2008, Plaintiff was still not being paid or compensated for her services at Defendant ZIP AVIATION.

50. Plaintiff had been performing, and would continue to perform as ZIP's Chief of Operations, in good faith.

51. In or around January 2008, Plaintiff's illness became more severe. Plaintiff went to St. Vincent's Hospital and was diagnosed with Lyme disease. Defendant SHOSHANI paid for Plaintiff's medical bills but informed her that they were "over the top expensive."

52. Plaintiff thought that Defendant SHOSHANI's payment was made in good faith and supported her belief that his promises to compensate her in accordance with their agreement would be fulfilled.

53. In or around mid-January 2008, Plaintiff was approached by a headhunter. The headhunter offered Plaintiff a position as the director of a new department of Agusta Westland, a helicopter manufacturing company in Philadelphia. Defendant SHOSHANI was not pleased. Defendant SHOSHANI attempted to persuade Plaintiff to stay with Defendant ZIP, and promised to compensate Plaintiff with shares of stock/ownership in Defendant ZIP if she would stay. Plaintiff reasonably relied on Defendant SHOSHANI's promises and declined the offer.

54. In or around January 2008, Defendant SHOSHANI had Plaintiff move into a corporate apartment located in White Plains, New York. Plaintiff was still not being paid the salary that they had agreed upon, but was reassured by the fact that Defendant ZIP and Defendant

SHOSHANI were handling her lodging expenses.

55. Upon information and belief, this apartment was leased by Defendant ZIP.

56. Defendant SHOSHANI began spending a lot of time with Plaintiff in this apartment.

57. On a daily basis, Defendant SHOSHANI began to tell Plaintiff how much he loved her.

58. In or around late spring of 2008, Plaintiff was sitting in the office with a client, when a woman with two children calling out, "Daddy," entered the office. Defendant SHOSHANI did not disclose to Plaintiff that he was married. Plaintiff never considered Defendant SHOSHANI to be married given the amount of time that Defendant SHOSHANI spent with her.

59. On numerous occasions, Plaintiff asked Defendant SHOSHANI when she was going to be paid for her services. Plaintiff was working very hard for Defendant SHOSHANI and Defendant ZIP, and expected to receive payment for her service to the company.

60. Aside from Defendant ZIP and Defendant SHOSHANI providing Plaintiff with the corporate apartment, Plaintiff was struggling to pay her bills, purchase food and even personal hygiene products.

61. Defendant SHOSHANI began to leverage his wealth and exert his influence over Plaintiff in order to control her.

62. Defendant SHOSHANI relished in the fact the Plaintiff had become reliant on him.

63. On several occasions, Plaintiff was forced to beg Defendant SHOSHANI for money.

64. This fed Defendant SHOSHANI's enormous ego, and in order to maintain his hold over Plaintiff, Defendant SHOSHANI periodically wired Plaintiff some money.

65. However, Defendant ZIP and Defendant SHOSHANI never paid Plaintiff her agreed upon salary, or any salary for that matter. Defendant ZIP and Defendant SHOSHANI constantly

concocted a string of falsehoods with the intention of stalling and discouraging Plaintiff's requests.

66. Furthermore, Defendant SHOSHANI and Defendant ZIP still had not made any attempt to resolve Plaintiff's immigration issues.

67. In or around the spring of 2008, Defendant SHOSHANI put Plaintiff in contact with his lawyer. Defendant SHOSHANI's lawyer informed Plaintiff of the specific information and documentation she would need in order to resolve her immigration issues. Defendant SHOSHANI's lawyer instructed Plaintiff to give Defendant SHOSHANI all of her paperwork and it would be taken care of.

68. Believing Defendant SHOSHANI, Plaintiff gave Defendant SHOSHANI all of her documentation, the majority of which were originals.

69. However, after several months, Plaintiff spoke to Defendant SHOSHANI's lawyer, who informed her that Defendant SHOSHANI never gave him anything.

70. In addition to financial control, Defendant SHOSHANI used Plaintiff's immigration status as another means of using his power to control Plaintiff.

71. Defendant SHOSHANI began to treat Plaintiff like his personal slave, both for work and for sex. Defendant SHOSHANI frequently told Plaintiff, "All you need is to be fucked," and proceeded to rape Plaintiff on a regular basis.

72. Furthermore, Defendant SHOSHANI frequently forced Plaintiff to pick him up and drive him around for work.

73. In or around June 2008, Defendant SHOSHANI purchased a company car for Plaintiff to use. Defendant SHOSHANI told Plaintiff it was a gift for her, but placed the title in Defendant ZIP's name. As will be discussed later, this car was one of the many tools which

Defendant SHOSHANI used to track and stalk Plaintiff.

74. Despite the fact that it was not a cash payment, Plaintiff again thought that Defendant SHOSHANI's actions gave her reason to continue to believe that Defendant ZIP and Defendant SHOSHANI would pay her in accordance with their agreement.

75. Plaintiff, believing she would eventually be compensated as promised, continued to build and operate Defendant ZIP in reliance on his promise and their agreement.

76. In the summer of 2008, Plaintiff began to find advertising avenues to promote the company. In order to jump-start the business, Plaintiff gave Defendant SHOSHANI and Defendant ZIP a corporate branding plan which she had developed and designed for her previous helicopter business in Canada. A component of the branding plan was promotional brochures. These brochures were identical to the brochures of Plaintiff's other venture.

77. The brochures were very successful in attracting new customers. As a result, over the summer of 2008, Plaintiff became increasingly busy operating and growing Defendant ZIP's expanding business.

78. Plaintiff was now bombarded by a daily invasion of calls from the call center that Defendant SHOSHANI had hired. Defendant SHOSHANI hired the call center to filter the new wave of passengers that came from Plaintiff's efforts.

79. As a result of the large volume of calls pouring in, Defendant SHOSHANI purchased iPhones for Plaintiff and several other employees of Defendant ZIP. As will be discussed later, this phone was one of the many tools which Defendant SHOSHANI used to track and stalk Plaintiff.

80. In addition, Defendant SHOSHANI asked Plaintiff to manage the payroll, interview, and even hire new staff for the newly created positions.

81. Defendant SHOSHANI requested that Plaintiff make schedules for the newly hired pilots and staff.

82. Unbelievably, Plaintiff was still not being paid or compensated for her employment with Defendant ZIP. Plaintiff had still not received a paycheck or the stock/ownership Defendant SHOSHANI had promised her.

83. Still, Plaintiff remained optimistic that Defendant SHOSHANI would keep his promise to her, and make her a substantial partner in Defendant ZIP.

84. Around August 2008, Plaintiff attempted to discuss an issue regarding Defendant ZIP with Defendant SHOSHANI.

85. Defendant SHOSHANI barked at Plaintiff, "If you ever go against my wishes again and send out another empty helicopter, I WILL FUCK YOU UP." This was the first, but certainly not the last, of Defendant SHOSHANI's violent outbreaks towards Plaintiff. As discussed below, Defendant SHOSHANI's behavior towards Plaintiff became increasingly hostile and violent.

