UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
KATHARINA ROELCKE,

              Plaintiff,

      v.

ZIP AVIATION, LLC, MANHATTAN
HELICOPTERS LLC, and ITAI SHOSHANI,
individually,

                              15-CV-6284 (DAB)
          Defendants.       MEMORANDUM AND ORDER
-------------------------------------------X
ZIP AVIATION, LLC, MANHATTAN
HELICOPTERS LLC, and ITAI SHOSHANI,
individually,

            Counterclaim Plaintiffs,

      v.

KATHARINA ROELCKE,

            Counterclaim-Defendant.
-------------------------------------------X
    DEBORAH A. BATTS, United States District Judge

    Before the Court is Plaintiff/Counterclaim-Defendant Katharina

Roelcke's Motion to Dismiss under Federal Rule of Procedure

12(b)(6) the Counterclaims of Zip Aviation, LLC, Manhattan

Helicopters, LLC, and Itai Shoshani (collectively, "Defendants" or

"Counterclaim-Plaintiffs"). For the following reasons, the Motion

is GRANTED in part and DENIED in part.

I.  Background

    The procedural history of this case has already been discussed

in the Court's March 26, 2018 Memorandum and Order. Eight of

Plaintiff Roelcke's claims were dismissed and eleven remain. She

was denied leave to replead all dismissed claims.

Defendants/Counterclaim-Plaintiffs filed their Answer on May 16, 2018. In their Answer, they asserted the following Counterclaims: abuse of process (Count One), intentional infliction of emotional distress (Count Two), tortious interference with business relations (Count Three), and conversion (Count Four). Defs' Answer, May 16, 2018. Plaintiff Roelcke moved to dismiss all counts under Fed.R.Civ.Pro 12(b)(6). Pl. Mem. Supp. June 21, 2018.

For the purposes of this Motion, the following facts are taken from the Defendants'/Counterclaim-Plaintiffs' Answer and, to the extent applicable, are assumed to be true.

Mr. Shoshani is the president and principal owner of Zip Aviation and the principal owner of Manhattan Helicopters. These companies provide chartered helicopter service to Long Island and helicopter tours around Manhattan. He first met Plaintiff Roelcke in 2007 when she sought employment at his companies. Counterclaim Compl. ¶ 2, 16. Roelcke represented herself as a pilot and a graduate of the Massachusetts Institute of Technology with a degree in aerospace engineering. Shoshani alleges that both of those statements are untrue. Shoshani also alleges that at their first meeting, Roelcke said that she ran a transportation company in Canada (her home country) but was leaving to explore business opportunities in New York. Id. ¶ 17. Roelcke was not employed by Shoshani, but the two did begin a consensual sexual relationship that lasted for seven years. Id. ¶ 2. During this relationship, Roelcke allegedly took tens of thousands of dollars from Shoshani,

2

various personal items from Shoshani, and forged a bill of sale to transfer ownership interest in one of his automobiles to herself. Counterclaim Compl. Id. ¶ 4.

When Shoshani ended the relationship in late 2014, Roelcke allegedly "launch[ed] a campaign" to embarrass and harass him and his family – she began by seeking an ex parte order of protection against him form the Family Court of the State of New York, County of Westchester on or about February 10, 2015. Counterclaim Compl. ¶ 5, Defs.' Mem. Opp. at 7; see Roelcke v. Shoshani, File #141426, Docket No. O-02469-15/16C. Roelcke allegedly falsely claimed that Shoshani hacked into her cell phone, tracked her movements, was physically abusive, and made it known to her that he was carrying a gun. Id. Shoshani was traveling out of the country on February 5, 2015. Counterclaim Compl. ¶ 31.

In June of 2015, Roelcke sent the first of two letters to the Federal Aviation Administration ("FAA") allegedly making false allegations about Shoshani, including allegations that he routinely engaged in insurance fraud, falsified aircraft maintenance reports, mistreated pilots, physically abused pilots, stole aircraft and equipment, falsified pilot logs, stole company case, flew illegal charters, and flew machines that should have been grounded, among other things. In an internal FAA investigation file that Shoshani obtained via a FOIA request, the FAA allegedly acknowledged receipt of Roelcke's letter and determined that "the complaint seems to stem from many personal issues that Ms. Roelcke had with Mr.

