EXHIBIT 2

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3        KATHARINA ROELCKE,                    :

 4                       Plaintiff,             :

 5                                              :

 6        -against-                             :    Case No.

 7                                              :    15-CV-06284-JGK-JLC

 8        ZIP AVIATION, LLC, MANHATTAN          :

 9        HELICOPTERS LLC, and ITAI            :

10        SHOSHANI, individually,              :

11                       Defendants,            :

12                       ----------

13        ---  This is the Deposition of KATHARINA ROELCKE, a

14    witness herein, called for examination by counsel for the

15    Defendants in the above-mentioned matter, the witness having

16    been duly sworn, taken via Neesons, a Veritext Company's

17    virtual platform, commencing at 9:53 a.m. on Monday, November

18    16th, 2020.

19                       ----------

20                    REPORTED BY:

21                Emily Wittet, CVR

22

23

24

25
```

```
                                              Page 19

 1                stamp DEF-0011340.

 2                BY MS. PEYSER:

 3                Q.   Ms. Roelcke, do you recognize

 4         this document?

 5                A.   It looks like my old passport.

 6         Yes.

 7                Q.   And does this document look

 8         accurate to you?

 9                A.   I don't have the document on

10         hand.  I don't have that passport, so I can't

11         tell you if it does or not.

12                Q.   Ms. Roelcke, you just testified

13         that your birthday is September 3rd, 1971; is

14         that correct?

15                A.   Correct.

16                Q.   Can you read what your birthday

17         is on this passport?

18                A.   Yes.  It says '74.

19                Q.   I'd like to ask you again.  For

20         the record, what is your birthday?

21                MR. HOLZBERG:  Objection --

22                THE WITNESS:  September 3rd, 1971.

23                MR. HOLZBERG:  -- asked and answered.

24                BY MS. PEYSER:

25                Q.   Do you have any understanding why
```

```
                                                      Page 20
 1          this passport has a different birthday on it?
 2                   A.    No.
 3                   Q.    Have you ever seen this passport
 4          before?
 5                   A.    Well, this is a copy of my
 6          passport, but it's not an original so I can't
 7          tell you.   It's a photocopy of what was my
 8          passport.
 9                   Q.    Do you have any -- can you
10          explain why the birthday on this passport is
11          different than the birthday you just testified
12          to?
13                   MR. HOLZBERG:   Objection to the form.
14                   THE WITNESS:  No, I cannot.
15                   MR. HOLZBERG:   Asked and answered.
16                   BY MS. PEYSER:
17                   Q.    Have you ever applied for a
18          passport using the birth year 1974?
19                   A.    When you apply for a passport
20          here, you give them your old passport and they
21          give you a new one within two weeks.   So it's
22          not as if you submit documents or anything for
23          it once you've had a passport in the system.   So
24          I don't know.
25                   Q.    Do you have any understanding of
```

```
 1          how there came to be a passport for you where
 2          your birthday was listed as 1974?
 3                    A.   I don't work in the passport
 4          office, so no.  I can't tell you that.
 5                    Q.   Is this a false passport?
 6                    A.   I don't have the passport on
 7          hand.  Mr. Shoshani has it.  So I can't tell
 8          you.  I didn't have a -- any trouble travelling
 9          with it, so I'm assuming it was okay.
10                    Q.   And you were the individual who
11          applied for this passport, correct?
12                    A.   Correct.
13                    MR. HOLZBERG:  Objection to the form.
14                    BY MS. PEYSER:
15                    Q.   This passport was given to you,
16          correct?
17                    MR. HOLZBERG:  Objection to the form.
18          You can answer.
19                    THE WITNESS:  Yes.
20                    BY MS. PEYSER:
21                    Q.   Have you ever listed your
22          birthday as September 3rd, 1974 on other
23          occasions?
24                    MR. HOLZBERG:  Objection to the form.
25                    THE WITNESS:  Not --
```

```
                                                    Page 22
 1                MR. HOLZBERG:  You can answer.
 2                THE WITNESS:  Not that I'm aware of.
 3                BY MS. PEYSER:
 4                Q.   All right.  We can set aside this
 5      document.
 6                Ms. Roelcke, I'd like to show you one
 7      more document.  Ms. Roelcke, do you recognize
 8      this document?
 9                A.   I do.
10                Q.   What is this document?
11                A.   This was the original order of
12      protection for Connecticut -- or, actually, no.
13      This is the secondary.
14                Q.   And you made this application for
15      this order of protection; is that correct?
16                A.   No, I did not.  A third party
17      did.
18                Q.   Who is that third party?
19                A.   It was a women's organization in
20      Connecticut.
21                Q.   Did you provide them the
22      information in order for them to make this
23      application?
24                A.   I'm assuming I did, but I don't
25      recall.
```

Page 31

```
 1        grandparents in the beginning?
 2                  A.   Because my mother was a
 3        delinquent and my father was busy working all
 4        the time.
 5                  Q.   What do you mean by delinquent?
 6                  A.   She was a young -- she was a
 7        young mother, so my grandparents assumed the
 8        role of me.
 9                  Q.   Were your parents also living in
10        Toronto?
11                  A.   They were.
12                  Q.   Where did you go to elementary
13        school?
14                  A.   I went to a French elementary
15        school.  It was called Georges-Étienne-Cartier.
16                  Q.   Where did you go to high school?
17                  A.   I went to Étienne Brûlé.
18                  Q.   What language was --
19                  A.   French.
20                  MR. HOLZBERG:  Kate, just wait til
21        she's done, please.
22                  THE WITNESS:  Okay.  Sorry.
23                  BY MS. PEYSER:
24                  Q.   You went to a French-speaking
25        high school?
```

```
                                               Page 32

 1                    A.   I did.

 2                    Q.   When did you learn English?

 3                    A.   I think we started learning

 4       English Grade 4 or 5.

 5                    Q.   Did you graduate high school?

 6                    A.   I did.

 7                    Q.   What year did you graduate?

 8                    A.   It was '89, I believe.  Oh,

 9       shoot.

10                    Q.   So you have a high school

11       diploma?

12                    A.   I do.

13                    Q.   I'd like to show you what we will

14       mark as Exhibit 3.  For the record, we will mark

15       this as Exhibit 3.  This is a document Bates

16       stamped DEF-0000776.

17                    EXHIBIT NO. 3:  Document with Bates

18                    stamp DEF-0000775.

19                    BY MS. PEYSER:

20                    Q.   Ms. Roelcke, do you recognize

21       this document?

22                    MR. HOLZBERG:  Kate, you can take a

23       moment and review the document and then let

24       Ms. Peyser know when you're ready for the

25       question, okay?
```

```
                                                        Page 33
 1                    THE WITNESS:  That's what I'm doing.
 2                    MR. HOLZBERG:  Sure.  And that goes
 3          with all exhibits today.  She provides you with
 4          a document, take your time, look at it, and then
 5          let her know once you're ready, all right?
 6                    THE WITNESS:  No.  I don't recall
 7          that.  It's not how I speak.
 8                    BY MS. PEYSER:
 9                    Q.   Is your testimony that this is
10          not an email that you wrote?
11                    A.   Most definitely, because that's
12          not at all how I write or how I speak.
13                    Q.   Do you see who this email is
14          from?
15                    A.   It says it's from me.
16                    Q.   Is helikatt@me.com one of your
17          email addresses?
18                    A.   It is.
19                    Q.   Yet your testimony today is that
20          you did not write this email?
21                    A.   I've never seen it.
22                    Q.   Is it possible that you don't
23          recall this email sitting here?
24                    A.   Oh, no.  I know every single
25          email that -- black and white that has
```

1       transpired between Itai and myself and that's

2       not one that I've ever written because my

3       signature on my helikatt@me.com at that time

4       would have had chief of operations at the

5       bottom, Zip Aviation.

6                  Q.   How do you believe this email

7       came to exist?

8                  MR. HOLZBERG:  Objection to the form.

9       You can answer.

10                 THE WITNESS:  Would you like an honest

11      answer or would you like the la-la one?

12                 BY MS. PEYSER:

13                 Q.   You are under oath --

14                 A.   Okay.

15                 Q.   -- so I would like the honest

16      answer.

17                 A.   Okay.  Well, I have from Apple

18      many times where Mr. Shoshani hacked into my

19      emails and at that point in time between summer

20      2012 to 2013, I spent a countless amount of time

21      at the Apple in the meatpacking district trying

22      to recapture my email, my helikatt@me.com

23      because it had been re-registered into some

24      other woman's name.

25                 Q.   Do you think someone else wrote

Page 35

