UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KATHARINA ROELCKE,

                              Plaintiff,

        v.

ZIP AVIATION, LLC                                    Case 1:15-cv-06284-JGK-JLC
MANHATTAN HELICOPTERS LLC, and
ITAI SHOSHANI, individually,

                              Defendants.
-------------------------------------------------------------------X

ZIP AVIATION, LLC                                    *ORAL ARGUMENT*
MANHATTAN HELICOPTERS LLC, and                          *REQUESTED*
ITAI SHOSHANI, individually,

                              Counterclaim Plaintiffs,

        v.

KATHARINA ROELCKE,

                              Counterclaim-Defendant.
-------------------------------------------------------------------X

## PLAINTIFF/COUNTERCLAIM-DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**DEREK SMITH LAW GROUP, PLLC**
**Zachary Holzberg**
**One Penn Plaza, Suite 4905**
**New York, New York 10119**
**(212) 587-0760**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT……………………………………………………………1

   STATEMENT OF MATERIAL FACTS………………………..…………………………..4

   ARGUMENT……………………………………………………………………14

I.    LEGAL STANDARD……………………………………………………..…………14

II.   Summary Judgment Should Be Denied On Plaintiff's
     Employment Claims (Counts I, IV, VII, XVII, and XVIII)
     Because Plaintiff Is A Covered Employee Under The Relevant
     Statutes ……………………………………………..…………………………16

          a.   Employee Status Under the NYSHRL and the NYCHRL…………………17

          b.   Employee Status Under the FLSA and the NYLL………………………18

III.  Summary Judgment Should Be Denied On Plaintiff's Breach of
     Contract Claim (Count X) Because There Was An Express Oral
     Agreement Between The Parties, Or At The Very Least There Remains
     A Genuine Issue Of Material Fact Whether There Was A Contract
     Implied In Fact Between The Parties…..………………………………………23

IV.  Summary Judgment Should Be Denied On Plaintiff's Quantum
     Meruit and Unjust Enrichment Claims (Counts XI and XII)
     Because Plaintiff Presented Evidence Showing a Reasonable
     Expectation to Be Paid …………………………………………………25

V.   Summary Judgment Should Be Denied On Plaintiff's Assault
     Claims (Counts XIV, XV, and XVI) Because Plaintiff's Testimony
     Is Corroborated By Witness Testimony And Questions of Fact Remain
     Regarding The Sexual Assaults...………….…………………………………...26

VI.  CONCLUSION………………………………………………………27

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)...................................................20

*Alamo,* 471 U.S. 290, 292 (1953) ..............................................................................19, 20

*Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324-25, (1986) ...............................................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ..............................................16

*Atkins v. Pitney Bowes Mgmt. Servs.*, No. 12 CV. 5575 JGK, 2015 WL 144158, at *1 (S.D.N.Y.

Jan. 12, 2015).......................................................................................................14

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15 CIV. 9945 (LGS), 2018 WL 4253152, at

*9 (S.D.N.Y. Sept. 6, 2018) ...........................................................................23

*Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d at 141............................26

*Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ........................................................19

*Beautiful Jewelers Private, Ltd. v. Tiffany & Co.,* No. 06 Civ.3085 (GBD), 2010 WL 2720007

(S.D.N.Y. June 28, 2010) ...........................................................................24

*Berlinger v. Lisi*, 288 A.D.2d 523, 524–25 (2001)..........................................................23

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ...........................19, 20

*Carver v. State*, 26 N.Y.3d 272, 281 (2015) ..............................................................19, 20

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986) ...................................................20

*Chambers v. TRM Copy Ctrs.* Corp., 43 F .3d 29, 37 (2d Cir.1994)...............................15

*D'Arpa v. Runway Towing Corp.*, No. 12-cv-1120, 2013 WL 3010810, at *18 (E.D.N.Y. June 18,

2013) ......................................................................................................................18

*Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 360 (E.D.N.Y. 2015) .......................18

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223, 1224 (2d Cir.1994)   15

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) ...................................19

*Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996)....................................16

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260–61 (S.D.N.Y. 2002) ....................................................................................................................21, 23

*Matsushita Elec. Indus.* Co. *v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986) ..........15

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ....................................................................................................................25

*Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F. Supp. 2d 500, 503–04 (E.D.N.Y. 2009)      25

*Minskoff v. American Exp. Travel Related Servs. Co.,* 98 F.3d 703, 708 (2d Cir.1996) ..22

*Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 211 [1959] .........................20

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) .......................................19

*Nationwide Life Ins. Co. v. Hearst/ABC–Viacom Entm't Servs.,* 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996) ................................................................................................22

*Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ......16

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) ................................25

*Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 231 (1978)........................................15

*Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2nd Cir. 1996)....................................................16

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) ........................................... ....................................................................................................................................19

*Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 139–40 (2d Cir. 2017)...........19

*Sillman, supra*, 3 N.Y.2d at 404....................................................................................15

*St. Luke's- Roosevelt Hosp. v. American Transit Ins. Co.*, 274 A.D.2d 511, 512, (2d Dep't 2000) ...................................................................................................................  21

*State Farm Fire & Cas. Co. v. LiMauro*, 103 A.D.2d 514, 521–22 (1984), *aff'd*, 65 N.Y.2d 369, (1985) ...................................................................................................................16

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, No. 00 CIV. 4763 RMB JCF, 2006 WL 2136249, at *5 (S.D.N.Y. Aug. 1, 2006), *adhered to on reconsideration*, No. 00 CIV.4763 RMB JCF, 2006 WL 2556339 (S.D.N.Y. Sept. 5, 2006) ...................................3

*United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994) .......................................................21

*Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 532 (S.D.N.Y. 2013)  17

*Winegrad v. New York University Med Center*, 64 N.Y.2d 851,853, (1985) ...................15

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (alterations in original) (quoting 29 U.S.C. § 203(g)); *see also* ...................................................................................19

*99 Commercial St., Inc. v. Goldberg,* 811 F.Supp. 900, 906 (S.D.N.Y.1993)         22

**STATUTES & RULES**

26 U.S.C. § 132........................................................................................................23

29 U.S.C. § 203(e)(1)...............................................................................................18

42 U.S.C. § 2000e *et seq.*........................................................................................22

52 Stat. 1060, § 3, codified at 29 U.S.C. §§ 203(e), (g) ........................................25

CPLR 3212[b]..........................................................................................................23