86. Immediately after Defendant SHOSHANI's outrageous comment, Plaintiff drove back to the apartment in White Plains. Later that night, Defendant SHOSHANI let himself into the apartment and crawled into bed with Plaintiff, crying and telling Plaintiff how sorry he was.

**2009**

87. In or around mid-February 2009, Defendant SHOSHANI went away with his family to Miami leaving Plaintiff to run the operation by herself.

88. While away with his family, Defendant SHOSHANI sent Plaintiff a Facebook message telling Plaintiff to commit to him. Defendant SHOSHANI told Plaintiff, "You are the only

one for me. Can't you see how hard I'm trying and just how much I love you."

89. Defendant SHOSHANI promised "I'll never let you down." Plaintiff was struggling to hold Defendant ZIP together for Defendant SHOSHANI.

90. Plaintiff began focusing on building Defendant ZIP to be the best business possible, believing Defendant SHOSHANI's words.

91. Shortly after his return from Miami, Defendant SHOSHANI went away to Israel with his family.

92. Again, Plaintiff was left to take care of Defendant ZIP's operations.

93. The night Defendant SHOSHANI returned from Israel, he dropped his family off at their home in New Jersey and then went to the apartment where Plaintiff was sleeping. Defendant SHOSHANI made his way into the apartment and into Plaintiff's bed where he forced non-consensual sex on Plaintiff.

94. On one occasion, Defendant SHOSHANI decided he wanted harsh, kinky sex. Plaintiff attempted to refuse. However, Defendant SHOSHANI ignored Plaintiff's refusal and forced non-consensual sex on Plaintiff. These encounters would take place often throughout Plaintiff's professional relationship with Defendant SHOSHANI. Plaintiff would learn to mentally and physically block out the pain.

95. In or around March 2009, Defendant ZIP had a going away party for one of their pilots, Assaf Ben Tzion. While at the party, Defendant SHOSHANI received a text message from his then-wife. Defendant SHOSHANI's wife has subsequently divorced him.

96. Defendant SHOSHANI's then-wife, revealed to Defendant SHOSHANI that she had learned that he was cheating on her, and of his extra-marital behavior with Plaintiff.

97. Immediately, Defendant SHOSHANI went over to Plaintiff and forcibly grabbed her arm,

telling her that they had to leave. Defendant SHOSHANI dragged Plaintiff out of the restaurant and told Plaintiff that he would be moving into the corporate apartment in White Plains, New York with her.

98. Defendant SHOSHANI, without consent, moved in with Plaintiff.

99. Still, Defendant SHOSHANI promised Plaintiff her salary, back pay as well as shares in the company and her citizenship.

100. Again, Plaintiff relied on his promises and representations.

101. Defendant SHOSHANI would give Plaintiff cash out of his pocket to take care of the shopping and supplies that were required for the business. Plaintiff was given permission to use what was left over for her personal use, provided that Plaintiff supplied Defendant SHOSHANI with receipts.

102. Most times, the money that was left over was not enough for Plaintiff to eat, let alone pay her bills. Plaintiff was forced to sleep on an air mattress on the floor of the White Plains apartment. All the while, Defendant SHOSHANI would continuously and forcefully have sex with Plaintiff.

103. In or around May 2009, Plaintiff revamped Defendant ZIP's website to add all the new tours and charter services that had expanded.

104. In or around August 2009, Plaintiff continued working hard to redesign the 2009 tours for the new tour hosts, the FAA, and Defendant ZIP's own site. Plaintiff also designed a computer program for customer service to keep track of incoming tours via the network.

105. Still, Plaintiff was not being paid.

106. Once again, Plaintiff insisted that she needed money to pay her bills.

107. Plaintiff worked an estimated twelve hours per day for seven (7) days per week as there

was no set schedule for her to abide by.

108.   At one point, Plaintiff approached Defendant SHOSHANI and told him that she had gone beyond proving her loyalty to the company and had not been given any monetary compensation. In addition, Plaintiff complained to Defendant SHOSHANI that he treated her like a "slave" and a "whore." Plaintiff told Defendant SHOSHANI that because of his continuous sexual harassment and discriminatory treatment and she would be leaving and not returning.

109.   Once again, Defendant SHOSHANI begged Plaintiff to stay. Defendant SHOSHANI swore he would fix everything in time and never let Plaintiff down again. Defendant SHOSHANI also knowingly and maliciously gave Plaintiff false hope that she would be paid and he would work on her citizenship.

110.   Plaintiff, having no money and no home, relied on Defendant SHOSHANI's continued promise to pay her and help with her immigration status.

111.   In response to Plaintiff's complaints, Defendant SHOSHANI became increasingly sexually forceful with Plaintiff and began to force anal sex on Plaintiff. Plaintiff had never engaged in anal sex before and every time that Defendant SHOSHANI sodomized Plaintiff, it caused her great physical pain. In fact, it was something the Defendant SHOSHANI thrived off of.

112.   At this time, Plaintiff began to notice a change in herself. Plaintiff began to have regular panic attacks and her health began to deteriorate.

113.   Defendant SHOSHANI retaliated against Plaintiff for attempting to exercise her protected right for a workplace free from discrimination.

114.   Subsequently, Defendant SHOSHANI intensified his behavior and began to publicly

humiliate Plaintiff on a daily basis while at work for Defendant ZIP. Defendant SHOSANI would intentionally bring Plaintiff in front of the office and would insult and chastise her to the point of tears. Defendant SHOSHANI called Plaintiff, "the rude nasty bitch," and stated for all of the employees to hear, "You are worthless."

115.   When Defendant ZIP's employees would comfort Plaintiff, Defendant SHOSHANI would harshly remind the employees that Plaintiff does not pay them and does not need their concern.

116.   Plaintiff was emotionally tormented and was struggling to maintain her composure. Plaintiff began to contemplate suicide.

117.   In or around October 2009, Plaintiff confided in another employee of Defendant ZIP, VICTOR ROBLES (hereinafter referred to as "ROBLES"), that she was the only one not getting paid, and how Defendant SHOSHANI was abusing her both physically and emotionally.

118.   However, ROBLES told Defendant SHOSHANI what Plaintiff had told him. Defendant SHOSHANI became enraged and threatened to fire Plaintiff on the spot.

119.   Defendant SHOSHANI began saying to Plaintiff phrases such as:

- You're out of your mind.

- You are insane.

- What are you talking about?

- You are out of control.

- Seek help.

- You don't know what you are talking about.

120.   Around December 2009, Plaintiff returned to Canada for the holidays. Plaintiff notified

Defendant SHOSHANI that she would not be returning to New York because Plaintiff could see that she would never be paid fairly for her work and dedication.