3

Shoshani." Id. ¶ 39. The investigative file concluded that the "investigation failed to produce any credible information or evidence to substantiate [Roelcke's] allegations" and closed the investigation. Id.

Defendants allege that in October of 2015, Roelcke sent a second letter to the FAA, again alleging falsification of aircraft maintenance records. After describing in detail the steps taken by FAA inspectors in an effort to substantiate Roelcke's claims, including interview with Zip Aviation pilots and mechanics and a visit to Zip Aviation's maintenance base in New Jersey, the investigative file concluded that the complaint for airworthiness was considered closed. Id. ¶ 40.

Before filing the original complaint in this action, Roelcke and her counsel contacted The New York Post, and fielded inquiries from the television shows Inside Edition and Dr. Phil asking whether Roelcke and Shoshani would be willing to appear. Roelcke made several "false and defamatory" statements about Shoshani to The Post, which ran under the headline, "'You can't just escape': 'Sex slave' assistant sues helicopter boss." Id. ¶ 34. Roelcke is quoted in The Post that when she did run away, Shoshani would find her and threaten her. Id.

In August of 2015, Roelcke filed the present action, "falsely asserting" that she was employed by Zip Aviation and Manhattan Helicopters. Plaintiff Roelcke's Second Amended Complaint contains "graphic false allegations" that Shoshani repeatedly assaulted and

4

raped her, and abused her in a variety of other physical and psychological fashions. Id. ¶ 32; Defs.' Mem. Opp. at 8. Roelcke "was never subject to gender discrimination, sexual harassment, or retaliatory action at either company, and she has no claim for wages against either company." Id.

Also in August, Roelcke filed an allegedly "baseless" civil action against Shoshani in the Small Claims Court of the City of White Plains, New York, seeking the return of certain possessions from a White Plains apartment she previously shared with Shoshani. She allegedly initiated this action only after Shoshani offered to return the possessions to Roelcke through his counsel and Roelcke ignored the offer. Id. ¶ 43.

In September of 2015, Roelcke filed a complaint against Shoshani with the Florida Division of Consumer Services allegedly involving Shoshani's handgun license. Counterclaim Compl. ¶ 42. Defendants allege that Shoshani is required to carry a handgun while working when he is transporting items of value. Defs.' Mem. Opp. at 8. The investigation was closed after a finding of no merit. Counterclaim Compl. ¶ 42.

Upon information and belief, Shoshani alleges that Roelcke filed a "baseless complaint" with the IRS regarding assorted improprieties on Shoshani's personal tax returns and business finances. The IRS allegedly issued approximately a dozen subpoenas duces tecum and conducted numerous witness interviews.

On or about January 29, 2016, Roelcke allegedly made harassing phone calls to Shoshani's ex-wife. Shoshani's counsel contacted Roelcke's counsel, asking her to stop. Id. ¶ 44. On March 29, 2016, Roelcke allegedly sent "a voluminous packet of materials" to Shoshani's ex-sister-in-law, including a detailed chronology of his alleged misdeeds. Again, Shoshani's counsel asked her to stop contacting them. Id.

In July of 2016, Roelcke submitted an application to the Family Court of the State of New York, County of Westchester, seeking to hold Shoshani in contempt of court for an alleged violation of the prior order of protection because Shoshani and Roelcke arrived at a police station in White Plains, New York at the same time. Id. ¶ 36. Roelcke also alleged that her "phone [had] been hacked by Mr. Shoshani," that he had vandalized her car, and that he had threatened her. Id.

In January of 2017, Roelcke sought another ex parte restraining order against Shoshani, this time in the State of Connecticut Superior Court, see In re Katharina Roelcke, No. FST-FA17-4030293-S, with an allegedly "perjurious sworn affidavit" submitted in support of the application. Counterclaim Compl. ¶ 37.

As a result of Roelcke's campaign against Shoshani, he allegedly "has suffered tremendous distress, both emotionally and financially." Id. ¶¶ 45-49. Shoshani accrued expenses in responding to Roelcke's false complaints in various courts, with the FAA, with the IRS, and with the Florida Division of Consumer Services.