```
 1        this email?
 2                    A.   Oh, most definitely.  "Ha ha ha
 3        ha ha ha ha."  Do I look like I say that?  I'm
 4        very frank and point -- "pointual" in my emails.
 5        And yes, my emails are very sappy.  This has
 6        absolutely -- this does not sound like me at
 7        all.
 8                    Q.   Do have any direct knowledge of
 9        anyone else writing this email?
10                    A.   Well, I don't want --
11                    MR. HOLZBERG:  Objection to the form.
12        You can answer.
13                    THE WITNESS:  I don't want to point
14        fingers.  I don't know for sure.
15                    BY MS. PEYSER:
16                    Q.   Do you have any email records of
17        this account being hacked?
18                    A.   Yes.  My attorney has countless
19        pages of proof of my -- my personal emails and
20        apps being hacked into.  It was a sport.
21                        "I never knew sheets could change
22                    someone's life."
23                    Q.   Okay.  Do you see in this email,
24        it says:
25                        "I was in Germany until I was
```

Page 36

```
 1                    seven then went to a French school my
 2                    entire childhood, only starting one
 3                    English class in Grade 9 through 12."
 4               A.   Not something I would say.
 5               Q.   All right.
 6               A.   But yes, I did -- I did only
 7     speak pretty much speak German as my first
 8     language until I went to French school.  And
 9     that was -- I did to admit that.  Yes.
10               Q.   But you were not in Germany until
11     you were seven?
12               A.   No, I was not.  I was back and
13     forth, yes.  I travelled with my grandparents
14     back and forth.
15               Q.   All right.  We can put this
16     exhibit aside.
17                    Are you aware of whether you have
18     produced any records of this account being
19     hacked in this lawsuit?
20               A.   I believe so.  Yes.  And if not,
21     they were in all the documents provided to you
22     by my attorney.  That was one of the hardest
23     emails to --
24               MR. HOLZBERG:  Kate --
25               THE WITNESS:  -- get back.
```

1              that's fine.   The transcript won't reflect that.

2                      A.   I appreciate that.

3                      Q.   I would like to show you what we

4        will mark as Exhibit No. 4.

5                      EXHIBIT NO. 4:  Screenshot of a

6                      LinkedIn profile of Katharina Roelcke.

7                      BY MS. PEYSER:

8                      Q.   Ms. Roelcke, do you recognize

9        this document?

10                     A.   It looks like my LinkedIn, but

11       it's not.

12                     Q.   What do you mean by that?

13                     A.   Well, it's not my LinkedIn.

14       There's two or three LinkedIn accounts with my

15       name on them floating around.  I have my -- I

16       have access to one, but there's two other ones

17       floating around.  That's not the picture on my

18       LinkedIn.

19                     Q.   Why are there other two LinkedIn

20       accounts floating around with your name on them?

21                     A.   I could not tell you.  You would

22       have to look on this one and see what the email

23       is that's associated with this one.

24                     Q.   Do you see that you have 500 plus

25       connections on this LinkedIn?

Page 72

```
 1          parents were and my son was with his parents.
 2                    Q.    When Mr. Wahab was under house
 3          arrest, your son was residing with his parents;
 4          is that correct?
 5                    A.    Correct.
 6                    Q.    Where was Mr. Wahab residing?
 7                    A.    Some house in another town
 8          somewhere.
 9                    Q.    How old was your son at that
10          time?
11                    A.    He would have been 15.
12                    Q.    All right.  Let's keep going
13          through your CV.  The next position is from 1994
14          to 2001, 1168839 Ontario Limited; is that
15          correct?
16                    A.    Correct.  Yes.
17                    Q.    What type of business was this?
18                    A.    That was my incorporation.
19                    Q.    Who was the owner?
20                    A.    I was and still am.
21                    Q.    Were you the sole owner?
22                    A.    Yes.
23                    Q.    Have you always been the sole
24          owner?
25                    A.    Yes.
```

Page 118

1     have -- if it came from my email, always a
2     signature at the bottom.  And it doesn't show a
3     signature at the bottom.  It would say Katharina
4     Roelcke, my title, my phone number, my address.
5               Q.   Ms. Roelcke, do you have any
6     reason to believe that anyone else had access to
7     your email account in 2007?
8               A.   I don't believe that this is from
9     2007.
10              Q.   Along with every other exhibit
11    I've shown you, is your testimony that this is
12    not an accurate email?
13              MR. HOLZBERG:  Objection to the form.
14    You can answer.
15              THE WITNESS:  How do I answer that?
16              BY MS. PEYSER:
17              Q.   Yes or no?
18              A.   It would -- it would have a
19    footer on it if it came from my email.
20              Q.   Is your testimony that this is
21    not an accurate email?
22              A.   Yes.
23              Q.   You also mentioned that part of
24    the highlighted portion regarding your time in
25    Mexico was true.  What part were you referring

Page 119

1      to?

2                  A.    About being locked in my hotel

3      room.

4                  Q.    Can you tell me about that?

5                  A.    When Carlos -- we were in -- we

6      were in Carlos' town at this point.  The

7      newspapers had taken pictures of Carlos and I at

8      a -- the most beautiful bullfighting ring.  The

9      best mariachi singers, father and son, were

10     playing and they had plucked people out of the

11     front row and put Carlos, myself, Karen, and one

12     of the senators and the guy who owned the

13     nuclear generating plant in the front row.  So

14     that got put in the papers.

15                 So when I came to the city, he had to

16     take off and do something with -- with, I guess,

17     the party and Roberto was made to be in charge

18     of me at the time to watch over me.  I was

19     introduced to Carlos' cousin, Alberto Salas.  He

20     was the allergist in town.  He was a doctor.

21                 And so when I was in Mazatlan with

22     Roberto, Carlos found out that Alberto had asked

23     me to join him and a bunch of doctors on a

24     marlin fishing trip and he got very, very

25     jealous and very angry, basically took the phone

                                                    Page 120

1          out of my room and denied me -- denied me going
2          out of my room, so yes.  I was there for almost
3          two weeks trying to figure out how to get away
4          from the situation.
5                    Q.    Who else would have known this
6          story in December 2007?
7                    A.    Roberto Salas.
8                    Q.    Who -- so who else could have
9          written this email?
10                   A.    I -- as I'm saying, some of this
11         part is true, but it's not all true.  It's not
12         all accurate.  I know the story.  I lived it.
13                   Q.    Ms. Roelcke, if only you and
14         Roberto knew about your time being locked in
15         Mexico --
16                   A.    Oh, I told --
17                   Q.    -- who else could have written --
18                   A.    -- I told Mister --
19                   Q.    -- this email?
20                   A.    What had happened was your
21         client, when I -- prior to having -- and I will
22         tell you the story.  Prior to having a corporate
23         apartment, I was living in a hotel which the
24         company was paying for.  And I had been
25         moved from the -- what was it called?  The

1             A.   Yeah.  Allow me to read it,
2        please.
3             MR. HOLZBERG:  Nell, can you scroll so
4        both portions of the email are visible?  Thank
5        you.
6             MS. PEYSER:  I'm still figuring out
7        this Zoom stuff too.  It's hard for me to tell
8        what's visible to you guys sometimes.
9             MR. HOLZBERG:  No problem.
10            THE WITNESS:  I wrote that.  Yes.
11            BY MS. PEYSER:
12            Q.   On July 27th, 2007, you wrote:
13                 "Good morning, darling.  I've
14                 deliberated and played with the cost
15                 of living."
16            And you ask for a salary of between
17        120 and 150K per year; is that correct?
18            A.   Correct.  Yes.
19            Q.   Why did you refer to Mr. Shoshani
20        as darling in that email?
21            A.   Because that's how he referred to
22        me, so I just referred him back as darling.
23            Q.   Is that a way you would normally
24        refer to a prospective employer?
25            A.    Being that the aviation business

Page 132