Fair Labor Standards Act .........................................................................................18

Fed. R. Evid. 404 .......................................................................................................4

Fed. R. Civ. P. 56(a) ................................................................................................20

Internal Revenue Code.............................................................................................23

New York City Human Rights Law..........................................................................22

New York Lab. Law § 517(1) (McKinney) ..............................................................17

New York Labor Law ................................................................................................22, 24

New York State Human Rights Law ...................................................................................17

Penal Law § 135.35. ..........................................................................................................14

Title VII of the Civil Rights Act of 1964.........................................................................17

Plaintiff Katharina Roelcke ("Roelcke") respectfully submits this Memorandum of Law in opposition to the motion for summary judgment filed by Defendants Zip Aviation, LLC ("Zip"), Manhattan Helicopters LLC ("MH"), and Itai Shoshani ("Shoshani") (collectively referred to as "Defendants"). As illustrated by case law, documentary evidence, and the prior testimony and statements of the parties, there are material issues in dispute, which a rational fact finder could resolve in favor of Plaintiff.

## PRELIMINARY STATEMENT

Defendant Shoshani regularly raped, assaulted, and sodomized Roelcke over a period of almost seven (7) years. As will be discussed, this is a disturbing and unsettling case in which Shoshani preyed on Roelcke, both sexually and financially.

Shoshani is the principal owner of Zip and MH – companies that provide helicopter tours of New York City ("NYC"). Roelcke met Shoshani while visiting NYC in 2007, and the two discussed Roelcke relocating from Canada to New York so Roelcke could run Zip. After several conversations, Roelcke and Shoshani reached an agreement and Roelcke moved to New York in October 2007.

Shortly after Shoshani/Zip hired Roelcke, a press release was issued naming Roelcke as Chief of Operations ("COO"). Using Zip's bank account, Shoshani sent Roelcke money via wire transfer. Furthermore, Zip provided Roelcke with non-cash fringe benefits such as a corporate apartment, company car, company cellphone, company computer, as well as Zip business cards (listing Roelcke as COO), and an @zipaviation.com email address.[1] As COO, Roelcke worked

---

[1] Significantly, almost all of these benefits were paid for by Zip. Upon information and belief, Shoshani deducted these items as business expenses through Zip. However, as Shoshani claims that Roelcke was not employed by Zip, these items cannot qualify as business expenses and are therefore personal expenses. In

relentlessly and quickly built Zip into one of NYC's most prominent helicopter charter companies. Despite her tremendous efforts, Shoshani/Zip failed to compensate Roelcke in accordance with their agreement and used this leverage to manipulate Roelcke.  By way of example only, Roelcke was offered a position at a prominent helicopter company (for which Shoshani provided Roelcke a letter of recommendation indicating that she was an employee of Zip), and Shoshani offered Roelcke stock in Zip as an inducement to stay.

Both Roelcke and Shoshani acknowledge that they engaged in an affair that began *after* several months of Roelcke working for Zip. Their affair was volatile, and shortly after Shoshani's now ex-wife learned of the affair, Shoshani unleashed his animosity and enmity on Roelcke. Roelcke confided in Zip's General Manager, Norman Cantor, regarding the ongoing abuse. Cantor feared for Roelcke's safety and provided her with contact information for a battered women's shelter. In November 2014, Roelcke finally sought assistance from a shelter and obtained an order of protection against Shoshani, as well as the designation as a victim of human trafficking under New York law.

For the reasons set forth below, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety, and for such other and further relief as the Court deems just and proper. Summary judgment should be denied on:

1) All of Plaintiff's **employment claims** because undisputed evidence establishes that Plaintiff received remuneration from Defendants through wire transfers, as well as non-cash fringe benefits and is thus a covered employee under the relevant statutes;

---

deducting these personal expenses as business expenses to reduce his corporate taxable income, Shoshani possibly committed tax fraud.

2) Plaintiff's **breach of contract claim** because undisputed evidence establishes that there was an express oral agreement between the parties, or at the very least there remains a genuine issue of material fact whether there was a contract implied-in-fact between the parties;

3) Plaintiff's **quantum meruit and unjust enrichment claims** because undisputed evidence establishes that Plaintiff had a reasonable expectation to be paid for the services rendered to Zip and MH, or at the very least there remains a genuine issue of material fact whether Plaintiff had a reasonable expectation to be paid for the services rendered to Zip and MH; and

4) All of Plaintiff's **assault claims** because undisputed evidence establishes that Plaintiff's testimony is corroborated (contemporaneously) by her childhood friend, Karen Jackson, as well as Zip/MH's General Manager, Norman Cantor, and genuine issues of material facts remain as to whether Defendant Shoshani physically and sexually assaulted Plaintiff.[2]

---

[2] Defendants' reliance on inadmissible character evidence is prohibited by Federal Rules of Evidence Rule 404, and should not be considered. *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, No. 00 CIV. 4763 RMB JCF, 2006 WL 2136249, at *5 (S.D.N.Y. Aug. 1, 2006), *adhered to on reconsideration*, No. 00 CIV.4763 RMB JCF, 2006 WL 2556339 (S.D.N.Y. Sept. 5, 2006) (emphasis added) (When ruling on summary judgment, courts need only consider admissible evidence.); Accordingly, courts are free to strike or disregard inadmissible statements in parties' summary judgment submissions. *See also* Fed. R. Evid. 404 advisory committee's note to 2006 amendment ("The Rule has been amended to clarify that in a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait.").

## STATEMENT OF MATERIAL FACTS

*Formation of Oral Contract*

      Roelcke previously operated a helicopter company in Canada.[3] Roelcke first met Shoshani by happenstance in or around June 2007.  "As we began speaking, he said to me, he said, well, you just started a – well, you just finished a company and I'm just starting a company. He said, why don't you come and help me build this."[4]

      Despite Shoshani's email dated July 30, 2007, Roelcke and Shoshani had subsequent phone conversations and agreed to terms which resulted in Roelcke moving to New York and starting work for Zip in October 2007.[5] After their initial meeting, Shoshani communicated with Roelcke through, "a combination of – of conversations and emails."[6] Roelcke told her childhood friend, Karen Jackson ("Jackson"), that she was moving to New York to work for Zip/Shoshani <u>a few months before</u> she moved to New York.[7] Roelcke told Jackson that Shoshani had offered her a job at Zip to "run the operation."[8]

---

[3] Plaintiff's deposition transcript is attached as Exhibit U to the Declaration of Zachary Holzberg in Opposition to Defendants' Motion for Summ. J. ("Holzberg Decl."). All transcripts cited within this brief are attached to the Holzberg Decl. and will be referred to by the last name of the deponent (i.e. "Roelcke Dep." Roelcke Dep. 78:15-24, 81:25-83:23, 100:2-10, 125:6-13; Holzberg Decl. Ex E.