121.   Defendant SHOSHANI cried to Plaintiff, and demanded that she return to New York. Defendant SHOSHANI told Plaintiff, I will "love, honor, respect, cherish, adore, support, satisfy forever."

122.   Once again, Defendant SHOSHANI used any means necessary to control and manipulate Plaintiff.

123.   Plaintiff, felt she had no other choice than to submit and return.


**2010**

124.   Once back in New York, Defendant SHOSHANI continued to force anal sex on Plaintiff. Defendant SHOSHANI thrived off causing Plaintiff physical pain.

125.   Around March 2010, Plaintiff reached out to Defendant SHOSHANI by email, begging for Defendant SHOSHANI to stop physically hurting Plaintiff during sex. These sessions were becoming more intense. Plaintiff felt like she was fighting for her life. Defendant SHOSHANI had a clear intent to hurt and harm Plaintiff.

126.   Defendant SHOSHANI would leave visible bruises on Plaintiff after sex. Plaintiff was petrified of Defendant SHOSHANI.

127.   Now, Defendant SHOSHANI also made Plaintiff aware that he carried a gun all day, every day.

128.   Plaintiff found it impossible to demand that Defendant SHOSHANI end his harassment and provide her with her fair compensation. If Plaintiff did this, Defendant SHOSHANI would punish Plaintiff by not feeding her and becoming even more controlling.

129.   At one point, Defendant SHOSHANI refused Plaintiff toothpaste and deodorant. The

more Plaintiff refused Defendant SHOSHANI's sexual advances or opposed his conduct,

the more Defendant SHOSHANI would retaliate and intensify the harassment.

130.   Defendant SHOSHANI broke Plaintiff down and trained her to become reliant on him in

order to survive, needing his assistance for food, money, shelter and even her personal

hygiene.

131.   Around April 2010, Defendant SHOSHANI began to track Plaintiff's whereabouts using

a "Friends and Family" feature on his phone. Plaintiff became suspicious that Defendant

SHOSHANI was stalking her and demanded that he stop immediately.

132.   At the time, unbeknownst to Plaintiff, Defendant SHOSHANI had placed a GPS tracking

device in the sub-woofer of her company car. Defendant SHOSHANI monitored Plaintiff's

every move.

133.   On or about July 22, 2010, Defendant SHOSHANI came to the apartment belligerently

drunk. Plaintiff did not want to allow Defendant SHOSHANI into the apartment in fear that

he would attempt to rape her or physically harm her. Defendant SHOSHANI called the

police. Plaintiff informed the police that Defendant SHOSHANI was abusive and kept guns

inside of the apartment.

134.   In or around August 2010, Plaintiff was so disgusted with all of Defendant SHOSHANI's

lies and promises. The next opportunity she had to escape, Plaintiff left and went to Miami,

Florida.

135.   Defendant SHOSHANI located Plaintiff in Florida and flew to Miami.

136.   However, Plaintiff did not tell anyone, especially Defendant SHOSHANI that she had

gone to Miami.

137.   Upon his arrival, Defendant SHOSHANI texted Plaintiff that he had arrived in Miami and was there to spend her birthday with her.

138.   Again, Defendant SHOSHANI promised that he would make Plaintiff his priority by resolving Plaintiff's immigration issue and paying Plaintiff for her work, all that he owed her. In addition, Defendant SHOSHANI threatened Plaintiff, "You know what I'm capable of."

139.   Plaintiff was in shock that Defendant SHOSHANI was able to locate her. Plaintiff became frightened for her life, deathly afraid of what he was capable of doing to her. Plaintiff thought that she had gotten away, but Defendant SHOSHANI found her and brought her back. Plaintiff began to feel as though she could never escape; Defendant SHOSHANI had Plaintiff on a leash and would never let her get too far.

140.   Around September 2010, Plaintiff had serious abdominal pain and was uncontrollably bleeding from her vagina. Plaintiff went to the emergency room and found out that Defendant SHOSHANI had impregnated Plaintiff from his sexual abuse. However, Plaintiff suffered a hemorrhage in response to an ectopic pregnancy.

141.   Plaintiff again returned to New York to continue her employment with Defendant ZIP in fear and reliance on Defendant SHOSHANI's renewed promises.

142.   In or around November 2010, Plaintiff managed to run away and checked into a hotel. Again, Defendant SHOSHANI tracked Plaintiff to the hotel. Defendant SHOSHANI called Plaintiff and told her that he would have something delivered to her door via courier. Plaintiff heard a knock at her door, and saw that there was an envelope left against her door. Plaintiff opened the door to pick up the envelope when Defendant SHOSHANI jumped out from behind a wall.

**2011**

143.   Everything Plaintiff did had to meet with Defendant SHOSHANI's approval or he would

punish her. There was no visa and definitely no money or compensation of any kind.

Plaintiff was slowly realizing that she was nothing more than Defendant's slave while he

used work, pay and citizenship as carrots at the end of a stick she would never get. Since the

day Defendant SHOSHANI moved in with Plaintiff, her duties were to wash Defendant

SHOSHANI's clothes, scrub the toilets, clean the house, rub Defendant SHOSHANI's sore

feet and be at his beck and call sexually.

144.   On numerous occasions, Plaintiff was compelled to tell Defendant SHOSHANI that she

loved him in order to not be thrown into the street; in order to hopefully get paid one day

and because she was also at times suffering from a type of "battered woman's syndrome"

and/or "Stockholm Syndrome." Plaintiff also began suffering from intense psychological

trauma as a result of Defendant SHOSHANI's actions. When Defendant SHOSHANI would

ever temporarily stop the abuse, Plaintiff would sometimes mistake that lack of abuse as an

act of kindness.

145.   Around April 2011, Defendant SHOSHANI became irate with Plaintiff. Plaintiff asked

Defendant SHOSHANI, "Are you threatening me?" Defendant SHOSHANI responded,

"Never a threat, IT'S A PROMISE...YOU KNOW BETTER."

146.   Plaintiff lived in fear every single day. Defendant SHOSHANI constantly tracked

Plaintiff and always made sure he knew where Plaintiff was. At the time, Plaintiff never

knew why or how Defendant SHOSHANI was always aware of her whereabouts. As a

result, Plaintiff had severe panic attacks.

147.   On or about July 9, 2011, Defendant SHOSHANI told Plaintiff, "You are a whore, the

only worthless being not worth the shit under my shoe," and proceeded to spit in Plaintiff's

face. Defendant SHOSHANI grabbed Plaintiff by the throat and said, "I could throw you

out that fucking window and no one would care." Plaintiff attempted to fight back, but

Plaintiff was half the size of Defendant SHOSHANI. Plaintiff feared for her life. Defendant

SHOSHANI kept saying, "C'mon. Harder. You're turning me on you little bitch."

Defendant SHOSHANI mocked punching himself in the face and told Plaintiff, "That's how

you do it you worthless bitch." Defendant SHOSHANI then dragged Plaintiff to the door

and threw her into the hallway locking the door behind her.