Shoshani "has been forced to defend himself against the patently false allegations that he is a serial rapist and abuser who somehow 'enslaved' Ms. Roelcke over a seven year period, despite the fact that she traveled the globe during that time frame." Id. Defendants allege that her false allegations led to the collapse of a potentially lucrative sale of a portion of Zip Aviation, but the potential buyer backed out of the deal, fearing potential liability related to Roelcke's present lawsuit. Id. After allegedly inquiring with eleven major providers, Shoshani has been unable to obtain life insurance due to the pending litigation. Id.

In addition, Shoshani allegedly suffered "incalculable damage" to his reputation as this lawsuit has garnered "significant publicity." Id.

Shoshani's first Counterclaim against Roelcke is for abuse of process and alleges that Roelcke "caused civil process to be issued against Mr. Shoshani by intentionally, falsely, and maliciously asserting that Mr. Shoshani had committed various crimes, when she knew those accusations to be untrue." Id. ¶¶ 50-54. These civil processes include, among other things, filing the present action, seeking ex parte orders of protection against Shoshani on three separate occasions on false information, and initiating a meritless civil action against Shoshani in New York State Court. Id.

The second Counterclaim against Roelcke is for intentional infliction of emotional distress. "By falsely and maliciously asserting that Mr. Shoshani repeatedly raped her and turned her

into a 'sex slave,' making false and perjurious reports to law enforcement authorities," etc., Shoshani alleges that Roelcke intended to cause him emotional distress. Id. ¶¶ 55-59.

The third Counterclaim is for tortious interference with Shoshani's business relations. By filing this lawsuit and making false complaints to the FAA, IRS, and Florida Division of Consumer Services about Shoshani's business practices, Roelcke allegedly acted for the sole purpose of harming his business relations. In addition, she "injured at least one business relation" with a potential buyer of a portion of Zip Aviation's operations. Id. ¶¶ 60-64.

The fourth Counterclaim is for conversion. Shoshani alleges that Roelcke, throughout the course of their relationship, took tens of thousands of dollars from him, various "personal items," and "transferred to herself the ownership interest in an automobile" owned by him. Id. ¶¶ 65-67. For all of these counterclaims, Shoshani requests monetary damages, punitive damages, and attorney's fees. Id. ¶ 68.

Roelcke moved to dismiss all counterclaims for failure to state a claim pursuant to Fed.R.Civ.Pro. 12(b)(6). Pl.'s Mem. Supp. June 21, 2018. Defendants opposed. Defs. Mem. Opp. July 19, 2018.

II.   Motion to Dismiss Standard

For a claim to survive a motion brought pursuant to Fed.R.Civ.Pro. 12(b)(6), the party advancing it must have pleaded

"enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556-57). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679.

In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp., No. 13-CV-7169, 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014) ("Federal Rule of Civil Procedure 12(b) applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.") (citations omitted). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor should a court accept as true a legal conclusion couched as a factual allegation. Id.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).) Additionally, "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." Id. (internal quotation marks omitted).

III.   <u>Analysis</u>

    A. <u>Abuse of Process</u>

    Under New York law, a malicious abuse of process claim lies against a party who (1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. <u>See</u> <u>Curiano v. Suozzi</u>, 63 N.Y.2d 113, 116 (1984); <u>Board of Educ. of Farmingdale v. Farmingdale Classroom Teachers Ass'n</u>, 38 N.Y.2d 397, 403 (1975).

    As discussed in one treatise:

> The act must constitute a perversion of the process so as to deprive the process of its proper function and permit its use for a purpose not sanctioned by law. Misuse of process for the purpose of inflicting damage on a person's business is a sufficient collateral object on which to base an action for abuse of process.

86 N.Y. Jur.2d Process § 159 (citing <u>Hauser v. Bartow</u>, 273 N.Y. 370 (1937); <u>Marwood Mechanical, Inc. v. Davis & Warshow, Inc.</u>, 377 N.Y.S.2d 547 (2nd Dep't 1975); <u>Schulman v. Anderson Russell Kill & Olick, P.C.</u>, 458 N.Y.S.2d 448 (Sup. 1982)).