```
 1          is so tiny and 99.99999 percent men, a lot of
 2          the times, yes.
 3                    Q.   Mr. Shoshani responds to this
 4          email.  Do you see his response?
 5                    A.   I do now.
 6                    Q.   Mr. Shoshani writes:
 7                         "I don't think I can responsibly
 8                         take you on board."
 9               Do you see that?
10                    A.   I -- no.  I don't see that.
11          Where is it?  It says -- okay.  I'm reading it
12          now, but I don't ever remember getting this
13          email because I ended up in New York somehow.
14                    Q.   From this email, it was your
15          understanding that Mr. Shoshani would not employ
16          you?
17                    A.   From this email, I -- all it
18          states is that he couldn't afford me.
19                    Q.   From this email, did you
20          understand that he was not giving you an offer
21          of employment?
22                    A.   I've -- this is the first time
23          I'm reading this email.  From what I sent him, I
24          spoke to him on the phone afterwards, so this is
25          the first time I'm reading this email.
```

Page 133

1            Q.    You recall the email you wrote to
2      him?
3            A.    Of course.  Yes, I do.  I did
4      write that.
5            Q.    But you do not recall his
6      response?
7            A.    No.  I do not recall his
8      response.  I mean, obviously, I was charming,
9      but no, I'm -- no.  I don't ever remember seeing
10      this because we had a subsequent two telephone
11      conversations and then I was in New York.
12            Q.    You think this email is
13      inaccurate?
14            A.    I've never seen it to say that
15      it's accurate or not accurate.  I don't ever
16      remember receiving it.  It's not something that
17      I read.  This the first time I'm reading it.  So
18      whether he sent it and I didn't receive it
19      or whether it's -- I don't know.  But this is
20      not -- that is my email.  I sent him -- those
21      are my words down there.
22            Q.    This email appears to be sent to
23      rotarykatt@gmail.com on --
24            A.    Correct.
25            Q.    -- June 30th, 2007?

                                        Page 139

1           have to start paying me.

2                      Q.    You were involved in payroll

3           responsibilities at Zip?

4                      A.    Yes, I was.

5                      Q.    Was every employee on payroll?

6                      A.    Yes.  Yes, they were.  All the

7           pilots had a salary plus if they did training or

8           overtime and all of my support staff were --

9           were on payroll.

10                     Q.    But you were not on payroll?

11                     A.    No.

12                     Q.    What was your title at Zip?

13                     A.    Chief of operations.

14                     Q.    Did you give yourself this title?

15                     MR. HOLZBERG:  Objection to the form.

16          You can answer.

17                     THE WITNESS:  No.  I believe it was

18          the title that I had on the brochure that I

19          handed him and I just carried the title forward.

20          It was vice president of operations, I believe

21          it was at one point.

22                     BY MS. PEYSER:

23                     Q.    What brochure are you referring

24          to?

25                     A.    The one that I brought in when I

1          program, setting up the maintenance facility,

2          dealing with -- dealing with all day-to-day

3          operations.  A lot of times, I was there by

4          myself, so I was doing it by myself.

5                     Q.    Anything else?

6                     A.    Pilot scheduling; inventing

7          programs for charters and tours; attending

8          meetings; going to the helicopter convention;

9          attending audits.

10                    I was there for accidents when the FAA

11         came for a Liberty Helicopters accident that

12         almost decapitated one of our passengers.  I was

13         present there alone for that part and when the

14         NTSB showed up.  Any time there was a situation

15         with people complaining about helicopter tourism

16         and Manhattan, I was at every business

17         development or economic development committee

18         meeting; I registered with the Chamber of

19         Commerce; I registered with NYC city sites; I

20         attended all of the galas and openings for all

21         of the tourism companies, Madame Tussauds.

22         There wasn't much I didn't do.

23                    Q.    When you talk about these

24         responsibilities, what time frame are you

25         referring to?

1          Do you recognize this document?  And please let

2          me know when to scroll to the next page.

3                    A.    Okay.

4                    Q.    Ms. Roelcke, do you recognize

5          this document?

6                    A.    I do.

7                    Q.    Is this a consulting agreement

8          between Manhattan Helicopters and 1168839

9          Ontario Limited?

10                   A.    This came into effect.  Yes.

11                   Q.    You testified earlier that

12         1168839 Ontario Limited was dissolved as of 2005

13         or 2006, correct?

14                   A.    No.  I didn't say --

15                   MR. HOLZBERG:  Objection to the form.

16                   THE WITNESS:  I didn't say --

17                   MR. HOLZBERG:  You can answer.

18                   THE WITNESS:  -- it was dissolved.

19                   BY MS. PEYSER:

20                   Q.    Excuse me.  It was inactive after

21         2005 or 2006, correct?

22                   A.    Correct.  It was dormant.

23                   Q.    You had -- it was not a

24         registered entity after 2005 or 2006, correct?

25                   A.    It's still --

Page 158

1                    MR. HOLZBERG:  Objection to the form.
2           You can answer.
3                    THE WITNESS:  Okay.  It's still --
4           it's still registered.  It has never been
5           dissolved.  It's still -- it would require me
6           asking Karen to reactivate the company.
7                    BY MS. PEYSER:
8                    Q.   Did you ever ask Karen to
9           reactivate the company after 2005 or 2006?
10                   A.   No, I have not.
11                   Q.   So the company was inactive in
12          2013, correct?
13                   A.   Correct.  Yes.
14                   Q.   Who came up with the idea of this
15          consulting agreement?
16                   A.   Itai did.
17                   Q.   Did you discuss the consulting
18          agreement with him?
19                   A.   No, because it happened -- it was
20          so fast.  In 2000 -- well, it's as a
21          result of -- it's as a result of something that
22          transpired in 2012.
23                   Q.   What was the purpose of this
24          consulting agreement?
25                   A.   To finally make my employment

Page 159

1    there legal.  After all of the false premises

2    and craziness, to finally have purpose,

3    legality.

4            Q.   So your employment was not legal

5    up until this point, correct?

6            A.   In 2008, when I finally

7    confronted him about -- when we had the

8    discussion initially about making it legal, I

9    kept poking and prodding.  I even sent him a

10   list of aviation lawyers that he could consult

11   with to make me legal.

12            We were on our way to Kinko's to have

13   something printed for the company and he told me

14   to stop the car suddenly.  I was on Mamaroneck

15   Avenue.  He -- I don't know where he got the

16   number from, but he called some random attorney

17   that said that they were going to handle it.  I

18   provided Mr. Shoshani with the documents that

19   they required and never, ever heard anything

20   more about it.

21            Q.   This consulting agreement says in

22   part one:

23                "Consultant will be contracted

24                for expertise in the area of aerospace

25                engineering."

```
 1              Do you see that?
 2              A.   Well, that's false because Itai
 3     is not an aerospace engineering hub, nor does he
 4     have anybody who does plane building or
 5     helicopter building on his staff.  That is just
 6     how it was worded.
 7              Q.   So you did not provide any
 8     expertise in the area of aerospace engineering
 9     under this agreement, correct?
10              A.   No, but she had -- she placed me
11     in whatever platform she thought aviation was
12     in.
13              Q.   This agreement says 1168839
14     Ontario Limited will be paid 650 per day in part
15     four; do you see that?
16              A.   Yes.
17              Q.   Was the inactive company 116883
18     Ontario Limited ever paid $650 per day per the
19     terms of --
20              A.   What --
21              Q.   -- this agreement?
22              A.   No, because when this was printed
23     out and she had sent me the final draft, I
24     received a fax copy of it and so when I went to
25     present it to customs and border security, the
```

Page 221

1          incident?

2                    A.    It was too embarrassing.

3                    Q.    Did you consider calling the

4          police about this incident?

5                    A.    I never considered calling the

6          police on him because I didn't know how it would

7          turn, which way he would spin it.  I was already

8          in danger enough.  I didn't need to put myself

9          in any more harm and I already suffered.

10                   Q.    Let's take a look at the sixth

11         bullet point:

12                         "Defendant Shoshani hyperextended

13                         and dislocated plaintiff's left

14                         shoulder.  Defendant Shoshani

15                         violently shoved plaintiff's arm

16                         behind her back using military style

17                         maneuver.  Plaintiff was treated at an

18                         emergency clinic in Sarasota, Florida.

19                         Plaintiff cannot recall the name

20                         and/or identity of the physicians that

21                         treated her."

22         Do you see that?

23                   A.    I do.

24                   Q.    And is this response accurate?

25                   A.    Yes.

Page 225

1                    Q.   Was Mr. Carfaro present?
2                    A.   No.  He was back in New York,
3        flying.
4                    Q.   Were there any other witnesses
5        present?
6                    A.   No.  It was just Itai and I.
7                    Q.   Did you tell anyone about this
8        incident?
9                    A.   My girlfriend, Chantal.
10                   Q.   When did you tell Chantal about
11       the incident?
12                   A.   Well, when this incident
13       happened, I waited for Mr. Shoshani to get into
14       the shower and then I took off, so I drove from
15       Hypoluxo to Sarasota.  To her, basically.
16                   Q.   Your friend Chantal resided in
17       Sarasota --
18                   A.   Correct.
19                   Q.   -- at the time?  I see.  And what
20       did Chantal do when you arrived?
21                   A.   I have no idea.  I have no idea.
22       I mean, take me in with open arms, of course.
23                   Q.   Is your testimony that you drove
24       from Palm Beach -- sorry.  From Hypoluxo to
25       Sarasota with a dislocated shoulder?

Page 226

1                    A.    Yeah.   Same as I drove from New

2           York to Toronto with a broken foot.   I was

3           forced to do a lot of fuckin' stupid shit.   Yes.

4           Yes, I did.

5                    Q.    Okay.   And the response states

6           that you were treated at an emergency clinic in

7           Sarasota?

8                    A.    Correct.   I went to a walk-in

9           clinic.

10                   Q.    Okay.   Did Chantal accompany you?

11                   A.    No, she did not.   She had to

12          work.

13                   Q.    How soon after the alleged

14          incident did you go to the walk-in clinic?

15                   A.    I don't recall.

16                   Q.    What happened at the clinic?   Do

17          you -- do you recall?

18                   A.    I undressed, took my shirt off.

19          The guy looked at it.   He said it looks -- it

20          looks like it's been hyperextended and he gave

21          me a sling.   So if you want, you can go for

22          x-rays.   I think I did.   I don't recall.   And I

23          said no, I'll be okay.   Asked me how I did it.

24          I don't remember what I said to him.

25                   Q.    Okay.   Let's mark a document as

Page 227

1          Exhibit 13, I believe.

2                    MR. HOLZBERG:  Yes.

3                    EXHIBIT NO. 13:  Document with Bates

4                    number P01897.

5                    BY MR. NAUNTON:

6                    Q.   Now, Ms. Roelcke, Exhibit 13 is

7          an invoice bearing Bates number P01897 that your

8          counsel's produced in this litigation.  As you

9          see, it's an invoice from Sarasota walk-in

10         urgent care --

11                   A.   Correct.

12                   Q.   -- dated January 4th, 2012.  And

13         patient name lists you there as Katharina

14         Roelcke?

15                   A.   Um-hmm.  That's me.

16                   Q.   And to your recollection, is this

17         invoice related to the trip to the Sarasota

18         walk-in clinic you testified a -- you testified

19         to a few moments ago?

20                   A.   It seems that way.  Yes.

21                   Q.   And if you look at the portion of

22         the invoice where it says complaint diagnosis,

23         it states:

24                       "Complains of right shoulder

25                       discomfort.  On examination, one of

Page 228