[4] Id. 127:25-128:19; Shoshani Dep. 23:14-22.

[5] Id. 130:6-10, 132:19-25, 133:5-11, 149:15-19; Shoshani Dep. 29:25-30:10, Naunton Decl. Ex 12.

[6] Shoshani Dep. 57:24-58:10.

[7] Jackson Dep. 36:2-22.

[8] Id. 38:11-39:3.

Notably, Roelcke and Shoshani were not in a personal relationship at the time she started working for Zip.[9] Roelcke told Jackson her work relationship with Shoshani developed into a personal relationship <u>a few months after</u> she started working at Zip.[10]

*Employment*

Similar to many of her colleagues, Roelcke testified that she had a verbal contract with Defendants.[11] Moreover, Zip did not keep records regarding which employees were expected to work at certain times.[12] Notably, Maripen did not remember Roelcke or Shoshani arriving at a fixed time every day, but saw Roelcke on a regular basis the entire time that Maripen worked at the 12th Avenue Heliport.[13]

---

[9] Roelcke Dep. 191:1-7; Jackson Dep. 38:7-10, Defs.' Brief, Pg. 1 (relationship from December 2007 to December 2014).

[10] Jackson Dep. 60:13.22.

[11] Roelcke Dep. 135:18-136:20, 137:13-18; Shoshani Dep. 42:11-15; Lisa Maripen's ("Maripen") offer of employment was verbal and not in writing. Maripen Dep. 12:11-17, 13:12-14, 45:16-46:12. Michelle Friedberg ("Friedberg") did not sign an employment contract. Friedberg Dep. 19:22-24. Norman Cantor ("Cantor") was hired by Shoshani in the Fall of 2013 as General Manager of Zip and MH. Cantor Dep. 9:5-9, 22-24. Shoshani hired Cantor on the spot, but Cantor did not receive an offer of employment in writing and his salary was agreed upon verbally. Id. 10:13-24.

[12] Maripen Dep. 16:19-20, 18:8-11; Friedberg Dep. 26:7-11; Cantor Dep. 13:8-10.

[13] Maripen Dep. 26:8-20; Moya Dep. 27:19-23; Friedberg Dep. 43:17-44:3, 44:15-17; Roth Dep. 7:21-8:4,15:19-16:15; 20:16-20, 22:16-19, 22:21-23:3, Roth Dep. Cont'd 7:9-12.

After relocating to NY, Zip paid for Roelcke to live in a hotel.[14] Eventually, Shoshani/Zip moved Roelcke to a corporate apartment.[15] In December 2007, a press release was issued naming Roelcke as Vice President of Operations.[16] In connection with her employment, Shoshani/Zip provided Roelcke with non-cash fringe benefits such as a corporate apartment, company car, company cellphone, company computer, business card, and email address.[17]

Roelcke had a designated workspace and computer at Zip's offices.[18] Significantly, Shoshani admits that he provided Roelcke with an @zipaviation.com email address, as well as business cards that listed Roelcke as COO.[19] Shoshani informed Roelcke that she could list any title she wanted, and would have been comfortable with her business card stating that she was an owner of Zip.[20] Shoshani was comfortable with Roelcke presenting those business cards to members of the aviation industry, and acknowledged that by permitting Roelcke to communicate with outside parties while using her @zipaviation.com email address, it gave the impression that Roelcke was an employee of Zip.[21]

---

[14] Roelcke Dep. 120:22-24; Holzberg Decl. Ex. R.

[15] Shoshani Dep. 65:8-66:19, Holzberg Decl. Ex. O, S.

[16] Holzberg Decl. Ex. Q.

[17] Shoshani Dep. 45:5-10, 68:15-24, 104:19-105:11; Holzberg Decl. Ex. I, J, M, O, P, S, EE, UU.

[18] Maripen Dep. 43:9-18, 44:9-13; Friedberg Dep. 63:24-64:8.

[19] Shoshani Dep. 47:22-48:11; Roelcke Dep. 139:12-13, 140:6-12; Roelcke also received official identification badges from Zip and a local airport, which list her as COO of Zip. Holzberg Decl. Ex. NN, OO.

[20] Shoshani Dep. 49:5-17.

[21] Id. 48:12-18, 50:2-9; Holzberg Decl. Ex. LL.

In addition, Roelcke attended business meetings pertaining to Zip.[22] Roth understood Roelcke to be an owner of Zip, "because she would be invited to speak for the company at the – all the meetings, you know, the industry meetings or the meetings of the landlord and, you know, she pretty much said that she was speaking as an owner."[23] Roth recalled two specific instances in which Saker Aviation ("Saker"), landlord at the Pier 6 Heliport, held meetings with management of the companies at the heliport. Notably, Roelcke attended on behalf of Zip and Shoshani was not present.[24]

As COO, Roelcke's duties and responsibilities included, but were not limited to, designing the website/marketing materials, hiring staff, establishing a maintenance program/facility, handling all day-to-day operations, pilot scheduling, attending meetings and conventions on behalf of Zip, handling audits, and handling investigations by the FAA and NTSB.[25] Multiple employees testified that Roelcke held a supervisory position at Zip.[26] Roelcke testified, "There wasn't much I didn't do," as well as, "a lot of times, I was there by myself, so I was doing it by myself."[27] [28] In fact, Maripen acknowledged that Roelcke built Zip and stated, "Because at the time while I was

---

[22] Id. 50:10-15.

[23] Roth Dep. 20:21-22:13.

[24] Roth Dep Cont'd. 21:14-22:1, 22:18-23:4, 24:2-5.