148.   Once again, the police were called to the apartment.

149.   Upon their arrival, Defendant SHOSHANI told Plaintiff that she was no longer welcome

in the apartment and that she needed to leave immediately.

150.   The police then asked Defendant SHOSHANI to confirm the address of his family home

in New Jersey. Defendant SHOSHANI kept several guns in the White Plains apartment as

well as at his home in New Jersey.

151.   In fact, the police report shows that the officer initially wrote, "Two handguns and two

long guns were taken for safety reasons from Shoshani's house at 76 Heatherbloom Road in

White Plains. The weapons were put into the property system."

152.   However, Defendant SHOSHANI was well connected with the police department and

asked if he could make a phone call. Defendant SHOSHANI called in a favor from a pilot

he was friendly with that was also a member of the police department. Defendant

SHOSHANI then came back into the room and snickered, "Did you actually think they

would take me to my wife's house and embarrass me in front on my children?"

153.   The language in the police report was then crossed out and replaced with, "After further investigation, it was determined that Mr. Shoshani did not have direct access to the weapons and they were secured in a safe location other than 27 Barker Ave."

154.   That same night, at the conclusion of the police investigation, Plaintiff went to the airport. Plaintiff had to go into "survival mode." Plaintiff obtained a rental car and a cheap hotel so she could collect her thoughts and make a plan. Within an hour of Plaintiff checking into the hotel, Defendant SHOSHANI came directly to the hotel and dropped off a CD at the front desk for Plaintiff just to prove to Plaintiff that she could never escape. He would always find her and track her down.

155.   Plaintiff told Defendant SHOSHANI to leave her alone and never trace her again. Defendant SHOSHANI told Plaintiff, "You know better than to provoke me."

156.   Plaintiff was horrified. Defendant SHOSHANI had a clear motive to debilitate Plaintiff, to show Plaintiff that she would never be free. Defendant SHOSHANI continued to play mind games with Plaintiff, maliciously toying with her sense of safety.

157.   On or about August 15, 2011, Plaintiff returned from Europe with her children and booked a hotel near White Plains so that she could collect some mail from her post office box before returning her children to their father in Canada.

158.   After running their errands, Plaintiff and her children returned to their hotel. As they looked for a parking space, Plaintiff's daughter commented that she thought she saw Defendant SHOSHANI's car waiting outside of the hotel.

159.   Plaintiff stopped short and almost got into an accident. As Plaintiff looked at the car her daughter had indicated, the window rolled down and there was Defendant SHOSHANI, waiting for her.

160.   Plaintiff nervously sped away and brought her family into the hotel as quickly as possible, hoping to avoid Defendant SHOSHANI.

161.   Defendant SHOSHANI proceeded to enter the hotel and booked the room directly next to Plaintiff's. Defendant SHOSHANI told Plaintiff that he waiting there to see her for two (2) days and asked to speak with Plaintiff.

162.   Defendant SHOSHANI grabbed Plaintiff's arm and told her he wanted to talk in his hotel room. Once they got into the room Defendant SHOSHANI proceeded to rape Plaintiff while she cried. Defendant SHOSHANI told Plaintiff, "You feel like home."

163.   Immediately thereafter, Plaintiff left the room, grabbed her family and left the hotel.

164.   Defendant SHOSHANI did not wish to speak with Plaintiff, only to prove that he still obtained complete control over her.

165.   In or around November 2011, without telling Defendant SHOSHANI, Plaintiff went to a hotel in Greenwich, Connecticut. In the middle of the night, Defendant SHOSHANI tracked Plaintiff to the hotel and came to Greenwich. Defendant SHOSHANI proceeded to locate Plaintiff's car and ripped the license plates off of her car.

166.   The following morning, Plaintiff texted Defendant SHOSHANI asking why he ripped the plates off of the car. Defendant SHOSHANI responded, "I can read your texts now and it will cost others dearly."

167.   Plaintiff returned to New York and continued working with Defendant ZIP.

**2012**

168.   Around February 2012, Plaintiff received a package to the White Plains apartment that contained Viagra for Defendant SHOSHANI. Plaintiff attempted to hide the Viagra from Defendant SHOSHANI.

169.   Later that day, Defendant SHOSHANI returned to the apartment and became violent with Plaintiff when he discovered that she had mistakenly opened his package. Plaintiff was in the shower and Defendant SHOSHANI came into the bathroom, grabbed Plaintiff by her hair dragged her out of the shower. Defendant SHOSHANI proceeded to grab Plaintiff by the throat and choke her until she told him where the Viagra was. Once Plaintiff told him, Defendant SHOSHANI shoved Plaintiff backwards, causing her to slam her back into the shower. Plaintiff had significant bruising to her side and spine.

170.   Once again, Plaintiff attempted to escape from Defendant SHOSHANI. Plaintiff took the company car and started driving as far west as possible.

171.   Plaintiff eventually made it to Colorado when the car broke down. During her trip, Defendant SHOSHANI constantly attempted to contact Plaintiff. Plaintiff did not answer Defendant SHOSHANI's messages.

172.   Defendant SHOSHANI immediately reported the car stolen and threatened that if Plaintiff did not return to him, he would distribute her naked pictures, threatening to send them to everyone.

173.   Furthermore, Defendant SHOSHANI called U.S. Customs and Border Protection to report that Plaintiff was working in the country illegally.

174.   In or around September 2012, Plaintiff fled to Europe in fear of what Defendant SHOSHANI would do next.

175. Since Plaintiff was in Europe, Defendant SHOSHANI realized that he was no longer able to track Plaintiff's iPhone. As a result, Defendant SHOSHANI sent Plaintiff three (3) emails that contained sexually explicit photographs as well as a sexually explicit video of Plaintiff. Plaintiff was unaware that Defendant SHOSHANI was in possession of a sexually explicit video of her.

176. Defendant SHOSHANI told Plaintiff, "Seems like you are on European time," to let her know that he knew where she was. Moreover, Defendant SHOSHANI told Plaintiff, "We need to talk or this is gonna get fugly [fucking ugly]. More for you than me." Defendant SHOSHANI informed Plaintiff that the sexually explicit emails were slated to be sent out to Plaintiff's family, all of Plaintiff's business contacts, and her children's school if she did not return.

177. Plaintiff was so afraid of Defendant SHOSHANI that reason did not make sense in her head. Plaintiff was so brain-washed by Defendant SHOSHANI that she just submitted to his demands out of fear.

178. Plaintiff returned to New York in or around November of 2012.

179. At this time, not only would Defendant SHOSHANI regularly sodomize Plaintiff in the middle of the night while Plaintiff was sound asleep, now Defendant SHOSHANI began to sexually rape Plaintiff in the middle of the night. Defendant SHOSHANI would wrap his hand around Plaintiff's throat and whisper in her ear how much he loved raping her.

180. Around November 2012, Defendant SHOSHANI, Plaintiff, and several other employees of Defendant ZIP were at a restaurant in Tarrytown, New York.