    "As soon as the actor uses the process of the court, not to effect its proper function, but to accomplish through it some collateral objective," they commit this tort; using legal process, for example, "not for the purpose of attaining its proper end, but to extort money, or to coerce, action [is] a perversion of process." <u>Hauser</u>, 273 N.Y. 374 (1937). A court's process is also

11

abused when it is used to harass or to coerce action. While the mere institution of a civil action by summons and complaint is not legally considered a process that is capable of being abused for the purposes of this tort, repeated and improper use of other processes in combination with the filing of a civil lawsuit has been found sufficient to state a cause of action for abuse of process. See Hoppenstein v. Zemek, 403 N.Y.S.2d 542 (2nd Dep't 1978); Ginsberg v. Ginsberg, 443 N.Y.S.2d 439 (2nd Dep't 1981) (rejecting a motion to dismiss because party alleged that the opposing party "repeatedly and improperly used the subpoena power in [child custody and divorce] actions to harass defendant and exhaust her resources," but ultimately allowing dismissal for failure to set forth special damages, with leave to re-plead).

The first essential element of abuse of process – that the defendant employs regularly issued process to compel performance or forbearance of some act – requires that the process used must involve "an unlawful interference with one's person or property." Curiano, 63 N.Y.2d at 116 (internal citation omitted). The third element – the requirement of a collateral objective – requires that the party allege the improper use of process after it is issued. See Gilman v. Marsh & McLennan Companies, Inc., 868 F.Supp.2d 118, 131-32 (S.D.N.Y. 2012). To survive a motion to dismiss, a party must contend more than a malicious motive alone. Curiano, 63 N.Y.2d at 117. In addition, a party "must allege and prove actual or special damages in order to recover." Bd. of Educ. of Farmingdale

<u>Union Free Sch. District v. Farmingdale Classroom Teachers Assoc.</u>, 38 N.Y.2d 397, 405 (1975).

Defendants allege that Roelcke filed an "onslaught" of complaints against them – including the Second Amended Complaint in the present action; the efforts she made to contact members of the news media regarding the allegations in the Second Amended Complaint; two complaints with the FAA; a complaint with the IRS; a complaint with the Florida Division of Consumer Services; three different complaints seeking <u>ex parte</u> orders of protection against Shoshani; and a complaint initiating a civil action against Defendants in New York State Court. Counterclaim Compl. ¶¶ 5, 31-43.

Plaintiff characterizes the Counterclaim as alleging that she abused process in the following ways: (1) in instituting the current action, (2) in obtaining orders of protection against Shoshani, and (3) in instituting an action in New York State Court to recover property for Shoshani. Pl. Mem. Supp. at 2-3.

Defendants argue that this mischaracterizes the number and nature of the processes which Roelcke has allegedly abused. They include in this claim each of the processes that Roelcke instituted against Shoshani and his businesses. <u>See</u> <u>supra</u>; Defs. Mem. Opp. at 6; <u>see</u> Counterclaim Compl. ¶¶ 5, 31-43.

Plaintiff next argues that Defendants did not allege that Plaintiff used process for an improper purpose <u>after</u> process was issued – and that that defect is fatal to Defendants' claim.

"[T]here must be an unlawful interference with one's person or property under color of process" to support a cause of action for abuse of process. <u>Williams v. Williams</u>, 298 N.YS.2d 592, 596 (N.Y. 1969). Facts suggestive of the party's improper purpose or collateral objective must also be pleaded. <u>See</u> <u>Schilt v. Matherson</u>, 960 N.Y.S.2d 460 (2nd Dep't 2013). The proper use of legal process based on an improper or malicious motive – such as a desire for retaliation – is insufficient to satisfy the collateral objective requirement. <u>Pinter v. City of New York</u>, 976 F.Supp.2d 539, 568 (S.D.N.Y. 2013). "A malicious abuse of process claim thus requires an ulterior purpose such as the infliction of economic harm, extortion, blackmail, or retribution.'" <u>Hoyos v. City of New York</u>, 999 F.Supp.2d 375, 391 (E.D.N.Y. 2013). The Second Circuit has stated that the gist of the tort of abuse of process is not commencing an action or causing process to issue without justification, but rather the misuse or misapplication of process for an end other than that which it was designed to accomplish. <u>Weiss v. Hunna</u>, 312 F.2d 711, 717 (2d Cir. 1963).

Here, Defendants have plausibly alleged that Plaintiff's collateral objectives were to cause economic harm to Shoshani, to alert federal agencies to apparently meritless deficiencies in his business practices, to damage the reputation of himself and his companies in the eyes of a potential buyer of a portion of one of his companies, and to harass Shoshani and his family members.

Counterclaim Compl. ¶¶ 5, 31-43. Defendants have properly pleaded a claim for abuse for process.