```
 1                    the shoulder joints was moved or
 2                    forced out of its normal position.
 3                    This condition is called instability
 4                    and can result in a dislocation of one
 5                    of the joints of the shoulder.  I
 6                    recommended immobilization and rest."
 7                    Do you see that?
 8              A.    Which is why he gave me a splint.
 9              Q.    The diagnosis here is not a
10        dislocated shoulder, though.
11              A.    It was a hyperextended shoulder.
12              Q.    And the diagnosis states the
13        condition, which was diagnosed instability,
14        quote, "Can result in a dislocation," correct?
15              A.    I'm not a doctor.
16              Q.    No, I know.  I'm not asking you
17        if you're a doctor.  I'm just asking you what
18        this diagnosis says.  It says that the diagnosis
19        states that you had a condition called
20        instability, which can result in a dislocation,
21        correct?
22              A.    Correct.
23              Q.    So you were not, in fact,
24        diagnosed with a dislocated shoulder, correct?
25              A.    It -- they called it a distended
```

Page 229

1              shoulder, not dislocated shoulder.  A distended

2              shoulder.

3                        Q.   I don't see the term distended

4              shoulder anywhere.

5                        A.   Well, that's -- that's how he

6              referred to it to me.

7                        Q.   And what's your --

8                        A.   I had to rest and I was in a

9              sling.  That was it.

10                       Q.   Okay.  Your interrogatory

11             response says that Mr. Shoshani, quote,

12             hyperextended and dislocated your left shoulder;

13             do you recall that?

14                       A.   I don't recall using the words,

15             but if that's what I did, I may have misspoken

16             as per this paper.  That's how I viewed it as.

17                       Q.   Just -- but just so we're clear,

18             this paper, which says your shoulder condition

19             can result in a dislocation, closed quote, is

20             not consistent with your interrogatory response,

21             which says that Mr. Shoshani, quote, dislocated

22             your left shoulder, correct?

23                       MR. HOLZBERG:  Objection to the form.

24             You can answer.

25                       THE WITNESS:  I don't even know what

1         you want me to answer.

2                   BY MR. NAUNTON:

3                   Q.    Well, it's --

4                   A.    Put the words in my mouth and I

5         will tell you, but I have no idea what it is

6         that you want me to say to you.

7                   Q.    I'm not -- it's -- I'm not trying

8         to play games or hide the ball here,

9         Ms. Roelcke.

10                  My question is the following.  Your

11        interrogatory response says that Mr. Shoshani

12        dislocated your shoulder.  This diagnosis says

13        you did not in fact have a dislocated shoulder.

14        You have a condition called shoulder

15        instability, which may result in dislocation; is

16        that accurate?

17                  A.    If that's what it says in black

18        and white.

19                  Q.    Let's go to the next bullet

20        point, the seventh bullet point, which says the

21        following.  Quote:

22                      "Defendant Shoshani broke

23                      plaintiff's foot.  While dining at the

24                      Tarrytown Lodge with Zip pilots,

25                      plaintiff asked Shoshani not to call

Page 245

```
 1                    THE WITNESS:  Okay.
 2                    BY MR. NAUNTON:
 3                    Q.   Okay.  Let's look at one more
 4          document and then we'll take a break.  Let's
 5          label this next document Exhibit 14.
 6          Ms. Roelcke, this is an email exchange.  It
 7          bears Bates numbers 0003372 and 73.
 8                    EXHIBIT NO. 14:  Documents with Bates
 9                    numbers DEF-0003372 and DEF-0003373.
10                    BY MS. PEYSER:
11                    Q.   It's an email exchange between
12          you and Mr. Shoshani on November 15th and 16th,
13          2012.  If we could -- have you ever seen this
14          email before, Ms. Roelcke?
15                    A.   I'm reading it.  It vaguely looks
16          familiar.
17                    Q.   Let's scroll down to the first
18          email in the chain.  It's from Mr. Shoshani on
19          November 15th, 2012 at 11:21 p.m.  Strike that.
20          If you go down to the bottom of the page, you
21          write Mr. Shoshani on November 15th, 2012 at
22          9:58 p.m that you:
23                    "Hope no one in Tel Aviv was hurt
24                    and that your mom is getting
25                    stronger."
```

1              And then about an hour and a half

2        later, Mr. Shoshani responds:

3                  "You don't get to care about my

4                  mom and my friends.  You punched me in

5                  the face while I was driving 80 miles

6                  per hour, not once but twice so hard

7                  that you split my lip.  You almost

8                  killed us both pulling at the steering

9                  wheel full force while I was driving.

10                  While I know you have justified

11                  this in your head, you know -- you

12                  need to know that this is not okay,

13                  not rational, normal or sane."  [As

14                  read.]

15                  Do you see that?

16              A.   I'm reading it, but I've never

17        seen this before.

18              Q.   Your testimony is that you've

19        never seen this email before?

20              A.   Yes, because I never punched

21        Mr. Itai in the face.  It would have been

22        physically impossible for me to punch Itai in

23        the face sitting in the passenger seat while

24        he's driving.  Impossible.

25              Q.   Okay.  So your testimony is that

Page 247

```
 1          what Mr. Shoshani has written here is not
 2          accurate?
 3                    A.   This is not at all how it
 4          happened.  Correct.
 5                    Q.   Okay.  And you say you've never
 6          seen this email before; is that your testimony?
 7                    A.   I know my part of it, but I don't
 8          recall this second page of it.  No.
 9                    Q.   Okay.  Let's scroll up.  The very
10          next email, you respond to Mr. Shoshani's email;
11          do you see that?  The next day on November 16th.
12                    A.   It is the next day that I
13          responded, then there's something missing
14          because if he had -- he wrote something like
15          that, I would have responded right away.
16                    Q.   Well, it's about six hours later.
17          He wrote his at November 15th at 11:20 p.m. and
18          you responded on the 16th at 5:18 a.m.
19                    A.   And I don't think I would have
20          ever waited that much time to respond to
21          anything that insane.
22                    Q.   Does this refresh your
23          recollection that you saw the email Mr. Shoshani
24          wrote that we just looked at?
25                    A.   No, it doesn't.  I see my email.
```

Page 248