[25] Roelcke Dep. 141:19-21, 142:9-143:8, 143:9-144:22; Holzberg Decl. Ex. D, G, K, Q, T, DD, LL, PP, RR, SS; Maripen Dep. 12:3-10, 48:10-16, 58:11-24; Friedberg Dep. 23:5-12, 41:9-25, 50:18-22.

[26] Moya Dep. 33:9-24, 34:7-12; Maripen Dep. 15-22:16:2 "She was a second person in command would be making the decisions." Id. 23:5-12, 40:21-24.

[27] Roelcke Dep. 144:3-4, 22.

[28] Shoshani Dep. 44:3-11, 104:9-18; Maripen Dep. 22:7-21, 49:14-23, 50:19-51:8, 55:6-18.

there, especially at 34th Street, <u>I felt like she was the one who was performing the day to day operations more than Itai was.</u> I just remember seeing her more than I did see Mr. Shoshani."[29] Moreover, "I don't know her full job description there, but <u>I know that whenever we were faced with the harder decisions, we would always go to her.</u>"[30]

Notably, Shoshani admits that he permitted Roelcke to perform work for Zip.[31] Shoshani appreciated that Roelcke's work was helping Zip, and he may have encouraged her to continue doing so.[32] Shoshani permitted Roelcke to interview potential employees.[33] Friedberg testified that Roelcke was her supervisor because, "she hired me and behaved like my supervisor."[34] Moreover, Friedberg testified that Shoshani, "was the owner of the company, but I would think that he was a little bit on the hands-off side…" as well as, "<u>He let the crew and myself be managed by Katharina.</u>"[35] In instances in which Shoshani was not in the office, Friedberg testified, "<u>she certainly, in my opinion, was the person in charge. And ultimately when Itai showed up, if Katharina was still there, as far as I was concerned, she was my direct supervisor.</u>"[36]

---

[29] Maripen Dep. 37:3-9, 42:6-13, 60:9-23.

[30] Id. 60:24-61:11, 62:2-8.

[31] Shoshani Dep. 39:16-23; 39:24-40:14, 48:22-49:4, 123:17-124:15; Roth Dep. 11:15-12:7, 23:4-18.

[32] Shoshani Dep. 45:15-46:22, 56:8-14. Shoshani permitted Roelcke to communicate on behalf of Zip with the Helicopter Association International and the FAA. Holzberg Decl. Ex. D, DD, RR.

[33] Id. 43:8-13; Friedberg Dep. 17:13-18-4.

[34] Id. 30:19-22, 30:23-31:1, 40:11-14.

[35] Id. 31:3-15.

[36] Id. 66:2-14.

Shoshani acted in an unprofessional manner at the Zip offices, and would get upset whenever things didn't go according to plan.[37] Cantor described Shoshani as, "very brusk. Occasionally rude. Sometimes actually vicious."[38] At various times during his employment, Cantor felt physically threatened by Shoshani.[39] Moreover, although Roth was not employed by Zip/MH, Roth described Shoshani as "a predator...he takes advantage of people. And he's the type of individual that, if he can – if he can use you, he's very good at it, he will to his means or his ends."[40]

Despite wiring Roelcke money directly from Zip's bank account, Shoshani testified that during their relationship Roelcke did not have a job, and did not have any income.[41] Nevertheless, Shoshani told Roelcke that she helped him build the company.[42] Furthermore, Shoshani told Roelcke that he was going to provide her with the "keys to the kingdom."[43] When asked how Roelcke was providing for herself during this time, Shoshani testified, "I gave her money. I took care of her needs."[44] Thus, for approximately seven (7) years, Roelcke was entirely dependent and reliant upon Shoshani/Zip.[45]

---

[37] Maripen Dep. 20:4-7, 24:12-23.

[38] Cantor Dep. 17:24-18:2, 22:4-9, 53:22-54:5.

[39] Id. 55:17-25, 56:1-10, 57:19-22.

[40] Roth Dep. 25:17-26:7.

[41] Shoshani Dep. 66:23-67:7; Holzberg Decl. Ex. P, EE, UU.

[42] Id. 100:10-13.

[43] Id. 100:14-17, Holzberg. Decl. Ex. GG.

[44] Shoshani Dep. 67:8-12.

[45] Roelcke Aff. ₱ 35, Shoshani 67:12-17, 68:8-14, 101:11-23; Holzberg Decl. Ex. I, M, O, P, R, S.

Roelcke "would pester," Shoshani for payment, and sporadically received money from Zip.[46] Roelcke told Shoshani, "I need some money. You have to start paying me."[47] In that first year, Roelcke recalled receiving approximately $21,000.00 from Defendants and understood these payments to represent a portion of the wages for which she was owed.[48] Nevertheless, Shoshani did not view the money he gave Roelcke as any type of income or wage pertaining to the work she performed for Zip.[49] Notably, in several emails Shoshani promises to pay Roelcke and makes reference to previous payments made to Roelcke by Zip.[50]

While employed at Zip, Roelcke received an offer of employment from Bristow Helicopters and shared this news with Shoshani.[51] Interestingly, Shoshani provided Roelcke with a letter of recommendation, indicating that she was the Vice President of Operations of Zip for the past 3 years.[52] Roelcke testified that Shoshani offered her ownership shares of Zip in exchange for her declining the offer with Bristow and remaining an officer of Zip.[53] However, Shoshani testified

---

[46] Roelcke Dep. 137:19-138:3, Holzberg Decl. Ex. P

[47] Id. 138:12-139:1.

[48] Id. 138:4-11.

[49] Shoshani Dep. 126:21-25.

[50] Holzberg Decl. Ex. EE ("So…know I will get you money as promised, and that I love you forever."); Id. Ex. UU ("I think we should look at the dates when you you're were paid by Zip, and have our story straight.").

[51] Roelcke Dep, 180:13-181:5; Shoshani Dep. 98:4-9.

[52] Shoshani Dep. 98:23-99:20; Holzberg Decl. Ex. G.