181. Defendant SHOSHANI was audibly making fun of a couple for being overweight. Plaintiff told Defendant SHOSHANI to stop making fun of them and be nice. Defendant

SHOSHANI became enraged, and grabbed Plaintiff by the arm and dragged her out of the restaurant. Defendant SHOSHANI dragged Plaintiff into the street, causing Plaintiff to break her foot. Defendant SHOSHANI threw Plaintiff into the car and told her to get in. Plaintiff begged Defendant SHOSHANI to pull over and stop the car. Defendant SHOSHANI would not listen. Plaintiff grabbed the wheel and forced Defendant SHOSHANI to pull over.

182.   Defendant SHOSHANI reached for the emergency OnStar button and threatened to call the police. Plaintiff was still having issues with her immigration status and did not want Defendant SHOSHANI to call the police. Plaintiff attempted to prevent Defendant SHOSHANI from pressing the button; however, Defendant SHOSHANI pushed her out of the car door with one shoe and a broken foot.

183.   Plaintiff managed to hobble up the exit ramp and called a cab to the apartment.

184.   Plaintiff then fled to Canada.


**2013**

185.   In or around March 2013, Defendant SHOSHANI begged Plaintiff to come back to New York. Defendant SHOSHANI needed Plaintiff to continue managing Defendant ZIP's New York office in person.

186.   Since Plaintiff's visa had expired, Defendant SHOSHANI promised that he would secure Plaintiff a new visa. Plaintiff had been flagged, due to Defendant SHOSHANI reporting her, and now incurred a significant problem every time she crossed the border.

187.   On or around May 16, 2013, Defendant SHOSHANI sent Plaintiff a written Consulting

Agreement to work as an "Aviation Engineering Consultant" for Defendant MANHATTAN

HELICOPTERS LLC.

188.   Plaintiff and Defendants agreed to the above Consulting Agreement verbally and in

writing.

189.   The agreement provided for a 365-day term during which Plaintiff was to be paid $650

per day and during which she would report directly to the Director of Defendant

MANHATTAN HELICOPTERS LLC.

190.   Plaintiff was responsible for developing the newly acquired company, Defendant

MANHATTAN HELICOPTERS LLC, including hiring pilots, creating a maintenance

schedule, setting up new offices and call centers, and generating publicity campaigns.

191.   Plaintiff duly performed under the above contract in performing all of the above duties

and more.

192.   Defendants breached this agreement by never paying Plaintiff for her services and under

the above contract. The value of the contract was $237,250.00.

193.   The "Consulting Agreement" was to help Plaintiff get her visa and to induce Plaintiff to

return to New York.

194.   Defendant SHOSHANI sent Plaintiff a signed copy of a letter dated May 15, 2013,

addressed to "U.S. Customs and Border Protection," with the subject, "Request for

admission in TN Status Applicant: Ms. Katharina Roelcke." However, Defendant

SHOSHANI never filed the paperwork and Plaintiff never got the visa. It was an act with

the intention of drawing Plaintiff back into his grasp.

195.   At this time, Plaintiff also continued her employment with Defendant ZIP AVIATION.

196.   At all times material, Defendant SHOSHANI did business through and had Plaintiff work for both Defendant MANHATTAN HELICOPTERS LLC and Defendant ZIP AVIATION.

197.   At all times material, Defendant MANHATTAN HELICOPTERS LLC and Defendant ZIP AVIATION were joint employers of Plaintiff.

198.   In or around August 2010, Defendant ZIP and Defendant MH entered into an agreement by which Defendant ZIP fully absorbed and/or merged and/or aligned with Defendant MH.

199.   During the time of Plaintiff's employment with Defendants, Plaintiff aided in the Defendants' economic growth from approximately one million dollars annually to nearly fourteen million dollars annually.

200.   Even still, Plaintiff did not receive compensation from Defendants either for her work for Defendant ZIP, Defendant MH, or Defendant SHOSHANI.

201.   On a constant basis, Defendant would make Plaintiff empty promises on which she relied.

202.   In or around October 2013, Defendant SHOSHANI got into an argument with Plaintiff and punched her in the face. Plaintiff suffered a broken nose.

203.   In or around December 2013, Defendant SHOSHANI came to the apartment drunk and threw Plaintiff onto the bed. Defendant SHOSHANI once again aggressively pushed Plaintiff's head into the bed and raped her stating, "All you need is to be fucked."

204.   Plaintiff began formulating an "exit plan." Plaintiff knew a pilot in Hawaii and planned to go there and then possible go to Australia.

**2014**

205.   In or around January 2014, Plaintiff was finally able to make it to Hawaii. As soon as Plaintiff landed she received an email from Defendant SHOSHANI that simply stated, "Hawaii." Defendant SHOSHANI was once again reminding Plaintiff that he was in control and she would never be free.

206.   Defendant SHOSHANI contacted Plaintiff and told her, "You know what I can do to you and do to [her pilot friend in Hawaii]." Plaintiff was frightened that Defendant SHOSHANI would hurt someone else.

207.   Plaintiff flew from Hawaii to Los Angeles, California. Plaintiff planned to travel to Australia. However, before Plaintiff could get on her flight, Defendant SHOSHANI called Plaintiff and threatened her and her family.

208.   Plaintiff did not know what to do and feared for her children's safety. As a result, Plaintiff returned to New York.

209.   Plaintiff was immediately thrown back into working for Defendant ZIP and Defendant MH. Plaintiff redesigned Defendants' logo and continued to run all major operations.

210.   In or around March 2014, Plaintiff found the GPS tracking device that was placed in Plaintiff's company car's subwoofer.

211.   In or around June of 2014, Defendant SHOSHANI and Plaintiff met with several suppliers and customers. Anytime that Plaintiff attempted to engage in the conversation, Defendant SHOSHANI would pinch the back of Plaintiff's arm, pretend to put his arm around her and crush her ribs, and kick her underneath the table.

212.   In addition, Defendant SHOSHANI would hold Plaintiff's hand and twist her fingers backwards to keep her from talking. Plaintiff had several bruises and contusions as a result of Defendant SHOSHANI's juvenile conduct.

213.   In or around July 2014, Defendant SHOSHANI went to France. Plaintiff got in the car with her daughter and started driving to Florida. Again, to tell Plaintiff that he was aware of her every move, Defendant SHOSHANI texted Plaintiff, "You can stay at the yacht club." The Yacht Club was real estate that Defendant SHOSHANI owned in Florida.

214.   In or around August 2014, Plaintiff took her daughter to "Harry Potter World" when Defendant SHOSHANI called Plaintiff and said, "People tell me you're talking shit about me...you know how I'll play it and retaliate against you."