   B. <u>Intentional Infliction of Emotional Distress</u>
      <u>("IIED")</u>

   In order to assert a valid claim for IIED pursuant to New York law, a plaintiff must demonstrate the following elements: (i) extreme and outrageous conduct, (ii) an intent to cause, or disregard of substantial probability of causing, severe emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) the resultant severe emotional distress. <u>Howell v. New York Post Co.</u>, 81 N.Y.2d 115, 121 (N.Y. 1993). IIED claims are only viable when the plaintiff establishes that they were subjected to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Murphy v. Am. Home Prods. Corp.</u>, 58 N.Y.2d 293, 303 (N.Y. 1986).

   Here, the Counterclaim Complaint's second cause of action addresses each element above and alleges that Plaintiff has falsely and maliciously asserted on numerous occasions that Shoshani "repeatedly raped her and turned her into a 'sex slave'"; that Plaintiff made false reports to law enforcement, the FAA, and the IRS; and that in total Plaintiff made eight baseless lawsuits or complaints to various entities against Shoshani. Counterclaim Compl. ¶¶ 56-57. The Counterclaim Complaint also alleges that

15

Plaintiff engaged in a campaign to harass Shoshani and those closest to him. Id. ¶ 44. After Shoshani ended his relationship with Roelcke, she allegedly "frequently" sent him "unsolicited and harassing text messages." Id. She made harassing phone calls to Shoshani's ex-wife and sent a "voluminous packet of materials" to Shoshani's ex-sister-in-law that included a "detailed chronology of Mr. Shoshani's alleged misdeeds." Id. After each of these incidents, Shoshani's counsel contacted Roelcke's counsel and asked Roelcke's counsel to instruct Roelcke to cease and desist from her harassing behavior, but the behavior continued. Id.

The question for this Court is whether Plaintiff's behavior rose to the level necessary to satisfy the outrageousness element of the tort. New York sets a high threshold for conduct that is "extreme and outrageous" enough to constitute intentional infliction of emotional distress. Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. N.Y. Post Co., 81 N.Y.2d 115, 596 (N.Y.1993)). But the outrageousness element may be satisfied where "severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." Nader v. Gen. Motors Corp., 25 N.Y.2d 560, 569 (1970). The few claims of IIED that have been upheld by the Appellate Division were almost always supported by "allegations detailing a longstanding campaign of deliberate, systematic and malicious harassment of the plaintiff." See Seltzer v. Bayer, 709 N.Y.S.2d 21, 23 (1st Dep't 2000) (listing several cases); Shannon v. MTA Metro-North Railroad,

16

704 N.Y.S.2d 208 ("a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotions, suspensions, lost pay and psychological and emotional harm over a period of years"); Warner v. Druckier, 697 N.Y.S.2d 610 ("through various specified acts, deliberately, systematically and maliciously harassed him over a period of years so as to injure him in his capacity as a tenant"); Harvey v. Cramer, 653 N.Y.S.2d 3 (misdiagnosis of HIV status is sufficiently outrageous if intentional, as to which an issue of fact was raised by evidence that doctor also told plaintiff's long-term partner the diagnosis and provided free medical care to the partner in exchange for sexual favors). In Green v. Fischbein Olivieri Rozenholc & Badillo, for example, the Appellate Division affirmed the trial court's finding of outrageousness where a plaintiff-tenant alleged that his landlord (and their counsel) engaged in "a course of conduct designed to harass, intimidate and interfere with plaintiff's tenancy" over a period of three years. 119 A.D.2d 345, 347, 507 N.Y.S.2d 148 N.Y.A.D. (1st Dep't 1986). Specifically, the defendants in Green allegedly: (a) brought numerous eviction proceedings and other actions against plaintiff, all without legal cause or justification; (b) interrupted or discontinued certain services, which resulted in "the drastic deterioration of plaintiff's living conditions"; (c) interfered with plaintiff's mail; and (d) verbally abused plaintiff and his guests. Id. at 350.

Here, Defendants have adequately plead the existence of a "campaign." See supra, 3-6. These incidents are the kind of "longstanding campaign" described in Seltzer and Green.