```
 1          That very much looks like something that I would
 2          have --
 3                    Q.   And that photo, am I correct that
 4          that's a photo of what you contend to be your
 5          foot after this alleged incident happened?
 6                    A.   Yes.
 7                    Q.   Okay.  If you look below your
 8          foot, your email says, quote:
 9                         "This small snap in judgment
10                    where you were in total control."
11                    And then if you look below that, you
12          say, quote:
13                         "I said I was sorry.  I knew
14                    where the line was drawn."
15                    And then if you look at the bottom,
16          you say, quote:
17                         "I admitted to a quick snap in
18                    bad judgment knowing right away that
19                    it was not okay."
20                    So you apologize to Mr. Shoshani in
21          this email and refer twice to snaps in judgment.
22          What are you referring to here?
23                    MR. HOLZBERG:  Objection to the form.
24          You can answer.
25                    MR. NAUNTON:  What's the basis for
```

1              Q.    The response states that

2        Mr. Shoshani forcibly raped you, quote,

3        countless times; do you see that?

4              A.    That's what it says.  Yes.

5              Q.    Okay.  How many times do you

6        contend that Mr. Shoshani forcibly raped you?

7              A.    I don't know.  I was being

8        sodomized in my sleep almost every night, so

9        calculate that by 365 days a year.  I don't

10       know.

11             Q.    Your testimony is that

12       Mr. Shoshani raped you daily for over a year?

13             A.    I'm going to say it was over a

14       year.  Every time I wasn't good, all I needed in

15       his opinion was to be fucked and then he was

16       good with it.  I wasn't.

17             Q.    When was the first time that you

18       contend Mr. Shoshani raped you?

19             A.    I'm going to say that I can

20       recall that was disgusting and vulgar was when

21       my son was visiting.  So it would have been,

22       what, 2008, late summer after Todd Rome's

23       wedding.

24             Q.    Sorry.  After whose wedding?

25             A.    Todd Rome.

1            Q.   He is affiliated with the

2      naturopathic hospital?

3            A.   I believe he is the actual owner

4      of the naturopathic hospital.

5            Q.   And did he diagnose you with

6      lymphoma?

7            A.   He thought all the symptoms of

8      the stuff that I brought him could possibly be,

9      so he wasn't ruling it out.  I was.

10            Q.   So I guess I'm a little unclear.

11      Have you ever been formally diagnosed with

12      lymphoma since the first false-positive

13      diagnosis in or around 2007?

14            A.   No.

15            Q.   Okay.  So when your interrogatory

16      response states that you sought treatment from

17      naturopathic college in 2012 related to a

18      diagnosis of lymphoma, that refers to the

19      incorrect 2007, 2008 diagnosis?

20            A.   Correct.  It was -- it was to

21      have somebody outside of the, you know,

22      conventional medical field look at all of the --

23      the garbage that I was being fed and maybe come

24      up with some other solution as to why I was in

25      the situation I was in.

Page 280

```
 1              Q.   Okay.  And so sitting here today,
 2        you don't believe you have an active diagnose --
 3        diagnosis of lymphoma; is that correct?
 4              A.   No.  No.  I have other diagnoses,
 5        but not lymphoma.
 6              Q.   Have you ever received any
 7        chemotherapy?
 8              A.   No, I did not.  They were talking
 9        about radiation therapy for the swelling of my
10        eyes.  They thought maybe radiation would help
11        the glands around my eyes, but I never -- I
12        never followed through with it.  I thought that
13        was too extreme and the possibility of losing my
14        eyesight completely was not in my cards.
15              Q.   Okay.  In connection with your
16        efforts to identify what malady you were
17        suffering from was, did you ever receive
18        treatment from Markham Stouffville Hospital in
19        connection with your --
20              A.   A long -- a long time ago, I did.
21        That's where I sought my bereavement therapy
22        after my father passed.
23              Q.   So you sought bereavement
24        therapy --
25              A.   Correct.
```

Page 281

1                 Q.    -- at Markham -- and when was

2        that?

3                 A.    My father passed in '98, so in or

4        around '98, '99.

5                 Q.    Okay.  But you never sought any

6        treatment from Markham Stouffville?

7                 A.    No.  I would go -- the

8        laboratory's there, so I would have the

9        occasional late-night MRIs or blood tests, but

10       besides that, no.

11                Q.    Okay.  Let's take a look at

12       another exhibit.  Are we on number 16?  Madam

13       Court Reporter, are we on -- or anyone who's

14       willing to help me?

15                MR. HOLZBERG:  Yes.

16                MS. PEYSER:  Yes.  Sixteen.

17                EXHIBIT NO. 16:  Documents with Bates

18                stamps DEF-0010530 to DEF-0010532.

19                BY MR. NAUNTON:

20                Q.    All right.  It's defendant

21       0010530 to defendant 0010532.  Ms. Roelcke, this

22       is an email from rotarykatt@gmail.com to

23       itai@zipaviation.com dated October 19, 2012.  Do

24       you recognize this email?

25                A.    No, I don't.

Page 282

1            MR. HOLZBERG:  Sorry, Shaun.  Just to
2        correct you, I think it's 2011, not 2012.
3            THE WITNESS:  2011.  Yeah.
4            BY MR. NAUNTON:
5            Q.   I apologize.  2011.  You don't
6        recall seeing this email?
7            A.   No, I do not.
8            Q.   Do you recall writing this email?
9            A.   Well, if I don't recall seeing
10       it, I definitely don't recall writing it.
11           Q.   Okay.  You testified earlier that
12       your emails tended to be sappy; do you recall
13       that testimony?
14           A.   Yes.  But when I punctuate, it's
15       usually two dots at the end of every sentence.
16           Q.   Right.  Do you see where this
17       email ends with:
18                "My broken heart trumps all.  You
19                win...."
20                Do you see that?
21           A.   That's a hell of a lot more dots
22       than I would use.
23           Q.   So your testimony is -- well,
24       strike that.  Do you have any reason to believe
25       you didn't write this email?

```
                                          Page 283
 1               A.   I don't recall the email.  It
 2      doesn't sound like anything that -- I was in a
 3      very precarious situation with Itai after the
 4      police incident, but I don't recall this email.
 5      No.
 6               Q.   Okay.  But my question was do you
 7      have any reason to believe -- it comes from your
 8      email account, correct?
 9               A.   That's what it states.
10               Q.   Do you have any reason to believe
11      you didn't send this email?
12               A.   In all honesty, yes, because my
13      email had been hacked several times.
14               Q.   So your testimony is you believe
15      this email -- you didn't send this email because
16      your email --
17               A.   I -- I spent probably -- I'm
18      going to say September, October, November with
19      Apple, Apple Geniuses at the Apple Store trying
20      to get my -- my emails back.  Yes.  So I'm
21      stating that.  All around that time, I had no
22      access to any of these emails.
23               Q.   Okay.  Let's take a look at
24      the -- the middle email says, quote:
25                    "Debated sending this.
```

1           Stopping -- stopping those who truly
2           care from attacking.  This isn't sent
3           to you for any reason but for your
4           curiosity.  Wanting to believe in
5           nothing more than empty words, wanting
6           to believe so badly I was, but have
7           always known that I wasn't and would
8           never be and now fully understanding
9           the extent.  My broken heart trumps
10          all.  You win."  [As read.]
11          A.   That's not --
12          Q.   Did you write those --
13          A.   That's beyond sap.
14          Q.   So your testimony is you didn't
15     write those words because they're too sappy?
16          A.   That -- it doesn't sound like me.
17     Like, what am I saying?  It says here that I'm
18     pledging an oath to the -- like, an Elizabethan
19     oath to society?  No.  This is not -- this is
20     not -- doesn't sound right at all.
21          Q.   Okay.  Let's look at the
22     attachment.
23          A.   I've seen that.  Yes.
24          Q.   You've seen this document before?
25          A.   Yeah.  It's been floating around

Page 285