[53] Roelcke Dep. 167:13-22.

that he never offered or promised Roelcke equity in Zip.[54] Roelcke was COO, "from the moment I walked in 2007 to the time I left, tail end of 2014."[55]

*Assault*

On countless occasions during her employment with Zip, Shoshani verbally and physically abused Roelcke.[56] Roelcke told Jackson that Shoshani mistreated her, started yelling at her for making decisions regarding employees, and undermined her decisions on the job.[57] Similarly, Cantor testified that the way Shoshani spoke to Roelcke at the heliport was "really disrespectful."[58] Moreover, Roelcke testified that around October 2013, Shoshani punched Roelcke in the face and broke her nose.[59] Cantor, who was hired in the Fall 2013, testified that he observed a bruise under her eye on one of her cheeks while at work, "you could tell she had tried to cover something up with makeup and it was definitely a bruise."[60] Notably, Shoshani testified that he has never been physical, in an offensive way, with Roelcke.[61]

---

[54] Shoshani Dep. 100:5-9, 101:2-10.

[55] Roelcke Dep. 144:23-145:2.

[56] Roelcke Dep. 186:9-187:13, 187:15-25, 188:1-191:7, 192:3-10, 193:1-14, 195:2-24, 196:4-8, 207:11-25, 210:3-211:2, 219:9-220:8, 223:20-24, 240:9-24; Cantor Dep. 31:14-23, Holzberg Decl. Ex. A, B, C, L, FF, HH, II, JJ, KK, QQ.

[57] Jackson Dep. 62:10-17, 62:18-25, 63:5-16.

[58] Cantor Dep. 31:14-23; Maripen Dep. 56:24-57:12; also, Friedberg Dep. 57:24-58:8; Roth Dep. 24:7-18.

[59] Roelcke Dep. 253:9-23, Holzberg Decl. Ex. C.

[60] Cantor Dep. 9:5-9, 22-24, 38:17-39:4.

[61] Shoshani Dep. 70:9-11, 77:19-78:5, 78:14-22, 80:6-14, 150:21-24.

Roelcke also testified that Shoshani forcibly raped her.[62] Roelcke woke up with Shoshani's hand around her throat as he whispered how much he enjoyed raping her as he sodomized her.[63] Shoshani claims that they never had sex that was not consensual.[64]  However, in a text message dated January 6, 2011, Shoshani gloats about the enjoyment he received by sodomizing Roelcke with force.[65] Moreover, via text message dated February 3, 2014, Shoshani wrote, "Just beware! I do plan on sexually assaulting you!"[66]

Significantly, Roelcke told Jackson that Shoshani forced Roelcke to have sex when she did not want to.[67] Furthermore, Roelcke contemporaneously informed Jackson that Shoshani had assaulted her.[68] The last time Shoshani raped Roelcke was in October or November 2014.[69]

On two occasions the police were called regarding a dispute between Shoshani and Roelcke.[70] Shoshani testified that he did not call anyone with police connections, nor did he call in a favor to a friend of his seeking assistance.[71] However, the record reflects that the July 9, 2011 police report was subsequently amended and on July 11, 2011 Shoshani texted Roelcke, "Now

---

[62] Roelcke Dep. 268:12-25, 269:11-16, 271:6-14.

[63] Id. 271:10-14, 325:11-19; Holzberg Decl. Ex. FF.

[64] Shoshani Dep. 129:12-130:5, 130:13-17, 131:3-5, 134:3-6.

[65] Holzberg Decl. Ex. FF.

[66] Shoshani Dep. 131:13-17.

[67] Jackson Dep. 63:17-21, 64:20-24; Roelcke Dep. 330:1-12.

[68] Jackson Dep. 66:2-20.

[69] Roelcke Dep. 271:15-18.

[70] Holzberg Decl. Ex. HH, II.

[71] Roelcke Dep. 214:24-215:23; Shoshani Dep. 97:11-98:3.

imagine how I felt for one minute when they wanted to go with the police car and take my weapons in front of my kids like I was a criminal! I had to embarrass my self further and call in a favor which will of course…"[72] Roelcke attempted to flee on several occasions; however, a tracking device was found in Roelcke's car.[73] Shoshani admitted that he had the ability to view Roelcke's location using the phone that he provided her and used that function to determine her whereabouts on multiple occasions.[74]

Shortly before Shoshani fired Cantor, [75]  Roelcke told Cantor that Shoshani, "was keeping her a virtual prisoner. That they had an on-and-off relationship. That she was afraid of him. And at that time that he had struck her more than once. That he was keeping her prisoner. That he had trashed the ownership papers to her car and gotten rid of it. That he went through her phone looking at text messages and emails."[76] Cantor testified that he believed Roelcke more than Shoshani.[77] As a result, in response to Roelcke's complaint, Cantor, "did some homework on battered women centers in the area where she lived…" and provided Roelcke with the information he found.[78]

In November 2014, Roelcke moved out of the corporate apartment and finally sought assistance from a women's shelter, My Sisters' Place, for women who are victims of domestic

---

[72] Holzberg Decl. Ex. F, HH.

[73] Id. Ex. N.

[74] Shoshani Dep. 106:12-107:25, 107:2-17.

[75] Shoshani fired Cantor via text message on the day of his daughter's wedding, 5/18/14. Cantor Dep. 25:8-18.

[76] Id. 30:15-31:3.

[77] Id. 26:5-12; 59:1-19, 60:10-17.

[78] Id. 32:1-21.

violence or human trafficking.[79] Moreover, Maripen texted Roelcke, "I'm glad you left. I hated the way he treated you." Roelcke informed My Sisters' Place that Shoshani sexually assaulted her for approximately seven (7) years.[80] As a result, My Sisters' Place obtained a letter from the Director of Human Trafficking for the New York State Division of Criminal Justice Services confirming that Roelcke qualifies for the designation of a victim of human trafficking under Penal Law § 135.35.[81] Moreover, My Sisters' Place assisted Roelcke in contacting the police and obtaining an order of protection against Shoshani.[82]

## ARGUMENT

### I.   LEGAL STANDARD

As Your Honor succinctly stated in *Atkins v. Pitney Bowes Mgmt. Servs.*, "The standard for granting summary judgment is well established. 'The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[83] The movant carries the initial burden of production of evidence as well as the burden of persuasion.[84] The movant must tender sufficient evidence to demonstrate as a matter of law the absence of a material issue of fact. Failure to make that

---

[79] Roelcke Dep. 330:18-23.

[80] Id. 331:3-7.

[81] Holzberg Decl. Ex. QQ.

[82] Roelcke Dep. 332:5-9.

[83] No. 12 CV. 5575 JGK, 2015 WL 144158, at *1 (S.D.N.Y. Jan. 12, 2015) (internal citations omitted).