215.   Plaintiff began to panic and thought that Defendant SHOSHANI would try to hurt her children.

216.   Plaintiff returned to New York in September of 2014.

217.   In or around October 2014, Defendant SHOSHANI started communicating with Plaintiff's ex-husband in Canada.

218.   At this point Plaintiff was completely broken. Plaintiff acknowledged that she was sick and all she could think about was jumping off of the balcony.

219.   Plaintiff went to seek help at Pace University's Women's Shelter.

220.   In addition, Plaintiff called a hotline and was given information about therapy sessions that Plaintiff began to attend.

221.   Defendant SHOSHANI would frequently wear his gun in the apartment.

222.   Plaintiff was crippled and programmed by Defendant SHOSHANI to think that she was nothing and powerless.

223.   At this time, Defendant SHOSHANI was still using Plaintiff as his sex slave and would rape her regularly.

224.   In or around December 2014, Plaintiff called the police and told Defendant SHOSHANI that she would no longer speak to him.

225.   On or about December 15, 2014, Plaintiff started the process with the police of obtaining an order of protection against Defendant SHOSHANI.

226.   Plaintiff's paperwork was filed on or about December 18, 2014.

227.   Shortly thereafter, Plaintiff went to Florida and stayed at an "Airbnb" with her kids.

228.   Around January 2015, Plaintiff briefly returned to New York. Plaintiff planned to return to Florida but re-broke the same foot from the year prior.

229.   Plaintiff was in the hospital for approximately forty (40) minutes when Defendant SHOSHANI texted her "Hope you are doing well."

230.   Upon information and belief, Defendant SHOSHANI asked a mutual friend to keep him apprised of Plaintiff's whereabouts.

231.   On or about February 5, 2015, Plaintiff was in a restaurant in Greenwich, Connecticut, when Defendant SHOSHANI arrived at the restaurant and sat directly behind Plaintiff.

232.   Defendant SHOSHANI lifted his coat to show Plaintiff that he was carrying a gun.

233.   Plaintiff immediately left the restaurant.

234.   On or about February 10, 2015, Plaintiff was granted an order of protection against Defendant SHOSHANI by the Westchester County Family Court.

235.   On or about June 22, 2015, Defendant SHOSHANI intentionally violated the order of protection. Plaintiff had arrived in White Plains, New York from Florida to attend a court appearance.

236.   Defendant SHOSHANI hacked into Plaintiff's phone and learned that Plaintiff had arranged a meeting with her lawyer – part of the Women's Coalition League.

237.   At the conclusion of Plaintiff's meeting, Plaintiff went to the police department to get copies of the prior police reports regarding Defendant SHOSHANI.

238.   While in the records office, Defendant SHOSHANI entered the room and stood directly behind Plaintiff, and began breathing down her neck in a clear attempt to intimidate her. In fact, the violation was caught on film.

239.   Defendant SHOSHANI's unwelcomed and abusive sexual behaviors continued regularly into 2014.

240.   Beginning around 2007 continuing all the way until Plaintiff's departure in December of 2014, Defendant SHOSHANI continued to regularly sexually harass Plaintiff by continuously making Plaintiff engage in sexual acts with him and forcing sex upon her.

241.   Furthermore, Plaintiff claims a continuing violation of sexual harassment laws beginning at the start of her employment and continuing throughout her employment until January of 2015.

242.   Defendants also wrongfully engaged in quid pro quo sexual harassment by continuously making Plaintiff have sex with SHOSHANI with promises of payments for her work.

243.   At all times material, Defendant SHOSHANI's sexual actions were unwelcome.

244.   Plaintiff summoned the courage to finally rid herself of Defendants and finally left in December 2014.

245.   Plaintiff was constructively terminated from Defendant ZIP and Defendant MH in December of 2014.

## AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION
## UNDER STATE LAW
## (AGAINST ALL DEFENDANTS)

246.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

247.  Executive Law Section Executive Law § 296 provides that "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment"

248.  Defendants violated the section cited herein by discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of her sex, together with sexual harassment and retaliation.

249.  Plaintiff further relies on all other sections of the NY Executive Law as are applicable to the facts herein.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW
## AIDING AND ABETTING
## (AGAINST DEFENDANT SHOSHANI)

250.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

251. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

252. "Courts have routinely held that individuals may be liable as "aiders and abettors" under NYSHRL. See Tomka v. Seiler Corp., 66 F.3d 1295, 1317-19 (2d Cir. 1995). To avoid the absurd results of Defendants proposed approach, in which the very individual whose conduct gave rise to the claim could avoid liability by showing that his superiors were not also culpable, courts have recognized that an individual can be liable for aiding and abetting his own discriminatory conduct. See Lewis v. Triborough Bridge & Tunnel Auth., No 97 Cir. 0607(PKL), 2001 U.S. Dist. LEXIS 361, 2001 WL 46986, at *2 (S.D.N.Y. Jan. 18, 2001), aff'd, 31 F. App'x 746 (2d Cir. 2002) ("this Court follows the majority of decisions in recognizing that an individual can be liable for aiding and abetting his own discriminatory conduct"); Maher v. Alliance Mortg. Banking Corp., 650 F.Supp.2d 249, 262 (E.D.N.Y, 2009) ("an individual may be liable under § 296(6) for aiding and abetting an unlawful discriminatory practice of his employer even where his conduct serves as the sole predicate for the employer's liability."); Salvatore v. KLM Royal Dutch Airlines, No. 98 Cir. 2450(LAP), 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172, at *8 (S.D.N.Y. Sep. 30, 1999) (permitting case to proceed against "the sole KLM employee alleged to have engaged in the discriminatory conduct."). *Marchuk v. Faruqi & Faruqi, LLP,* 2015 U.S. Dist. LEXIS 15304, 2-3 (S.D.N.Y. Feb. 2, 2015)

253. Defendant Shoshani violated the section cited herein as set forth.

254. Plaintiff further relies on all other sections of the NY Executive Law as are applicable to the facts herein.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW
## RETALIATION
## (AGAINST ALL DEFENDANTS)

255.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

256.   New York State Executive Law §296(7) provides that it shall be an unlawful

discriminatory practice: "For any person engaged in any activity to which this section

applies to retaliate or discriminate against any person because he has opposed any practices

forbidden under this article."

257.   When Plaintiff complained about Defendants' conduct, Defendants would intensify the

harassment and retaliate against Plaintiff for her opposition.

258.   Defendants violated the section cited herein as set forth.

259.   Plaintiff further relies on all other sections of the NY Executive Law as are applicable to

the facts herein.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (AGAINST ALL DEFENDANTS)

260.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

261.   The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice:  "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

262.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of Plaintiff's gender and sexual harassment.

263.   Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

### AS A FIFTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (AGAINST ALL DEFENDANTS)

264.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

265.   The New York City Administrative Code Title 8, §8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

266.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST DEFENDANT SHOSHANI)

267.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

268.   The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice:

269.   "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

270.   Because the language of the NYCHRL's aiding and abetting provision is virtually identical to that of the NYSHRL, the two statutes are analyzed under the same standard.