### C. Tortious Interference with Business Relations

In count three, Defendants assert a claim for tortious interference with prospective business relations. Under the analysis laid out in Carvel Corp., the cause of action requires that (1) the plaintiff had business relations with a third party; (2) the defendant intentionally interfered with those business relations; (3) the defendant acted for the sole purpose of harming the plaintiff or by using wrongful (or unlawful) means; and (4) that the defendant's interference caused injury to the relationship with the third party. See Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189 (N.Y. 2004); NBT Bancorp v. Fleet/Norstar Fin. Group, 87 N.Y.2d 614, 641 (N.Y. 1996); Guard-Life Corp. v. Parker Hardware Mfg. Corp., 50 N.Y.2d 183 (N.Y. 1980).

Defendants have successfully alleged a business relationship with only one third party – in or about the summer of 2015, Shoshani was engaged in "serious discussions" with a competitor who was interested in buying a portion of Zip's operations. Counterclaim Compl. ¶ 47. Shoshani and the potential buyer had retained a banker to negotiate the specifics of the sale when Roelcke's first lawsuit was filed. The buyer backed out of the deal, fearing potential liability relating to the lawsuit. Id. Even

viewed favorably, this does not state a claim for tortious interference; Defendants have not alleged that Roelcke initiated any contact between herself and the potential buyer. See G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F.Supp. 477, 482 (S.D.N.Y. 1997) (to make out a claim for tortious interference, plaintiff must allege that that the defendant "direct[ed] some activities towards the third party and convince[d] the third party not to enter into a business relationship with the plaintiff"). Plaintiff's motion to dismiss this Counterclaim is GRANTED.

### D. Conversion

Under New York law, conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with, and is in defiance of, a superior possessory right of another in the property. Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 53 (2d Cir.1993) (quoting Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)). To maintain a claim for conversion, a counterclaim-plaintiff must show: "(1) the property subject to conversion is 'a specific identifiable thing;' (2) [counterclaim-plaintiff] had 'ownership, possession or control' over the property before its conversion; and (3) [counterclaim-defendant] 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the [counterclaim-

plaintiff's] rights." <u>Moses v. Martin</u>, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) (internal citations omitted).

Defendants allege that Plaintiff took "tens of thousands of dollars" from Shoshani, "various personal items of value" from Shoshani, and that she "forged a bill of sale to transfer to herself the ownership interest in an automobile" owned by Shoshani. Counterclaim Compl. ¶¶ 4, 66.

Plaintiff's alleged transfer of the ownership interest in the automobile to herself is sufficient to establish a claim for conversion.

However, the "various personal items" and the "tens of thousands of dollars" described in the Counterclaim Complaint are not described with particularity – the pleadings give no hint as to what these items may be, as to their value, or how Plaintiff exercised unauthorized dominion over them. For this reason, Plaintiff's Motion to Dismiss this Counterclaim is GRANTED in part and DENIED in part. Defendants' Counterclaim is DISMISSED to the extent that it relates to Plaintiff's alleged conversion of the "various personal items" and "tens of thousands of dollars" described in paragraphs 4, 28, and 66 of the Counterclaim Complaint. However, the Counterclaim may proceed as to alleged conversion by Plaintiff of Defendants' automobile and "tens of thousands of dollars."

20

IV.   <u>Leave to Amend</u>

A court "should freely give leave" to replead "when justice so requires." Fed.R.Civ.Pro. 15(a)(2). But "it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d Cir. 2007) (internal citations omitted). Repleading would be futile when the "problem with [the pleader's] causes of action is substantive." <u>See, e.g.</u>, <u>Cuoco v. Moritsugu</u>, 222 F.3d 99, 112 (2d Cir. 2000).

Here, dismissal without leave to replead is appropriate for Defendants' tortious interference with business relations counterclaim and the element of their conversion counterclaim regarding Defendants' "various personal items" and "tens of thousands of dollars," because leave to replead would be futile under these circumstances. Defendants have fallen far short of their pleading burden on both counts.


V.   <u>Conclusion</u>

Plaintiff's Motion to Dismiss in part is GRANTED, as to Defendants' Counterclaim for tortious interference with business relations and for the elements of Defendants' Counterclaim for conversion regarding "various personal items" and "tens of thousands of dollars." Plaintiff has 45 days from the date of this

21

Order to answer the Counterclaims that remain. There shall be no extensions.

SO ORDERED.


Dated:      January 8, 2019
            New York, New York.




                                    *Deborah A. Batts*
                            Deborah A. Batts
                       United States District Judge