```
 1          for a while.
 2                    Q.    When you say it's been floating
 3          around, what do you mean?
 4                    A.    I got a copy from Itai -- I can't
 5          tell you, probably around the end of the year of
 6          2011 with this.  He said I sent it to him.  I
 7          don't believe I did.  At one point, I sent him
 8          something from Dr. Koshman because he asked me
 9          what it was that I was taking from Dr. Koshman.
10          I had no idea, so I forwarded him that.  But no.
11          I don't know what that is.
12                    Q.    Okay.  This document states that
13          you have end-stage lymphoma, correct?
14                    A.    I don't know.  I have to read it.
15                    Q.    Let's look.  It says -- halfway
16          down the page, it says "Patient" --
17                    A.    I can't scroll on this.
18                    Q.    Halfway down the page, it says:
19                    "Presents with HL/HNL, formally
20                    non-Hodgkin's lymphoma."
21          And then if you go down to prognosis,
22          it says "End-stage."  Do you see that?
23                    A.    Okay.  I see that.
24                    Q.    And when you look at the top of
25          the page, patient name, your name is listed
```

Page 286

1    there, correct?

2              A.   That's what it says.

3              Q.   So this is -- the information in

4    this document is not accurate, correct?

5              A.   Obviously not.  No.

6              Q.   You were not diagnosed in October

7    2011 with end-stage lymphoma, correct?

8              A.   I was not.  No.  Thank God.

9              Q.   And your testimony a few minutes

10   ago was that Mr. Shoshani sent you this

11   document?

12             A.   That's how I got this document,

13   was from his hands.  Yes.

14             Q.   Okay.  The email we just looked

15   at is an email from you to Mr. Shoshani; is that

16   right?

17             A.   That's what you're stating.  I

18   don't know if it is or not because it doesn't

19   sound like -- like I said, it sounds like

20   something random, Elizabethan-ish.

21             Q.   That --

22             A.   It doesn't say anything towards

23   him.  Doesn't say anything towards me.  It's

24   just sort of like an oath to the world.

25             Q.   Okay, but let's just scroll up to

```
1          the middle email.  The face of this document
2          indicates that it was sent from the account
3          rotarykatt@gmail.com to Mr. Shoshani's account,
4          Zip Aviation; is that right?
5                    A.   That's what it states.
6                    Q.   Okay.  Do you have any
7          understanding of how this document came to be?
8                    A.   I have absolutely no idea.
9                    Q.   Okay.
10                   A.   If -- and around that time, if I
11         sent him anything, it was from Dr. Koshman.
12                   Q.   Okay.  We can put that document
13         away.  The interrogatory response we looked at a
14         few minutes ago, it said -- it says that:
15                        "Plaintiff suffers from abnormal
16                        swelling in the face and lips."
17                   A.   Correct.
18                   Q.   Were you ever given a diagnosis
19         as to what caused the abnormal swelling of the
20         face and lips?
21                   A.   What did they call it?
22         Melkersson-Rosenthal something or
23         Rosenthal-Melkersson.  One of the two.
24                   Q.   And what is that related to?
25                   A.   It's an autoimmune disorder.
```

Page 314

1    other things that were more important, like his
2    acting career.
3                    Q.   Okay.  I want to focus your
4    attention on some of the allegations in the
5    complaint.  Paragraph 41 to 43 of the complaint
6    recounts an alleged incident in December 2007
7    where you and Mr. Shoshani were allegedly at the
8    Soho House?
9                    A.   Yes.
10                   Q.   And the complaint alleges that
11   Mr. Shoshani ultimately, quote:
12                         "Overpowered plaintiff and forced
13                         plaintiff to have sex with him.  This
14                         occasion marked a precedent.
15                         Defendant Shoshani began to pressure
16                         plaintiff to have sex with him as part
17                         of her job.  Defendant Shoshani had a
18                         key made for himself to enter
19                         plaintiff's hotel room.  Defendant
20                         Shoshani began to enter plaintiff's
21                         room every morning, forcing sex on
22                         plaintiff."
23                   Is that an accurate allegation?
24                   A.   It's how it went.  That's how it
25   started out.  Yes.  That's how it started out.

Page 315

1          That's how it started out and how I was

2          convinced that we were having a relationship.

3                    Q.    And so the first time

4          Mr. Shoshani forced sex on you was after this

5          evening at the Soho House in December 2007?

6                    A.    No.   We were actually kicked out

7          of the Soho House.   I guess there's no lewd and

8          lascivious behaviour allowed at the Soho House

9          and he was grabbing me and kissing me and then

10         finally the maître d' asked us to leave.

11                   Q.    And then later that evening, you

12         alleged in your complaint that he forced you to

13         have sex with him, correct?

14                   A.    Later than that.   Later.   I

15         didn't -- I didn't have an option.   Later in

16         that evening, he brought me back to my hotel and

17         he was there with me.

18                   Q.    And you also allege -- and he

19         forced you to have sex?   Is that --

20                   A.    I -- I'm not going to say it was

21         forceful.   It just -- I wasn't expecting it.

22                   Q.    The complaint alleges that

23         Mr. Shoshani forced you to have sex with him.

24         Do you stand by that allegation?

25                   A.    Again, I'm going to say that it

1      wasn't -- it wasn't at all on my radar or what I

2      intended.

3                  Q.    Did Mr. Shoshani --

4                  A.    Whether it was viewed as such, it

5      wasn't on my radar.  I was not expecting after

6      an evening out with Todd Rome and other people

7      that I was going to be ending up having sex with

8      Itai Shoshani.

9                  Q.    Ms. Roelcke, you're suing my

10     client on the basis -- based on an allegation

11     that he sexually assaulted you, as you allege,

12     countless times.  My question to you is the

13     following:  The complaint alleges that in

14     December 2007, after an evening at the Soho

15     House, you contend that Mr. Shoshani forced you

16     to have sex with him.  Do you stand by that

17     allegation?

18                 A.    I'm going to stand by that

19     allegation because every morning thereafter, he

20     had a key to my hotel room and he would let

21     himself in.  Yes.  But under the pretense that

22     he kept saying to me, can't you see me?  I love

23     you.  I love you.  Can't you see me?

24                 Q.    So your testimony --

25                 A.    Okay.  So I'm completely thrown

1          out of left field as to what exactly was going

2          on.  I was there to provide a -- a service of

3          employment, not a service of sexually satisfying

4          Itai Shoshani.  That was never my intent.

5                     Q.   Are you seeking damages for

6          Mr. Shoshani based on the alleged incident that

7          you contend transpired the night that you were

8          at the Soho House?

9                     A.   For specifically the Soho House?

10                     Q.   No.  For your allegation in the

11          complaint that that evening, Mr. Shoshani,

12          quote, overpowered you and forced you to have

13          sex with him.  Do you stand by that allegation

14          and are you seeking damages for Mr. Shoshani

15          based on that allegation?

16                     MR. HOLZBERG:  Objection to the form.

17          You can answer.

18                     THE WITNESS:  I don't know how to

19          answer it.  I honestly don't know how to answer

20          that.

21                     BY MR. NAUNTON:

22                     Q.   Did Mr. Shoshani force you to

23          have sex with him the night that you were at the

24          Soho House or was it just not on your radar?

25                     MR. HOLZBERG:  Objection to the form.

Page 318

1          You can answer.

2                    MR. NAUNTON:  They're two different

3          things.

4                    MR. HOLZBERG:  Is there a question

5          pending?

6                    THE WITNESS:  I would have never -- I

7          would have never participated had I not thought

8          that it would have changed the whole dynamics of

9          our business relationship.

10                    BY MR. NAUNTON:

11                    Q.  But he didn't sexually assault

12          you that evening, correct?

13                    A.   It wasn't --

14                    MR. HOLZBERG:  Objection to form.  You

15          can answer.

16                    THE WITNESS:  Thank you.  It wasn't --

17          it wasn't at all how I initially --

18                    BY MR. NAUNTON:

19                    Q.  Did Mr. Shoshani sexually assault

20          you the evening you were together at the Soho

21          House, Ms. Roelcke?

22                    MR. HOLZBERG:  Objection.  Asked and

23          answered.  You can answer.

24                    BY MR. NAUNTON:

25                    Q.  It's been asked.  It has not been

Page 319

1           answered.

2                   A.   Yes, because it wasn't

3           consensual.

4                   Q.   So your contention is the night

5           that your sexual interaction with Mr. Shoshani

6           the night you were together at the Soho House

7           was not consensual?

8                   A.   I did not in any way put it out

9           there.  It was out there.

10                  Q.   Did you tell him you did not want

11          to have sex with him that evening?

12                  A.   I'm sure I told him I don't think

13          we should be doing this.

14                  Q.   Did you ever tell him you did not

15          want to have sex with him?

16                  A.   Mr. Shoshani was very clever with

17          his words.

18                  Q.   That's not the question.

19                  A.   Everything was always us, we,

20          together, I love you.  Can't you tell that, you

21          know, I'm mad about you?

22                  Q.   We're short on time.  It's a yes

23          or no question.  Did you ever tell him you did

24          not want to have sex with him that evening?

25                  A.   I don't recall.  It was so long

1    ago.

2             Q.   Did you ever ask him to stop

3    whatever it was he was doing that evening?

4             A.   I don't recall.  It was so long

5    ago.

6             Q.   Okay.  The complaint says that

7    Mr. Shoshani then began to force you to have sex

8    every morning thereafter.  Do you stand by that

9    allegation?

10            A.   Almost every single morning, he

11   would come into the hotel room, let himself in

12   and then let himself out and go to the airport

13   and my job was to follow him to the airport.

14            Q.   So you contend he was sexually

15   assaulting you daily as of December 2007?

16            A.    No, because he had me convinced

17   it was a relationship.  He had me convinced that

18   that's how the relationship started.

19            Q.   So is your testimony that at the

20   time, you didn't view it as sexual assault, but

21   you do now?

22            A.   I don't understand what you're

23   saying.

24            Q.   The complaint alleges that

25   Mr. Shoshani forced you to have sex every day as

Page 321

1          of December 2007.  Do you stand by that
2          allegation?
3                    A.   Something was going on and it
4          wasn't right.  The whole thing.
5                    Q.   Was Mr. Shoshani sexually
6          assaulting you on a daily basis as of December
7          2007 as you allege in your complaint?
8                    A.   I don't know how to answer.
9                    MR. HOLZBERG:  Objection to the form.
10         You can answer.
11                   BY MR. NAUNTON:
12                   Q.   Sitting here today, is it your
13         position, Ms. Roelcke, that Mr. Shoshani, as you
14         allege in your complaint, began sexually
15         assaulting you every morning after the night at
16         the Soho House in December 2007?
17                   A.   Again, I don't -- I don't know
18         how to answer you.
19                   Q.   Now, the complaint also alleges
20         an incident on New Year's Eve in December 2007
21         when you returned to New York from Canada; do
22         you recall that?
23                   A.   I do.  Yes.
24                   Q.   First of all, did you consider
25         not returning to New York from Canada after the

Page 322

1      holidays in 2007?
2                A.   A few times, I considered not
3      returning.
4                Q.   Did you tell anyone during your
5      time in Canada over the holidays in December
6      2007 that Mr. Shoshani was sexually assaulting
7      you every day?
8                A.   I wasn't speaking to anybody to
9      tell anybody anything.
10               Q.   And so the complaint alleges that
11     the night you returned to New York, New Year's
12     Eve, you got together with Mr. Shoshani in a
13     hotel room and he, quote, forced rough and
14     unusual sex on you.  Do you stand by that
15     allegation?
16               A.   It was definitely unusual.  Yes.
17               Q.   You contend that he sexually
18     assaulted you that evening?
19               A.   It was, in my opinion, not normal
20     behaviour.
21               Q.   Was --
22               A.   But again -- but again, it was
23     under the guise of him telling me that it was
24     us, we, together, I love you, can't you see?
25     You're the only one for me.

Page 328

1          of the shower by my hair and flung me into the
2          spare bedroom like I was some frigging ragdoll,
3          I believe that happened then.  But then other
4          horrifying things happened after that that led
5          to me fleeing.  Yes.
6                    Q.   Did you flee New York -- do you
7          contend that you fled from New York to Colorado
8          in February 2012?
9                    A.   I'm still barking.  Hold on.  I
10         didn't hear that.
11                   Q.   Do you contend as alleged in the
12         complaint that you fled from New York to
13         Colorado in February 2012?
14                   A.   That would be -- that would be
15         incorrect because I did not -- not -- it wasn't
16         February.  It was -- it was July, I believe.
17         June, July.
18                   Q.   So again, this is another
19         incident where the allegations in the complaint
20         are incorrect?
21                   A.   I don't think they're incorrect.
22         I just think the timeline -- there's just so
23         many events.  The timeline is shifted a little
24         bit.
25                   Q.   Okay.  And your contention is

Page 329

1      that in July of 2012, you fled New York to

2      Colorado?

3                  A.   No.  I fled New York to Toronto

4      first.

5                  Q.   To Toronto and then to Colorado?

6                  A.   And then I picked up my daughter

7      and then I headed west.  I had no clear

8      destination.  Colorado was one of those places I

9      stopped.

10                 Q.   So Savannah was with you at the

11     time?

12                 A.   She was.  Yes.

13                 Q.   Okay.  Let's take a five-minute

14     break and then we'll finish up.

15                 THE VIDEOGRAPHER:  We are --

16                 MR. HOLZBERG:  Okay.

17                 THE VIDEOGRAPHER:  We are now off the

18     record.  The time on the video monitor is

19     6:34 p.m.

20                 --RECESS TAKEN AT 6:34 P.M.

21                 --UPON RESUMING AT 6:41 P.M.

22                 THE VIDEOGRAPHER:  We are now back on

23     the record.  The time on the video monitor is

24     6:41 p.m.

25                 BY MR. NAUNTON:

Page 337