[84] *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324-25, (1986).

initial showing requires denial of the motion, regardless of the sufficiency of the opposing papers.[85]

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.[86] Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.[87] Since summary judgment is a drastic remedy, it should not be granted where there is any doubt as to the existence of a triable issue.[88] Thus, when the existence of a material issue of fact is even arguable or debatable, summary judgment should be denied.[89]

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."[90] "Assessments of credibility and choices between conflicting versions of the events

---

[85] *Winegrad v. New York University Med Center*, 64 N.Y.2d 851,853, (1985); *St. Luke's- Roosevelt Hosp. v. American Transit Ins. Co.*, 274 A.D.2d 511, 512, (2d Dep't 2000).

[86] *Matsushita Elec. Indus.* Co. *v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986) (internal citation omitted).

[87] *Chambers v. TRM Copy Ctrs.* Corp., 43 F .3d 29, 37 (2d Cir.1994).

[88] *Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 231 (1978).

[89] *Sillman, supra*, 3 N.Y.2d at 404.

[90] *Gallo,* 22 F.3d at 1224 (emphasis added).

are matters for the jury, not for the court on summary judgment.[91] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[92] As set forth more fully herein, Defendants are not entitled to summary judgment because there are genuine or material issues of fact to defeat Defendants' motion.

## II.   Summary Judgment Should Be Denied On Plaintiff's Employment Claims (Counts I, IV, VII, XVII, and XVIII) Because Plaintiff Is A Covered Employee Under The Relevant Statutes

Plaintiff's employment claims fall into two categories: (1) sex discrimination claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"); and (2) unpaid minimum wage claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL). As discussed herein, undisputed evidence establishes that Plaintiff is a covered employee under these statutes. Fatal to their motion, Defendants' brief fails to raise arguments as to why summary judgment may be granted if Plaintiff is a covered employee.[93] As a result, their motion should be denied in its entirety regarding Plaintiff's employment claims.

---

[91] *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2nd Cir. 1996); *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996).

[92] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[93] It is beyond cavil that raising a new substantive issue of law for the first time in a reply brief is improper, and in such circumstances an order to strike is the proper remedy. *State Farm Fire & Cas. Co. v. LiMauro*, 103 A.D.2d 514, 521–22 (1984), *aff'd*, 65 N.Y.2d 369, 482 N.E.2d 13 (1985); *Novosteel SA v. U.S.,*

### a.   Employee Status Under the NYSHRL and the NYCHRL

Contrary to Defendants' erroneous contentions that Roelcke is not a covered employee under the NYSHRL or NYCHRL, Roelcke received remuneration from Defendants, thus satisfying the most critical inquiry when determining the existence of an employment relationship under the NYSHRL and NYCHRL.[94] New York law defines remuneration as, "every form of compensation for employment paid by an employer to his employee; whether paid directly or indirectly by the employer, including salaries, commissions, bonuses, and the <u>reasonable money value of board, rent, housing, lodging, or similar advantage received</u>."[95]

Here, undisputed evidence establishes that Plaintiff received remuneration from Defendants through wire transfers, as well as non-cash fringe benefits as defined by 26 U.S.C. § 132. The wire transfers received by Roelcke came from Zip's bank account at Citibank ending in 8798.[96] Moreover, Shoshani acknowledged via email dated September 19, 2012 that Roelcke had been paid by Zip, "I think we should look at the dates when you we're were paid by Zip, and have

---

*Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration).

[94] It is axiomatic in this Circuit that compensation is a threshold issue in determining the existence of an employment relationship under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the NYSHRL. *Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 532 (S.D.N.Y. 2013).

[95] N.Y. Lab. Law § 517(1) (McKinney).

[96] Holzberg Decl. Ex. P.

our story straight." [97] In exchange for services rendered, Zip paid for Roelcke's corporate apartment, [98] company car, [99] cellphone, and other similar advantages – the reasonable monetary value of which is treated as remuneration to Roelcke under both New York law and the Internal Revenue Code. [100] As these forms of compensation qualify as remuneration under New York law, Roelcke has satisfied the threshold requirement and established an employment relationship with Defendants under the NYSHRL and NYCHRL. Thus, Defendants' motion must be denied with respect to Plaintiff's NYSHRL and NYCHRL claims.

### b. Employee Status Under the FLSA and the NYLL[101]

The FLSA defines an "employee" as "any individual employed by an employer." [102] "An entity 'employs' an individual under the FLSA" if it " '**suffer[s] or permit[s] that individual to**

---

[97] Holzberg Decl. Ex. UU.

[98] Holzberg Decl. Ex. O, R, S – The bank account listed matches the account number used to pay Roelcke via wire transfer.

[99] FN. 17.

[100] Holzberg Decl. Ex. I ("Did Verizon shut off your Zip phone also.")

[101] "The New York Labor Law is the state analogue to the federal FLSA." *D'Arpa v. Runway Towing Corp.*, No. 12-cv-1120, 2013 WL 3010810, at *18 (E.D.N.Y. June 18, 2013) (internal citation omitted). Because of these similarities, courts approach FLSA and NYLL claims in the same manner. *, e.g., Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 360 (E.D.N.Y. 2015) ("[C]ourts in the Second Circuit have generally applied their analysis of a plaintiff's FLSA claim to a plaintiff's NYLL claim due to the substantial similarity in the provisions.").

[102] 29 U.S.C. § 203(e)(1).

**work**.' "[103] This definition is necessarily a broad one, in accordance with the remedial purpose of the FLSA.[104] In light of the definition's circularity, courts have endeavored to distinguish between employees and independent contractors based on factors crafted to shed light on the underlying economic reality of the relationship." [105] This Court has focused on "the totality of the circumstances" in addressing our "ultimate concern ... whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."[106]

For example, in *Carver v. State*, 26 N.Y.3d 272, 281 (2015), the Court examined a case that is analogous to the case at hand. In *Alamo,* 471 U.S. 290 (1953), the United States Supreme Court applied the economic reality test to determine if certain individuals were "employees" under the FLSA. The Alamo Foundation was a not-for-profit organization founded to " 'establish,

---

[103] *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (alterations in original) (quoting 29 U.S.C. § 203(g)).