271.   Defendant SHOSHANI engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS A SEVENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST ALL DEFENDANTS)

272.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

273.   Section 8-107(19), entitled Interference with protected rights provides that "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

274.   Defendants violated the above section as set forth herein.

## AS AN EIGHTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST ALL DEFENDANTS)

275.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

276.   Section 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section." b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this

section only where: (1) the employee or agent exercised managerial or supervisory

responsibility; or (2) the employer knew of the employee's or agent's discriminatory

conduct, and acquiesced in such conduct or failed to take immediate and appropriate

corrective action; an employer shall be deemed to have knowledge of an employee's or

agent's discriminatory conduct where that conduct was known by another employee or agent

who exercised managerial or supervisory responsibility; or (3) the employer should have

known of the employee's or agent's discriminatory conduct and failed to exercise reasonable

diligence to prevent such discriminatory conduct.

277.   Defendants violated the above section as set forth herein.


## AS A NINTH CAUSE OF ACTION
## ASSAULT & BATTERY
## (AGAINST DEFENDANT SHOSHANI)


278.   Plaintiff repeats and realleges each and every allegation made in this complaint as if they

were set forth herein fully at length.

279.   The aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the

intent, carelessness and recklessness of Defendant SHOSHANI did suddenly and without

provocation,  did physically assault and batter Plaintiff, herein causing Plaintiff to sustain

damages; in that Defendant SHOSHANI did conduct himself in a wanton, willful, reckless

and heedless manner without regard to the safety of the Plaintiff herein; in that said

Defendant was physically abusive; in behaving in a disorderly manner; in using

unnecessary, excessive and unlawful touching against the plaintiff; in willfully and

maliciously assaulting and battering the Plaintiff herein.

280.   As a result of Defendant SHOSHANI's acts of assault and battery, Plaintiff has been

damaged in an amount to be determined at the time of trial.


**AS A TENTH CAUSE OF ACTION
BREACH OF CONTRACTS
(AGAINST ALL DEFENDANTS)**

281.   All above paragraphs are repeated herein as if set forth fully at length.

282.   Defendants agreed Plaintiff would receive a salary and shares of stock.

283.   Defendants also agreed to pay Plaintiff under the above Consulting Agreement.

284.   Defendants also agreed to pay Plaintiff for her services.

285.   Defendants have failed to complete or fully perform their obligations.

286.   Defendants have also breached their covenants of good faith and fair dealing in their

dealings with Plaintiff.

287.   By reason of the foregoing, Defendants breached the subject contracts (written and oral)

with Plaintiff.

288.   By reason of the foregoing, Plaintiff has been damaged an amount to be determined at

trial.


**AS AN ELEVENTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER STATE LAW
QUANTUM MERUIT
(AGAINST ALL DEFENDANTS)**


289.   All above paragraphs are repeated herein as if set forth fully at length.

290.   Plaintiff rendered valuable services.

291.   The services were rendered to Defendants.

292. The services were accepted, used, and enjoyed by Defendants.

293. Defendant was aware that Plaintiff, in performing the services, expected to be paid by Defendants.

**AS A TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

294. All above paragraphs are repeated herein as if set forth fully at length.

295. Plaintiff has expended numerous hours and monies in performing the above work for Defendants.

296. As a result of the above, Defendants have received an enrichment.

297. As a result of the above, Plaintiff has suffered an impoverishment.

298. There exists a connection between the enrichment and the impoverishment.

299. There is an absence of a justification for the enrichment and impoverishment.

300. Plaintiff pleads in the alternative, that in the event there is no other remedy under law, Plaintiff is entitled to recovery under the doctrine of unjust enrichment.

**AS A THIRTEENTH CAUSE OF ACTION**
**PROMISSORY ESTOPPEL**
**(AGAINST ALL DEFENDANTS)**

301. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

302. Plaintiff relied on the Defendants' above promises by remaining with Defendants, expending various sums of money and time, and forgoing other business opportunities elsewhere, to the Plaintiff's detriment.

303.   Defendants continuously assured Plaintiff that they had an agreement.

304.   Plaintiff met with various clients and conducted due diligence on various deals that Plaintiff and Defendants were working on.

305.   Indeed, to date, Defendants have refused to discuss the matter any further with Plaintiff and has refused to pay Plaintiff what she is owed.

306.   Defendants acted in bad faith in eliminating Plaintiff from ZIP AVIATION and what they were working on together and then keeping all of the moneys earned for himself.

307.   Defendants are in breach of the above agreements.

308.   Despite repeated demands, Defendants has refused to make any payments to Plaintiff.

309.   As a result of the above, Plaintiff has been damaged in an amount to be determined at trial in excess of the jurisdictional limits of all lower courts.

## AS A FOURTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

310.   Plaintiff repeats and realleges each and every allegation made in the complaint as if they were set forth herein fully at length.

311.   Defendants' behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

312.   Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

313.   Defendants caused Plaintiff to fear for Plaintiff's own safety.

314.   Defendants' breach of their duties to Plaintiff caused Plaintiff to suffer numerous injuries as set forth herein.

315.   As a result of Defendants' acts, Plaintiff has been damaged in an amount to be
determined at the time of trial.

## AS A FIFTEENTH CAUSE OF ACTION FOR CIVIL ACTION FOR CONDUCT CONSTITUTING CRIMES UNDER PENAL LAW §130

316.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above
paragraphs of this Complaint as if more fully set forth herein at length.

317.   § 130.35 of the New York State Penal Law provides as follows: Rape in the first degree 1
A person is guilty of rape in the first degree when he or she engages in sexual intercourse
with another person: 1. By forcible compulsion; or 2. Who is incapable of consent by reason
of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than
thirteen years old and the actor is eighteen years old or more. NY CLS Penal § 130.35

318.   § 130.50 of the New York State Penal Law provides as follows: Criminal sexual act in
the first degree 1 A person is guilty of criminal sexual act in the first degree when he or she
engages in oral sexual conduct or anal sexual conduct with another person: 1. By forcible
compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3.
Who is less than eleven years old; or 4. Who is less than thirteen years old and the actor is
eighteen years old or more. NY CLS Penal § 130.50.

319.   Section 130.70 of the New York State Penal Law; "Aggravated sexual abuse in the first
degree" provides that "A person is guilty of aggravated sexual abuse in the first degree when
he inserts a foreign object in the vagina, urethra, penis or rectum of another person causing
physical injury to such person:

320.   Defendant SHOSHANI violated the herein sections as set forth herein.

321.   § 213-c of the Civil Practice Law and Rules provides as follows: Action by victim of conduct constituting certain sexual offenses: Notwithstanding any other limitation set forth in this article, a civil claim or cause of action to recover from a defendant as hereinafter defined, for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in section 130.35 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law, or aggravated sexual abuse in the first degree as defined in section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in section 130.75 of the penal law may be brought within five years. As used in this section, the term "defendant" shall mean only a person who commits the acts described in this section or who, in a criminal proceeding, could be charged with criminal liability for the commission of such acts pursuant to section 20.00 of the penal law and shall not apply to any related civil claim or cause of action arising from such acts. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action. NY CLS CPLR § 213-c

322.   Defendant SHOSHANI is civilly liable for violating all of the above Sections of the New York State Penal Law as described above.