```
 1                 MR. HOLZBERG:  This is Exhibit No. 19.
 2                 MR. NAUNTON:  Yeah.  Let's mark this
 3        as Exhibit 19.
 4                 EXHIBIT NO. 19:  Documents with Bates
 5                 numbers DEF-0011784 to DEF-0011795.
 6                 BY MR. NAUNTON:
 7                 Q.   Ms. Roelcke, this is a tweet that
 8        you posted on February 1st, 2011.  And if we
 9        scroll to the second page -- well, first of all,
10        do you see the account?  It says Katharina
11        Roelcke, @helikatt.  Is this your Twitter
12        account?
13                 A.   I don't have a Twitter account,
14        so...
15                 Q.   Did you have a Twitter account in
16        2011?
17                 A.   I had a Twitter account, but my
18        image on the Twitter was me riding a horse.
19                 Q.   So is your testimony that this is
20        not your Twitter account?
21                 A.   I can pull up through my Gmail
22        where it continuously tells me that my Twitter
23        account has been compromised because I've never,
24        ever used it.  I may have used the one with me
25        on a horse --
```

1              Q.    Okay.

2              A.    -- once or twice.  May have, if

3      that, maximum, and that was a long time ago.

4      So, no.  I can't tell you that this is -- this

5      is even me.

6              Q.    So your testimony is your Twitter

7      account was hacked as well, so whatever is

8      posted on your name under your Twitter account

9      can't be trusted as words coming from you; is

10     that your testimony?

11             A.    "One more day, one more night of

12                   solid indecision.  Do I return to NYC

13                   and continue a hard, glamorous life

14                   with" --

15             And what is the -- what is the little

16     hashtag?  Continuation -- can that be opened up

17     so I can see that?

18             Q.    Yeah.  If we scroll to the second

19     page, you'll be able to see the entirety of the

20     text.  Right below the red ad, the Adobe ad.

21             A.    I can't see that.  Do you want to

22     pull it up a bit more, please?

23             Q.    I'll read it to you:

24                   "One more day, one more night of

25                   solid indecision.  Do I return NYC and

Page 339

```
 1                    continue a hard, glamorous life with
 2                    no life or throw caution to the wind
 3                    just to see where I end up yet again?
 4                    It's too cold outside to think.  I'll
 5                    ask again tomorrow.  Good night."  [As
 6                    read.]
 7                    Do you recall posting that to Twitter?
 8               A.   I don't recall posting it, but it
 9          sounds like something I would have posted.
10               Q.   Okay.  So you don't have any --
11          do you have any reason to believe that as you
12          testified a moment ago that your Twitter account
13          was hacked and this tweet was posted by someone
14          else?
15               MR. HOLZBERG:  Objection to the form.
16          You can answer.
17               THE WITNESS:  Well, being that this
18          was so long ago and everything was so chaotic,
19          it -- but I don't say good night like that.
20          I've never -- that's not my style, "G night."
21          If you can find somewhere where I said that,
22          that's not my -- that's not my thing.
23               It sounds -- it sounds right that I
24          would have said that, because I was in such a
25          state of mind where I just didn't know what the
```

1        heck to do with this person.  But again, this

2        isn't -- this isn't the account that I have.

3        The account that I had started has me on a

4        horse.  This is me with blonde hair, so I don't

5        know.

6                    BY MR. NAUNTON:

7                    Q.   So your testimony is you never

8        set up this Twitter with this photo?

9                    A.   That's helikatt@me.com?  No.  The

10       one that I have is helikatt -- no.  Not

11       helikatt.  It's rotarykatt@gmail.com.

12                   Q.   This Twitter account is under the

13       handle @helikatt.

14                   A.   Okay.  Let me just -- give me one

15       second.  I'm just going to -- for my own sake.

16       I don't want to waste your time.  If you want to

17       just put it on pause, I'm just going to look.

18       Social --

19                   MR. HOLZBERG:  Kate, there's no --

20                   MR. NAUNTON:  Yeah.  There's no need

21       to look.

22                   MR. HOLZBERG:  Wait for a question

23       pending.

24                   MR. NAUNTON:  Yeah.

25                   THE WITNESS:  Twitter.  Well, I'm

Page 347