[104] *Zheng* at 66 (2d Cir. 2003); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058 (2d Cir.1988); *also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (emphasis added) (This latter definition, whose striking breadth we have previously noted, *Rutherford Food, supra,* at 728, 67 S.Ct., at 1475, stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles.)

[105] *Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 139–40 (2d Cir. 2017).

[106] *Brock* 840 F.2d at 1059; *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (" '[E]conomic reality' rather than 'technical concepts' is to be the test of employment." (internal citation omitted); *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service.")

conduct and maintain an Evangelistic Church ... and generally to do those things needful for the promotion of Christian faith, virtue, and charity.' " It supported itself by operating gas stations, stores and other businesses staffed by "associates." <u>Associates "receive[d] no cash salaries, but the Foundation provide[d] them with food, clothing, shelter, and other benefits."</u> (471 U.S. at 292).

Noting that it "has consistently construed the [FLSA] liberally to apply to the furthest reaches consistent with congressional direction,"[107] the Supreme Court found that the associates were "employees" (*Alamo,* 471 U.S. at 301, citing *Goldberg,* 366 U.S. at 33). <u>The Court focused on three factors: (1) the associates received compensation, albeit "primarily in the form of benefits rather than cash," a distinction deemed " immaterial"; (2) they were "entirely dependent upon the Foundation for long periods, in some cases ... years"; and (3) any other result would have undermined the purposes of the FLSA by giving the Foundation a competitive advantage and "exert[ing] ... downward pressure on wages in competing businesses."</u> (*Alamo,* 471 U.S. at 301, 302).[108]

Here, the economic reality test as applied in *Alamo* and *Carver* compels the same conclusion, that Roelcke was an "employee" of Defendants under the FLSA and NYLL.[109]

---

[107] *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 211 [1959].

[108] "The economic reality test, as applied in *Alamo,* compels the conclusion that Carver was an "employee" of the City. Like the associates in *Alamo,* Carver's benefits were "compensation," given in exchange for his work—even if some of those benefits were not paid in cash—and he was "entirely dependent" on those benefits for years." *Carver* at 281.

[109] Notably, "the existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law. *Brock,* 840 F.2d at 1059.

Shoshani admits that Roelcke performed work for Zip and "did not stop her." Defs. Brief Pg. 10.[110]
Moreover, Roelcke received compensation, albeit primarily in the form of benefits rather than
cash;[111] she was entirely dependent upon Defendants for almost seven (7) years;[112] and any other
result would undermine the broad and remedial purposes of the FLSA.

Furthermore, the parties' behavior also compels the conclusion that Defendants employed
Roelcke. Strikingly, a number of witnesses corroborated the significance of Roelcke's role at Zip.
Friedberg testified that Shoshani, "was the owner of the company, but I would think that he was a
little bit on the hands-off side…" as well as, "He let the crew and myself be managed by
Katharina."[113] Maripen acknowledged that Roelcke built Zip and stated, "Because at the time
while I was there, especially at 34th Street, I felt like she was the one who was performing the day
to day operations more than Itai was. I just remember seeing her more than I did see Mr.
Shoshani."[114] In sum, the record establishes that Roelcke was an employee, and at a minimum, the
record reveals questions of fact as to the existence of the aforementioned factors.

Assuming *arguendo* that Roelcke is not a covered employee under any the aforementioned
statutes, an employment relationship exists under common law agency principles. An agent's
authority may be actual or apparent.[115] Actual authority exists when an agent has the power "to do
an act or to conduct a transaction on account of the principal which, with respect to the principal,

---

[110] Shoshani Dep. 48:22-49:4.

[111] Holzberg Decl. Ex. P.

[112] Roelcke Aff. ⸗ 35.

[113] Friedberg Dep. 31:3-15.

[114] Maripen Dep. 37:3-9, 42:6-13, 60:9-23; Roth Dep. Cont'd. 9:7-13.

[115] *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260–61 (S.D.N.Y. 2002).

he is privileged to do because of the principal's manifestation to him."[116] "Apparent authority is 'entirely distinct from authority, either express or implied,' and arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.' "[117]

Here, the record reveals that questions of fact exist as to whether Zip manifested Roelcke with actual authority or, at minimum, apparent authority, thus rendering summary judgment inappropriate.[118] Shoshani manifested Roelcke with actual authority internally within Zip through implication that she was second in command,[119] and Shoshani manifested Roelcke with apparent authority by representing to third parties that she was employed by Zip.[120] Thus, Defendants are

---

[116] *Minskoff v. American Exp. Travel Related Servs. Co.,* 98 F.3d 703, 708 (2d Cir.1996) (internal citation omitted). Actual authority may be express or implied. Express authority is "[a]uthority distinctly, plainly expressed, orally or in writing." *Nationwide Life Ins. Co. v. Hearst/ABC–Viacom Entm't Servs.,* 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996) (internal citation omitted), while implied authority exists "when verbal or other acts by a principal reasonably give the appearance of authority to the agent." *99 Commercial St., Inc. v. Goldberg,* 811 F.Supp. 900, 906 (S.D.N.Y.1993).

[117] *Minskoff,* 98 F.3d at 708 (citations omitted). Thus, in contrast to actual authority, apparent authority does not turn on the representations made by a principal to his agent, but rather on whether the representations made by the principal to a *third party* created the appearance of authority. These representations, however, need not be made through actual contact between the principal and third party.

[118] "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff,* 98 F.3d at 708.

[119] Maripen Dep. 23:5-12, 40:21-24; Friedberg Dep. 31:3-15, 66:2-14.

[120] FN. 21.

estopped from denying Roelcke's authority to act as an agent on behalf of Zip.[121] Based on the foregoing, Defendants motion must be denied in its entirety with respect to Roelcke's employment claims.

### III. Summary Judgment Should Be Denied On Plaintiff's Breach of Contract Claim (Count X) Because There Was An Express Oral Agreement Between The Parties, Or At The Very Least There Remains A Genuine Issue Of Material Fact Whether There Was A Contract Implied In Fact Between The Parties

Roelcke's breach of contract claim stems from an express oral contract with Zip/Shoshani. The record reveals questions of fact as to the existence of an express oral agreement between the parties or, at minimum, a contract implied-in-fact rendering summary judgment inappropriate (*see,* CPLR 3212[b] ). Under New York law, "a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." [122] Notably, with respect to implied-in-fact contracts, "[b]ased on the facts and circumstances surrounding the dispute as manifested in the acts and conduct of the parties, there must be an indication of a meeting of minds of the parties constituting an agreement. <u>As a general rule, the performance and acceptance of services can give rise to the inference of an implied contract to pay for the reasonable value of such services</u>."[123]

---

[121] "[A] principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Hidden Brook Air, Inc. at* 264 (S.D.N.Y. 2002).