323.   Defendant SHOSHANI violated the above law as set forth herein.

**AS A SIXTEENTH CAUSE OF ACTION**
**GENDER MOTIOVATED VIOLENCE PROTECTION ACT**
**(AGAINST DEFENDANT SHOSHANI)**

324.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

325.  N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter: a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction. b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

326.  N.Y. ADC. LAW § 8-904 : NY Code – Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief: 1. compensatory and punitive damages; 2. injunctive and declaratory relief; 3. attorneys' fees and costs; 4. such other relief as a court may deem appropriate."

327.  N.Y. ADC. LAW § 8-905 Limitations states in relevant part: "a. A civil action under this chapter must be commenced within seven years after the alleged crime of violence motivated by gender as defined in section 8-903 of this chapter occurred. . . . c. Nothing in

this section requires a prior criminal complaint, prosecution or conviction to establish the elements of a cause of action under this chapter.

328.   Defendant SHOSHANI's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

329.   As a result of defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.


### AS A SEVENTEENTH CAUSE OF ACTION
### UNDER THE FAIR LABOR STANDARDS ACT
### (AGAINST ALL DEFENDANTS)


330.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

331.   Defendants willfully employed Plaintiff in the afore-mentioned enterprise for work weeks and failed to compensate Plaintiff for her employment.

332.   Defendants failed to pay wages to Plaintiff as required by the FLSA, 29 U.S.C. §201 et seq. and its implementing regulations.

333.   At all times material, Defendants did and continue to do substantial business in New York County, New York, and engage in commerce within the meaning of the FLSA.

334.   Plaintiff was an employee of Defendants who at the time of employment were engaged in commerce or in the productions of goods for commerce as covered under the FLSA.

335.   Defendants are an enterprise engaged in commerce and/or have annual gross volume of sales made or business done in excess of $500,000 as per the FLSA and 29 U.S.C. Section 203(s)(1)(A)(ii).

336.   29 USCS § 206 states as follows in relevant part:  § 206.   Minimum wage

(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) except as otherwise provided in this section, not less than--

(C) $ 7.25 an hour, beginning 24 months after [May 25, 2007];

337.   Defendants failed to pay Plaintiff the required federally mandated $7.25 per hour.

338.   Defendants' failure to comply with the FLSA caused Plaintiff to suffer loss of wages and other damages.

## AS AN EIGHTEENTH CAUSE OF ACTION
## VIOLATION OF NEW YORK WAGE AND HOUR LAW
## MINIMUM WAGE & WAGE THEFT
## (AGAINST ALL DEFENDANTS)

339.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

340.  Plaintiff was an employee of Defendants within the meaning of New York Wage Regulations.

341.  New York Labor Law states in relevant part as follows; § 652.  Minimum wage

1. Statutory. Every employer shall pay to each of its employees for each hour worked a wage of not less than:

$ 7.15 on and after January 1, 2007.

342.  New York Labor Law § 663 states in relevant part as follows: * 1. By employee. If any

employee is paid by his employer less than the wage to which he is entitled under the provisions of this article, he may recover in a civil action the amount of any such underpayments, together with costs and such reasonable attorney's fees as may be allowed by the court, and if such underpayment was willful, an additional amount as liquidated damages equal to twenty-five percent of the total of such underpayments found to be due him and any agreement between him and his employer to work for less than such wage shall be no defense to such action. * NB Effective until November 24, 2009 * 1. By employee. If any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she may recover in a civil action the amount of any such underpayments, together with costs and such reasonable attorney's fees as may be allowed by the court, and unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to twenty-five percent of the total of such underpayments found to be due the employee and any agreement between the employee, and the employer to work for less than such wage shall be no defense to such action. * NB Effective November 24, 2009.

343. New York Labor Law §198(1)(a) provides that In any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court may allow such employee in addition to ordinary costs, a reasonable sum, not exceeding fifty dollars for expenses which may be taxed as costs. No assignee of a wage claim, except the commissioner, shall be benefited by this provision. * 1-a. In any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's

failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due. * NB Effective until November 24, 2009 * 1-a. On behalf of any employee paid less than the wage to which he or she is entitled under the provisions of this article, the commissioner may bring any legal action necessary, including administrative action, to collect such claim and as part of such legal action, in addition to any other remedies and penalties otherwise available under this article, the commissioner may assess against the employer an additional amount as liquidated damages equal to twenty-five percent of the total amount of wages found to be due, unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law. In any action instituted in the courts upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due. * NB Effective November 24, 2009 2. The remedies provided by this article may be enforced simultaneously or consecutively so far as not inconsistent with each other. 3. Notwithstanding any other provision of law, an action to recover upon a liability imposed by this article must be commenced within six years. All employees shall have the right to recover full wages, benefits and wage supplements accrued during the six years previous to the commencing of such action, whether such action is instituted by the employee or by the commissioner. committed wage theft from Plaintiff.

344.   Defendants violated Plaintiff's rights to a minimum wage.

345.   Defendants failed to pay Plaintiff her agreed upon wages.

346.    On account of such violations, Defendants are liable to Plaintiff for actual, statutory and

liquidated damages.

347.   Plaintiff also claims that Defendants violated the New York Labor Law by failing to pay

Plaintiff her wages for the work performed. Defendants violated all applicable sections of

the New York Labor Law to which these facts apply.


**AS A NINETEENTH CAUSE OF ACTION**
**FRAUD AND MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**


348.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint as if same were set forth herein fully at length.

349.   All of the above statements by Defendants to Plaintiff were false.

350.   At the time Defendants made the above statements, Defendants knew that they were

false.

351.   Plaintiff relied on the above statements and representations.

352.   Plaintiff was damaged by her reliance on such statements and representations.

353.   Defendants are therefore liable to Plaintiff for such misrepresentations.


**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount to be

determined at the time of trial in excess of the jurisdiction of all lower courts, plus interest ,

attorneys' fees, costs, and disbursements of action, punitive damages due to Defendants'

malicious and/or reckless indifference to Plaintiff's rights, emotional distress, physical

injury, lost wages, liquidated and statutory damages;  as well as having a receiver appointed

and conduct a full accounting of Defendants' finances, and for such other relief as the Court

deems just and proper.


Dated: December 8, 2015
            New York, New York

                                        _____
                                        DEREK T. SMITH, ESQ.
                                        DEREK SMITH LAW GROUP, PLLC
                                        Attorney for Plaintiffs
                                        30 Broad Street, 35th Floor
                                        New York, NY 10004
                                        (212) 587-0760