```
 1          what Mr. Shoshani would do next?
 2                    A.    No.   I fled to Europe --
 3                    MR. HOLZBERG:  Objection to the form.
 4                    MR. NAUNTON:  Yes.
 5                    MR. HOLZBERG:  You can answer.
 6                    BY MR. NAUNTON:
 7                    Q.    You fled to Europe out of fear of
 8          what Mr. Shoshani would do next?
 9                    A.    Correct.
10                    Q.    Let's mark -- what exhibit are we
11          on?
12                    MR. HOLZBERG:  Twenty-one [sic].
13                    MR. NAUNTON:  Okay.  We'll mark as
14          Exhibit 21 [sic] defendant 0003480 to 3482.
15                    EXHIBIT NO. 20:  Documents with Bates
16                    stamps DEF-0003480 to DEF-0003482.
17                    BY MR. NAUNTON:
18                    Q.    This is an email exchange between
19          you and Mr. Shoshani from rotarykatt@gmail.com
20          to itai@zipaviation.com.  The date is October
21          3rd, 2012.
22                    A.    No.  That is absolutely,
23          absolutely not even -- no.  This is an utter
24          disgusting piece of crap.  What the hell is
25          that?
```

Page 348

```
1                    Q.   So is your testimony that the
2          email from you to Mr. Shoshani on October 3rd,
3          2012 at --
4                    A.   No.  I provided you with all of
5          those documents and I'm sure this --
6                    Q.   Ms. Roelcke, there's no question
7          pending.  The email states, quote:
8                         "Get those hazel eyes and hard
9                    dick to me and redeem yourself."
10                   A.   No.
11                   Q.   Your testimony is you did not
12         send that email?
13                   A.   Absolutely not.
14                   Q.   And you see this email has a
15         footer:
16                        "Katharina it wasn't me Roelcke,
17                   it was the voices."
18                   That's the footer that typically
19         accompanies your email, correct?
20                   A.   Not at -- I don't think that's
21         exactly how it was worded.
22                   Q.   But doesn't it appear -- take a
23         look at this email chain.
24                   A.   I am looking at it and I'm
25         telling you right off the bat, that is
```

Page 349

1     absolutely no way.

2               Q.   So this is another email that's

3     been doctored; is that your testimony?

4               A.   This is -- this is disgusting.

5     This is absolutely disgusting.  I would never

6     ever, ever, ever on anyone's children's lives

7     talk like that with him, ever.

8               That is -- he was -- he was trying to

9     have me arrested for my car, so what are you

10    talking about that I would actually discuss --

11    that's -- this is filth.  This is filth.

12    Absolute filth.  "Redeem yourself."

13              Q.   And just so we're clear, this

14    email is from the time frame which the complaint

15    alleges you had fled to Europe out of fear of

16    what Mr. Shoshani would do next, correct?

17              A.   Correct.  So this would never in

18    a million years have transpired.

19              Q.   Okay.  Jay, you can take that

20    down.  Let's put as the next exhibit defendant

21    0003524.

22              EXHIBIT NO. 21:  Document with Bates

23              stamp DEF-0003524.

24              THE WITNESS:  What a monster.

25              BY MR. NAUNTON:

1              Q.   This is another email exchange

2       between rotarykatt@gmail.com and Mr. Shoshani.

3       The date is October 9th, 2012.  The first email

4       is from Mr. Shoshani.  It appears he sends you a

5       photo.  You respond:

6                    "For a second, I had to really

7                    look to see who's what's where's then,

8                    ouch.  I'll rub 'em later."

9              Mr. Shoshani responds "I love you" and

10      you respond:

11                   "LOL.  Yes.  Show time.  I just

12                   started warming up our dinner.  Love

13                   you [smiley face.]"  [As read.]

14             Do you see that?

15             A.   If I was in Europe, how am I

16      warming up dinner?

17             Q.   That's my question for you,

18      Ms. Roelcke.

19             A.   Exactly.  That's exactly --

20      that's exactly case in point.  If I'm in Europe,

21      how am I warming up dinner?

22             Q.   So is your contention that this

23      email is doctored?

24             A.   I don't even -- it's just -- it's

25      doctored.  It's bullshit.

Page 351

```
 1                Q.    So --
 2                A.    It's -- I have all those trails,
 3      you have all those trails and Zach has all those
 4      trails and there's nothing like that that exists
 5      in those.
 6                Q.    So your testimony is you did not
 7      write any of the emails in this exchange with
 8      Mr. Shoshani, correct?
 9                A.    Correct.
10                Q.    Okay.  Jay, you can take that
11      down.  Paragraph 180 of the complaint alleges
12      that around November of 2012 -- well, this is
13      around the time of the Tarrytown incident where
14      you broke your foot.  And the complaint alleges
15      in November of 2012, you fled to Canada; do you
16      recall that?
17                A.    I did.  Yes.
18                Q.    Okay.  How long did you stay in
19      Canada when you fled to Canada?
20                A.    I don't recall.
21                Q.    Okay.  And you fled to Canada out
22      of fear of Mr. Shoshani; is that your position?
23                A.    I -- I -- I needed time away from
24      him.  Yes.
25                Q.    Okay.  Let's put up as an exhibit
```

Page 352

1      defendant 0003091 to 93.

2              EXHIBIT NO. 22:  Documents with Bates

3              stamps DEF-0003091 to DEF-0003093.

4              BY MR. NAUNTON:

5              Q.   The subject line -- this is an

6      email from rotarykatt@gmail.com to

7      itai@zipaviation sent on November 23rd, 2012,

8      and the subject line is:

9                   "In case you forget me, as I do

10                  sometimes.  For an old lady I believe

11                  I fare better than most without makeup

12                  or dripping with Versace and

13                  diamonds."

14              A.   Excuse me.  Do I look -- look at

15      me.  I'm wearing a -- I only wear one ring and

16      maybe my watch.  Do I look like I'm dripping

17      with Versace and diamonds?  Seriously.

18      Seriously.  That is -- that is hilarious.  Okay.

19      I'm sorry, but that is an absolute utter --

20      whatever that is, that is -- that's just out

21      there.

22              Q.   So is your testimony that you did

23      not send this email?

24              A.   Definitely saying that.  That's

25      ridiculous.

Page 353

1                    Q.    And --

2                    A.    That's absolutely -- that's

3        absurd.

4                    Q.    This is another email from

5        rotarykatt@gmail.com, correct?

6                    A.    And if you look back at 2012, you

7        will see that I -- he completely tells me that

8        there is an email dump from my

9        rotarykatt@gmail.com of all these emails.

10       Didn't happen from me, but that is absurd.

11       Absolutely absurd.  Versace and diamonds.

12                   Q.    Who tells you that?

13                   A.    Itai does.

14                   Q.    That there was an email dump from

15       rotarykatt?

16                   A.    Yes.  That he receives an email

17       dump from my email.  Also at some point in 2012,

18       he tells me that my -- that his computer has

19       been compromised and that all of the photographs

20       or stuff pertaining to me was what's missing on

21       his computer, that an account was created,

22       Newmarket -- something Newmarket mom, hot

23       Newmarket mom, and was sent to me on my

24       birthday.

25                   It was actually naked pictures that he

Page 357

1      CERTIFICATE OF REPORTER

2      CANADA )

3      PROVINCE OF ONTARIO         )

4

5              I, EMILY WITTET, the officer before

6      whom the foregoing deposition was taken, do

7      hereby certify that the witness whose testimony

8      appears in the foregoing deposition was duly

9      sworn by me; that the testimony of said witness

10     was taken by me in verbal shorthand, using

11     Computer Aided Realtime, to the best of my

12     ability and thereafter reduced to written format

13     under my direction; that reading and signing was

14     requested; that I am neither counsel for,

15     related to, nor employed by any of the parties

16     to the action in which the deposition was taken,

17     and further that I am not related or any

18     employee of any attorney or counsel employed by

19     the parties thereto, nor financially or

20     otherwise interested in the outcome of the

21     action.

22     _____

23     EMILY WITTET, CVR

24     Commissioner for taking oaths

25     in the Province of Ontario