[122] *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15 CIV. 9945 (LGS), 2018 WL 4253152, at *9 (S.D.N.Y. Sept. 6, 2018) (internal citation omitted).

[123] *Berlinger v. Lisi*, 288 A.D.2d 523, 524–25 (2001) (citations omitted).

Here, undisputed evidence in the record establishes that Roelcke performed services for Zip, and those services were accepted, and even encouraged, by Zip/Shoshani.[124] This case is distinguishable from *Beautiful Jewelers Private, Ltd. v. Tiffany & Co.*,[125] as the record establishes circumstantial evidence of an agreement inferred by the performance and acceptance of services. It strains credulity for Defendants to claim that there was no mutual assent to be bound. Notably, similar to many of her colleagues, Roelcke testified that she had a verbal contract with Defendants.[126] [127] Defendants fail to address, and are unable to explain how there was no mutual assent to be bound - yet, Zip paid Roelcke via wire transfer and provided Roelcke with non-cash fringe benefits.[128]

Based on the foregoing, the record establishes questions of fact as to the existence of an express oral agreement between the parties or, at minimum, a contract implied-in-fact rendering summary judgment inappropriate. Thus, Defendants' motion must be denied in its entirety with respect to Roelcke's claim for breach of contract.

---

[124] Shoshani Dep. 39:16-40:14, 44:3-11, 47:22-48:11, 48:12-18, 50:10-15, 56:8-14, 123:17-124:15; Holzberg Decl Ex. T, LL, PP, RR, SS.

[125] No. 06 Civ.3085 (GBD), 2010 WL 2720007 (S.D.N.Y. June 28, 2010).

[126] Roelcke Dep. 137:13-18.

[127] FN. 11.

[128] FN. 17.

**IV.     Summary Judgment Should Be Denied On Plaintiff's Quantum Meruit and Unjust Enrichment Claims (Counts XI and XII) Because Plaintiff Presented Evidence Showing a Reasonable Expectation to Be Paid**

Quantum meruit and unjust enrichment are equitable doctrines available when an express contract is unenforceable.[129] Under New York law, quantum meruit and unjust enrichment claims may be analyzed as a single claim.[130] To recover in quantum meruit under New York law, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."[131]

Here, Defendants claim Roelcke is unable to establish a reasonable expectation of compensation. In doing so, Defendants admit that Roelcke satisfies the first and second elements. The record reveals that Roelcke had a reasonable expectation of compensation as she received regular compensation from Zip/Shoshani (albeit, not in accordance with their agreement).[132] Shoshani made statements and took actions that led Roelcke to believe that Shoshani intended to compensate her for the services she rendered to Zip.[133]  Roelcke testified that she "would pester," Shoshani for payment, and sporadically received money from Zip.[134] Notably, in several emails

---

[129] *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F. Supp. 2d 500, 503–04 (E.D.N.Y. 2009).

[130] *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

[131] *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (internal citation omitted).

[132] Shoshani Dep. 67:12-17, 68:8-14; Holzberg Decl. Ex. P.

[133] FN. 50.; Shoshani Dep. 100:14-17; Holzberg Decl. Ex. GG

[134] Roelcke Dep. 137:19-138:3, Holzberg Decl. Ex. P, EE, UU.

Shoshani promises to pay Roelcke and makes reference to previous payments made to Roelcke by Zip.[135]

Based on the foregoing, the record establishes Roelcke had a reasonable expectation of compensation, and at a minimum, a question of material fact that would render summary judgment inappropriate. Thus, Defendants' motion must be denied in its entirety with respect to Roelcke's claims for unjust enrichment and quantum meruit.

## V.  Summary Judgment Should Be Denied On Plaintiff's Assault Claims (Counts XIV, XV, and XVI) Because Plaintiff's Testimony Is Corroborated By Witness Testimony And Disputes of Fact Remain Regarding The Sexual Assaults

Defendants' inappropriately attempt to characterize the case at hand as a "rare circumstance," in which they ask this Court to weigh evidence and assess the credibility of witnesses. In furtherance of their inapt argument, Defendants erroneously contend that "[t]he only record evidence in support of these claims is the Plaintiff's own uncorroborated testimony." However, the undisputed evidence establishes that Plaintiff's testimony is corroborated by her childhood friend, Karen Jackson, as well as Zip/MH's General Manager, Norman Cantor.[136] Thus, this Court is bound by the well-established precedent in this Circuit.[137]

Lastly, Defendants' injudicious attempt to submit clearly inadmissible evidence regarding Roelcke's past should not, and cannot, be considered for purposes of this motion and should be stricken from the record.[138] Thus, there are genuine issues of material facts as to whether

---

[135] FN. 50.

[136] Statement of Material Facts, *Assault.*

[137] FN. 92.

[138] FN. 2.

Defendant Shoshani physically and sexually assaulted Plaintiff, and Defendants' motion must be denied in its entirety with respect to Roelcke's assault claims.

**VI.**   <u>**CONCLUSION**</u>

Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety and with prejudice.

Dated:          April 6, 2021
                New York, New York

                                    Respectfully submitted,

                                    DEREK SMITH LAW GROUP, PLLC
                                    *Attorneys for Plaintiff/Counterclaim-Defendant*

                                    <u>/s/Zachary Holzberg</u>
                                    Zachary Holzberg
                                    One Penn Plaza, Suite 4905
                                    New York, New York
                                    T: (212) 587-0760

## <u>CERTIFICATION OF COUNSEL</u>

In accordance with Your Honor's Individual Rules and Practices II(D):

I, Zachary Holzberg, Esq., certify that the total word count of this brief, is 6,999, and that this

brief complies with Your Honor's formatting rules.

Dated:       April 6, 2021
             New York, New York

                                                    /s/Zachary Holzberg_____
                                                    Zachary Holzberg