**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————————

**KATHARINA ROELCKE,**

                                 **Plaintiff/**
            **Counterclaim Defendant,**

            **- against -**

**ZIP AVIATION, LLC, ET AL.,**

                               **Defendants/**
            **Counterclaim Plaintiffs.**

——————————————————————————

          **15-cv-6284 (JGK)**

          <u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    The plaintiff/counterclaim defendant, Katharina Roelcke (the "plaintiff"), brought this action against the defendants/counterclaim plaintiffs Zip Aviation, LLC ("Zip"), Manhattan Helicopters LLC ("MH," together with Zip, "Zip/MH"), and Itai Shoshani (collectively, the "defendants"), advancing claims for violations of federal, state, and local employment statutes, breach of contract, quantum meruit, unjust enrichment, and claims arising from alleged physical and sexual assaults. The defendants brought several counterclaims against the plaintiff, including counterclaims for abuse of process, intentional infliction of emotional distress ("IIED"), and conversion.

    The defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing all the of plaintiff's claims. The plaintiff moves for summary judgment

dismissing all of the defendants' counterclaims. For the following reasons, the defendants' motion for summary judgment is **granted in part and denied in part** and the plaintiff's motion for summary judgment is **denied.**

## I. Background

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted. The Court assumes familiarity with Judge Batts' prior opinions in this case. See Roelcke v. Zip Aviation LLC, No. 15-cv-6284, 2018 WL 1792374 (S.D.N.Y. Mar. 26, 2018) ("Roelcke I"); Roelcke v. Zip Aviation LLC, No. 15-cv-6284, 2019 WL 10856680 (S.D.N.Y. Jan. 8, 2019) ("Roelcke II").[1]

### A. The Plaintiff's Employment, Contract, and Quasi-Contract Claims

Zip and MH both operate a New York City helicopter and charter tour company located at 6 East River Piers in Manhattan. Plaintiff's 56.1 Statement ¶¶ 1-2, 4-5 ("Pl.'s 56.1"). Shoshani is the President and owner of Zip and the Chief Operating Officer, Chief Pilot, and owner of MH. Id. ¶¶ 3, 6-7. The plaintiff, a Canadian national, met Shoshani in 2007 when the plaintiff was visiting New York City. Defendants' 56.1 Statement ¶ 27 ("Def.'s 56.1"). The plaintiff contends that after she

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

initially met Shoshani in June 2007, she had phone conversations with Shoshani in which they agreed to terms that resulted in the plaintiff's moving to New York and starting work for Zip in October 2007. Pl.'s Response to Def.'s 56.1 ¶ 7. The defendants maintain that Shoshani never offered any employment position to the plaintiff and that Shoshani rejected the plaintiff's request for employment. Def.'s 56.1 ¶¶ 7, 15.

The parties dispute whether the plaintiff was ever employed by Zip/MH, but generally agree that after the plaintiff moved to New York in 2007, until sometime in 2014, the plaintiff performed certain tasks for Zip/MH, including those related to payroll, staff interviews, and scheduling. Id. ¶ 13. The plaintiff maintains that she performed these tasks in her capacity as Chief Operating Officer of Zip/MH; the defendants argue that any work done by the plaintiff on behalf of Zip/MH or Shoshani was performed on a voluntary basis. Id. ¶¶ 13, 18-19; Pl.'s Response to Def.'s 56.1 ¶¶ 13, 18-19. For most of this time period, Shoshani and the plaintiff were involved in a romantic relationship, which ultimately ended in 2014. Def.'s 56.1 ¶¶ 28, 32.

The plaintiff was not placed on Zip/MH's payroll and never had a Zip/MH personnel file. Id. ¶¶ 1-3. The plaintiff also never submitted a W-4 withholding form to Zip/MH and never received a W-2 wage form from Zip/MH. Id. ¶¶ 4-5. The parties

dispute the frequency with which the plaintiff worked out of the Zip/MH offices and the extent to which the plaintiff had a fixed work schedule. Id. ¶¶ 11-12; Pl.'s Response to Def.'s 56.1 ¶¶ 11-12.

The defendants maintain that the plaintiff never received a paycheck from Zip/MH. Def.'s 56.1 ¶¶ 1-2. While the plaintiff concedes that she did not receive "regular paychecks" from Zip/MH, she argues that she received periodic wire transfers from Zip in exchange for her work, as well as non-cash fringe benefits in the form of lodging, transportation, and phone service. Pl.'s Response to Def.'s 56.1 ¶¶ 1-2; see also ECF No. 124-16 (bank records listing wire transfers from Zip to the plaintiff). For example, in 2008 or 2009, the plaintiff moved into the Zip/MH corporate apartment and lived there until 2014. Def.'s 56.1 ¶ 29; Pl.'s Response to Def.'s 56.1 ¶ 29. The parties do not dispute that while the plaintiff was residing in the corporate apartment, her living expenses were paid for. However, the defendants contend that Shoshani paid for these expenses, while the plaintiff maintains that Zip/MH primarily covered these costs. Id.

On September 10, 2010, Shoshani wrote a letter of recommendation on behalf of the plaintiff in which he reported that the plaintiff had "worked at Zip Aviation as Vice President of Operations for the past 3 years." ECF No. 124-7 at P01946

4

("Letter of Recommendation"). Shoshani also wrote in the Letter of Recommendation that the plaintiff's responsibilities at Zip included "operations, scheduling of daily flights, marketing, HR, payroll, and general management." Id. Additionally, the plaintiff was provided with an @zipaviation.com email address and Zip business cards that listed her as COO. Shoshani Dep. 47:22-48:11.

On May 16, 2013, 1168839 Ontario Limited ("Ontario"), a company owned by the plaintiff, entered into a consulting agreement with MH. ECF No. 104-11 ("Consulting Agreement"); Def.'s 56.1 ¶ 20. In the Consulting Agreement, MH retained the plaintiff as an "Aviation Engineering Consultant" for a one-year period. Under the Consulting Agreement, MH contracted to pay Ontario $650 per day for the plaintiff's services.

It is undisputed that Ontario was dissolved and had its certificate of incorporation canceled prior to the execution of the Consulting Agreement. Def.'s 56.1 ¶¶ 22-23. The plaintiff believed that the Consulting Agreement would be used to compensate her for services that she had previously rendered for Zip/MH, while the defendants argue that the agreement was executed solely to have the plaintiff, a Canadian citizen, achieve legal working status in the United States. Id. ¶¶ 24-25; Pl.'s Response to Def.'s 56.1 ¶¶ 24-25.

### B. The Plaintiff's Assault Claims

The plaintiff and Shoshani were involved in a romantic relationship between approximately 2007 to 2014. The plaintiff contends that during this period, Shoshani verbally and physically abused the plaintiff, and forcibly raped her on multiple occasions. Pl.'s Response to Def.'s 56.1 ¶¶ 28, 30. Shoshani disputes these allegations, arguing that Shoshani and the plaintiff's sexual relationship was always consensual and that Shoshani was never physically or emotionally abusive towards the plaintiff. Def.'s 56.1 ¶ 28.

### C. The Defendants' Abuse of Process and IIED Claims

Following the 2014 breakup of the relationship between Shoshani and the plaintiff, the plaintiff initiated several court and administrative proceedings involving the defendants. The plaintiff also had communications with certain third parties regarding the defendants.

#### i. Judicial Proceedings

On February 10, 2015, the plaintiff sought an ex parte order of protection against Shoshani in the New York State Family Court, claiming that on or around February 5, 2015, Shoshani threatened the plaintiff with a firearm in Greenwich, Connecticut. Def.'s 56.1 ¶ 33; ECF No. 100-10. The defendants contend that these allegations were false and that Shoshani was not in Greenwich during the relevant time period. Def.'s 56.1 ¶

6

33. On June 24, 2015, the New York State Family Court issued an order of protection that included a provision requiring Shoshani to surrender his handguns. Id.; ECF No. 100-10 at DEF-0011346-47. The order of protection was ultimately resolved by stipulation in December 2015 in which the parties agreed, among other things, to dismiss the proceedings if no further violation was reported to the court by the end of December 2015. ECF No. 100-10 at DEF-0011350.

In February 2016, after the June 24, 2015 order of protection expired, the plaintiff sought to hold Shoshani in contempt for violating that order, claiming that Shoshani followed her into a police station, vandalized her car, and threatened her. Defendants' Additional Statement of Material Facts ¶ 22 ("Def.'s Add'l Statement"); Pl.'s Reply to Def.'s Add'l Statement ¶ 22. The defendants maintain that these allegations were false. Def.'s Add'l Statement ¶ 22. The New York Family Court ultimately denied the plaintiff's request to hold Shoshani in contempt. Id. ¶ 31.

In January 2017, the plaintiff sought an ex parte order of protection against Shoshani in the Connecticut Superior Court, claiming that Shoshani had stalked and physically abused her. Def.'s Add'l Statement ¶¶ 32-33; see also ECF No. 100-11 at DEF-0011516. The defendants contend that these allegations were false. Def.'s Add'l Statement ¶ 32. The Connecticut Superior

7

Court issued an ex parte order of protection against Shoshani, which, among other things, required Shoshani to surrender or transfer all of his firearms and ammunition. Id. ¶¶ 34-35. The order of protection ultimately expired on January 31, 2017. Pl.'s Reply to Def.'s Add'l Statement ¶ 34.

Finally, the plaintiff filed an action against Shoshani in White Plains, New York small claims court seeking the return of certain of her personal items from Shoshani. Def.'s Add'l Statement ¶ 36. The action was eventually dismissed and Shoshani voluntarily made some of the plaintiff's personal items available to her. Id. ¶¶ 37-38. The defendants contend that the plaintiff never retrieved the items, while the plaintiff maintains that the items that she was looking for—clothes and shoes—were not made available to her and that the items that Shoshani attempted to give the plaintiff were either damaged or destroyed. Id.; Pl.'s Reply to Def.'s Add'l Statement ¶ 38.

## ii. Administrative Proceedings

Sometime after the breakup of the relationship between Shoshani and the plaintiff, the plaintiff filed several complaints with the Federal Aviation Administration ("FAA"). The defendants argue that the complaints included unfounded allegations that Shoshani, among other things, engaged in insurance fraud and knowingly flew unsafe aircrafts. Def.'s 56.1 ¶ 35. The defendants contend that the FAA found no credible

information to support the complaints and found that they stemmed from the plaintiff's personal animus towards Shoshani. Id. The plaintiff disputes that the complaints were unfounded and argues that she submitted letters to the FAA at the direction of and under duress by Shoshani. Pl.'s Reply to Def.'s Add'l Statement ¶ 7.

Additionally, the defendants contend that after the breakup, the plaintiff filed a complaint against Shoshani with the Florida Division of Consumer Services solely in order to have Shoshani's gun license revoked. Def.'s 56.1 ¶ 36. The plaintiff disputes this, arguing that she submitted a letter to the Florida Division of Consumer Services because she was residing in Florida at the time and the New York Family Court instructed her to provide a copy of the order of protection to local Florida authorities. Pl.'s Response to Def.'s 56.1 ¶ 36; ECF No. 121 ¶ 67 ("Roelcke Aff.").

Finally, the defendants contend that in early 2016, the plaintiff sent a complaint to the Internal Revenue Service ("IRS") alleging improprieties regarding Shoshani's personal tax returns and Zip/MH's finances. Def.'s Add'l Statement ¶ 15. The IRS has not taken any legal action against any of the defendants. Id. ¶ 16. The plaintiff denies having made any complaint to the IRS. Pl.'s Reply to Def.'s Add'l Statement ¶ 15.

### iii. Communications with Third Parties

It appears undisputed that the plaintiff and her counsel discussed the plaintiff's allegations in this action with a reporter at the New York Post, which ran an article about the plaintiff's claims under the headline "'You can't just escape:' 'Sex slave' assistant sues helicopter boss." Def.'s 56.1 ¶ 34; ECF No. 116-1. Moreover, it is undisputed that after the plaintiff and Shoshani broke up, the plaintiff contacted Shoshani's ex-wife. Def.'s 56.1 ¶ 37. The defendants contend that the plaintiff's phone calls to Shoshani's ex-wife were harassing; the plaintiff argues that she had no intention to harass Shoshani's ex-wife and instead called her to apologize for any pain that the plaintiff caused as a result of the plaintiff's affair with Shoshani. Id.; Pl.'s Response to Def.'s 56.1 ¶ 37. According to the defendants, the plaintiff also sent materials regarding Shoshani's alleged sexual abuse of the plaintiff to his ex-sister-in-law. Def.'s Add'l Statement ¶ 6.

### D. The Defendants' Conversion Claim

Before the plaintiff and Shoshani broke up, Shoshani purchased a Nissan 350Z that was registered to and owned by Zip. Pl.'s 56.1 ¶¶ 29-30. While the parties dispute whether Shoshani bought the car for the plaintiff, it is undisputed that for a certain period of time, the plaintiff used the car with Shoshani's permission. Id.

The defendants set forth the following version of events
with respect to the car. Shoshani became concerned with the
plaintiff's reckless driving and in early 2011, informed the
plaintiff that he would allow her to continue to use the car
only if she returned the license plates to Shoshani. Def.'s
Add'l Statement ¶¶ 44-46. The plaintiff stated that she would
only do so if Shoshani gave her ownership of the vehicle or sent
her a letter telling the plaintiff that the car was hers. Id. ¶
47. It appears that Shoshani did not do so and that the
plaintiff continued to use the car.

In July and August 2012, Shoshani demanded multiple times
that the plaintiff return the car. Id. ¶¶ 50-53. Shoshani also
informed the plaintiff that the car was not insured and should
not be driven. Id. In August 2012, Shoshani filed a police
report alleging that the car had been stolen. Id. ¶ 54. In
February 2013, to ensure that Zip would not face liability
regarding the car, Shoshani transferred the title to the
plaintiff. Id. ¶ 56. Shoshani did not sign a bill of sale to
complete the transaction. Id. ¶ 57.

The plaintiff disputes that she ever drove recklessly, and
generally contends that Shoshani bought the car for the
plaintiff, always regarded the car to be the plaintiff's, and
intended throughout this time period to transfer ownership to
the plaintiff. Pl.'s Response to Def.'s Add'l Statement ¶¶

11

44-57. The plaintiff concedes that Shoshani never signed a bill of sale memorializing that Shoshani transferred ownership of the car to the plaintiff. Id. ¶ 57.

## II.

The standard for granting summary judgment is well established. The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Id. at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998).

### III. The Defendants' Motion for Summary Judgment

The plaintiff advances (1) claims arising under various employment statutes for alleged workplace discrimination and unpaid compensation (Counts I, IV, VIII, XVII, and XVIII); (2) a breach of contract claim based on the plaintiff's alleged oral contract with Shoshani and the Consulting Agreement (Count X); (3) quantum meruit and unjust enrichment claims based on the unpaid services that the plaintiff performed for the defendants

(Counts XI and XII); and (4) assault claims, alleging rape/sexual abuse, IIED, and violations of New York City's Gender Motivated Violence Protection Act (Counts XIV, XV, and XVI). The defendant moves for summary judgment seeking to dismiss each of these claims.[2]

### A. The Plaintiff's Employment Claims

The plaintiff's employment claims fall into two categories: (1) sex discrimination claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"); and (2) unpaid wages claims under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). The defendants move for summary judgment dismissing each of the plaintiff's employment claims on the basis that the plaintiff was never employed by the defendants.

A plaintiff seeking relief under any of these statutes must establish the existence of an employer-employee relationship between the plaintiff and the relevant defendant. McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 80-81 (S.D.N.Y. 2020) (NYSHRL and NYCHRL); Martin v. Sprint United Mgmt. Co., 273 F. Supp. 3d 404, 443 (S.D.N.Y. 2017) (FLSA and NYLL). Whether a plaintiff was employed by a defendant may be resolved as a matter of law if the relevant underlying evidence is undisputed.

---

[2] Judge Batts previously dismissed the plaintiff's other causes of action at the motion to dismiss stage. See Roelcke I, 2018 WL 1792374, at *15.

See, e.g., Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590,
597-98 (E.D.N.Y. 2012); Nazinitsky v. Fairmont Ins. Brokers,
Ltd., No. 06-cv-5555, 2010 WL 836766, at *8 (E.D.N.Y. Mar. 8,
2010) (citing Murphy v. Guilford Mills, Inc., No. 02-cv-10105,
2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005)).

### i. NYSHRL and NYCHRL Claims

Under the NYSHRL and NYCHRL, courts apply a two-part test
to determine whether a plaintiff was employed by a defendant.
Areu v. Fox News Network, LLC, No. 20-cv-8678, 2021 WL 4124226,
at *8-10 (S.D.N.Y. Sept. 9, 2021). "To clear the first step—a
prerequisite to a finding of employment—the plaintiff must
demonstrate that she was hired by the putative employer. To
prove that she was hired, she must establish that she received
remuneration in some form for her work." Id. at *9 (quoting
United States v. City of New York, 359 F.3d 83, 91-92 (2d Cir.
2004)). This remuneration need not be a salary, but it must
convey a "substantial benefit" to the putative employee. City of
New York, 359 F.3d at 91-92 (defining employee for the purposes
of Title VII).[3] "Benefits must meet a minimum level of
significance or substantiality, in order to find an employment

---

[3] Cases analyzing whether a plaintiff was an employee within the meaning of
Title VII of the Civil Rights Act of 1964 are instructive in the NYSHRL and
NYCHRL context because courts use a "nearly identical standard to determine
the employment relationship" across the three statutes. See, e.g., Gallagher
v. AEG Mgmt. Brooklyn, LLC, No. 16-cv-4779, 2017 WL 2345658, at *4 (E.D.N.Y.
May 30, 2017); Wang v. Phoenix Satellite Television US, Inc., 976 F. Supp. 2d
527, 534-36 (S.D.N.Y. 2013).

relationship in the absence of more traditional compensation."
York v. Ass'n of the Bar, 286 F.3d 122, 126 (2d Cir. 2002).
Courts in the Second Circuit have found the following benefits
to be sufficiently substantial to qualify as remuneration:
"salary, vacation, sick pay [and] benefits such as health
insurance, disability insurance, life insurance, death benefits,
and retirement pension." Id. By contrast, "vague benefits" such
as networking opportunities, "widespread publicity," or "name
recognition" are insufficient. See Hughes v. Twenty-First
Century Fox, Inc., 304 F. Supp. 3d 429, 444 (S.D.N.Y. 2018).

If the plaintiff demonstrates remuneration, then courts
proceed to the second step in the analysis and consider whether
the proposed employer (1) had the power of the selection and
engagement of the employee; (2) made the payment of salary or
wages to the employee; (3) had the power of dismissal over the
employee; and (4) had the power to control the employee's
conduct.[4] Gallagher v. AEG Mgmt. Brooklyn, LLC, No. 16-cv-4779,
2017 WL 2345658, at *4 n.2 (E.D.N.Y. May 30, 2017); see also

---

[4] The parties both contend that after analyzing whether the plaintiff was
hired by the defendants, the Court should consider the thirteen factors laid
out in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989).
However, the correct legal standard under the NYSHRL and NYCHRL entails
consideration of the four factors articulated above, not the thirteen Reid
factors, which are relevant in the Title VII context. See, e.g., Wang, 976 F.
Supp. 2d at 536; State Div. of Human Rights on Complaint of Emrich v. GTE
Corp., 487 N.Y.S.2d 234, 235 (App. Div. 1985). However, in practice the Reid
test is "nearly identical" to the analysis under the NYSHRL and NYCHRL
four-factor test. Wang, 976 F. Supp. 2d at 536; see also supra n.3.

Cater v. New York, 316 F. Supp. 3d 660, 674 (S.D.N.Y. 2018).
Whether the alleged employer exercised control over the
employee's conduct and the incidents of her employment remains
the most important consideration in this analysis. Strohl v.
Brite Adventure Ctr., Inc., No. 08-cv-259, 2009 WL 2824585, at
*8 (S.D.N.Y. Aug. 28, 2009).

The question of whether the plaintiff was employed by
Zip/MH within the meaning of the NYSHRL and NYCHRL cannot be
resolved on a motion for summary judgment because the relevant
underlying evidence is disputed. Regarding remuneration, there
is evidence in the record that while the plaintiff did not
receive a salary from the defendants, she did receive benefits
from Zip/MH in the form of occasional wire transfers, lodging at
the Zip/MH corporate apartment, and the use of Zip/MH's Nissan
350Z. See supra Section I.A. If these benefits were in fact
given to the plaintiff by Zip/MH in exchange for her work, then
they may very well have constituted remuneration by Zip/MH
within the meaning of the NYSHRL and NYCHRL. See, e.g., City of
New York, 359 F.3d at 92 (concluding that benefits in the form
of cash payments, food stamps, transportation, and childcare
expenses were remuneration).

However, there is countervailing record evidence that
supports the conclusion that the plaintiff received these
benefits as a result of the plaintiff's personal relationship

17

with Shoshani and not in exchange for work that she did on behalf of Zip/MH. For example, certain of the plaintiff's statements, including allegations in the plaintiff's complaint, suggest that the plaintiff's work for Zip/MH was done on a voluntary basis and that it was Shoshani, not Zip/MH, that supported the plaintiff financially. <u>See, e.g.</u>, Second Amended Complaint ("SAC," ECF No. 30) ¶¶ 64-65 ("[I]n order to maintain his hold over Plaintiff, Defendant SHOSHANI periodically wired Plaintiff some money . . . However, Defendant ZIP and Defendant SHOSHANI never paid Plaintiff her agreed upon salary, or any salary for that matter."); ECF No. 135-1 at DEF-0007568 (March 4, 2010 email from the plaintiff to Shoshani; discussing Zip/MH matters and writing that "I'm a volunteer"); ECF No. 107-10 at P0483 (May 30, 2010 email from the plaintiff to Shoshani; "I know and [u]nderstand fully your priorities lie with the company and true employees come first, you don[']t need to do anything for me, <u>I've taken this all on myself and am not an employee of Zip but a self imposed volunteer.</u>") (emphasis added). This conclusion is also supported by Shoshani's testimony that he financially supported the plaintiff not because she was owed income or wages, but because she was his girlfriend. Shoshani Tr. 67:8-68:25, 126:5-25.

Likewise, there are genuine disputes of material fact underpinning the second step of the employer/employee test. As

18

discussed above, the parties dispute whether Zip/MH ever paid the plaintiff any salary or wages, either in the form of cash payments or fringe benefits. Additionally, the extent to which Zip/MH exercised control over the plaintiff cannot be resolved at this stage. For example, the defendants contend that the plaintiff was free to come and go from the Zip/MH offices as she pleased and that, at certain times, the plaintiff did not show up to the Zip/MH offices for weeks or months at a time. Def.'s 56.1 ¶¶ 11-12. By contrast, the plaintiff highlights deposition testimony in which Zip/MH employees explained that they witnessed the plaintiff work out of the Zip/MH offices daily. Pl.'s Response to Def.'s 56.1 ¶¶ 11-12. Likewise, the defendants argue that the plaintiff helped Shoshani with tasks "without much oversight," while the plaintiff contends that Shoshani oversaw all of the plaintiff's work. Def.'s 56.1 ¶ 13; Pl.'s Response to Def.'s 56.1 ¶ 13.

Finally, the general nature of the relationship between Zip/MH and the plaintiff is unclear given the conflicting record evidence. The defendants appear to have represented to third parties that the plaintiff was employed by Zip/MH by giving her business cards listing her as "COO" and an @zipaviation.com email address. Shoshani likewise represented that the plaintiff was employed by Zip/MH in the Letter of Recommendation. On the other hand, Shoshani testified and affirmed that he never hired

the plaintiff to work for Zip/MH, Def.'s 56.1 ¶ 15, and there is some evidence that suggests that the plaintiff understood herself to be an unpaid volunteer.

In sum, the question of whether the plaintiff was employed by Zip/MH within the meaning of the NYSHRL and NYCHRL turns on disputed material questions of fact. Accordingly, the defendants' motion for summary judgment with respect to the plaintiff's NYSHRL and NYCHRL claims is denied.

### ii. FLSA and NYLL Claims

In determining whether a plaintiff is employed by a defendant in the FLSA context, courts apply the "economic reality test," which weighs:

> (1) the degree of control exercised by the employer over the workers,
> (2) the workers' opportunity for profit or loss and their investment in the business,
> (3) the degree of skill and independent initiative required to perform the work,
> (4) the permanence or duration of the working relationship, and
> (5) the extent to which the work is an integral part of the employer's business.

Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988). "No one of these factors is dispositive; rather, the test is based on the totality of the circumstances." Id. at 1059.

Similarly, under the NYLL, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer

over the results produced or the means used to achieve the results." Bynog v. Cipriani Grp., Inc., 802 N.E.2d 1090, 1092-93 (N.Y. 2003). Factors relevant to assessing control include whether the worker (1) worked at her own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule. Id. Courts in the Second Circuit routinely conduct analyses under the FLSA and NYLL simultaneously in view of the "substantial similarity" of the statutes. See, e.g., Ethelberth v. Choice Sec. Co., 91 F. Supp. 3d 339, 360 (E.D.N.Y. 2015).

The issue of whether the plaintiff was employed by Zip/MH under the NYLL and FLSA cannot be resolved at this stage for largely the same reasons as discussed above with respect to the claims arising under the NYCHRL and NYSHRL. There is conflicting evidence in the record regarding whether the plaintiff was compensated by Zip/MH for her work, whether and to what extent the plaintiff worked on a fixed schedule, the amount of control and supervision the defendants exercised over the plaintiff's work, and the general nature of the relationship between Zip/MH and the plaintiff. Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's NYLL and FLSA claims is denied.

## B. Breach of Contract

The plaintiff contends that between June and October 2007, Shoshani and the plaintiff discussed and orally agreed to the terms of her employment. The plaintiff alleges that this constituted an oral contract that the defendants breached. The defendants move for summary judgment on this claim, arguing that there is no evidence in the record supporting the existence of an oral contract and that even if there were, any such contract would be unenforceable.[5]

To succeed on a claim for breach of contract under New York law, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).[6] Additionally, "it is well settled that for a contract to be valid[,] the salient terms must be set forth in sufficient detail so that the

---

[5] The defendants also moved for summary judgment dismissing the plaintiff's claim for breach of the Consulting Agreement. The plaintiff failed to address this issue in her brief in opposition to the defendants' motion for summary judgment. Accordingly, summary judgment dismissing the plaintiff's claim for breach of contract based on the Consulting Agreement is granted. See Scott v. JPMorgan Chase & Co., No. 13-cv-646, 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) (a plaintiff forfeits any claim not defended in the plaintiff's brief in opposition).

[6] The plaintiff alleges that the oral agreement was made in New York, SAC ¶¶ 20-22, and the parties do not dispute that New York law applies to this claim.

parties' intention may be ascertained with a reasonable degree of certainty." Time, Inc. v. Kastner, 972 F. Supp. 236, 239 (S.D.N.Y. 1997); see also Houlahan v. Raptor Trading Sys., Inc., No. 16-cv-9620, 2020 WL 2836255, at *9 (S.D.N.Y. May 30, 2020) (citing Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 372 (2d Cir. 2003)).

The parties dispute whether the plaintiff in fact entered into an oral contract with any of the defendants. However, whatever the discussions among the parties were, any oral agreement would be unenforceable because the record is devoid of evidence establishing the contract's essential terms, such as the plaintiff's job responsibilities, benefits, compensation, or the duration of the contract. The plaintiff did not delineate any of the specific terms of the putative oral contract at her deposition or in the affidavit that she submitted in opposition to the defendants' motion for summary judgment. The plaintiff simply described the oral contract as "a mutual agreement that [the plaintiff] would move to New York and work for Zip" but did not explain any of its material terms. Roelcke Aff. ¶ 9. Any alleged oral agreement is unenforceable in view of this failure of proof. See, e.g., Houlahan, 2020 WL 2836255, at *9 (severance agreement that does not contain the amount of the severance is unenforceable); Time, Inc., 972 F. Supp. at 239 ("[W]here a contract does not have such essential terms as the time or

manner of performance or price to be paid, the contract is unenforceable."); cf. Geller v. Reuben Gittelman Hebrew Day School, 826 N.Y.S.2d 103, 104 (App. Div. 2006) (material terms of an employment agreement include "salary and the amount of services required").

The plaintiff argues alternatively that the defendants breached an implied-in-fact contract. The elements of an implied-in-fact contract are the same as those of an express contract. Maas v. Cornell Univ., 721 N.E.2d 966, 970 (N.Y. 1999). Under New York law, "a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." Axiom Inv. Advisors, LLC v. Deutsche Bank AG, No. 15-cv-9945, 2018 WL 4253152, at *9 (S.D.N.Y. Sept. 6, 2018). The party asserting the existence of an implied-in-fact contract must supply "in nonconclusory language, the essential terms of the parties' contract, including those specific provisions of the contract upon which liability is predicated . . . ." Lapine v. Seinfeld, 918 N.Y.S.2d 313, 318 (Sup. Ct. 2011) (quoting Cangilia v. Chicago Tribune-New York Syndicate, Inc., 612 N.Y.S.2d 146, 147 (App. Div. 1994)); see also I.G. Second Generation Partners, L.P. v Duane Reade, 793 N.Y.S.2d 379, 381-82 (App. Div. 2005) (explaining that an implied-in-fact contract requires a showing that there was a meeting of the minds).

The claim that the defendants breached an implied-in-fact contract is absent from the SAC and was raised for the first time in the plaintiff's opposition brief. In any event, any argument based on an implied-in-fact contract theory is without merit. As with the alleged oral contract, the plaintiff does not point to anything in the record that evidences what the terms of the putative implied-in-fact contract would have been. The plaintiff cannot show that there was a meeting of the minds without evidence of the contract's essential terms, and consequently any implied-in-fact theory fails.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's claim for breach of contract is granted.

### C. Quantum Meruit and Unjust Enrichment

The plaintiff claims that she is entitled to compensation for her work under a quantum meruit and unjust enrichment theory. Quantum meruit and unjust enrichment are equitable doctrines available when an express contract is unenforceable. Milton Abeles, Inc. v. Farmers Pride, Inc., 603 F. Supp. 2d 500, 503-04 (E.D.N.Y. 2009). Under New York law, quantum meruit and unjust enrichment claims may be analyzed as a single claim. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). To recover in quantum meruit under New York law, a plaintiff must establish: "(1) the

performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000). Regarding the third element, the plaintiff's expectation of compensation must be reasonable under the circumstances. See Learning Annex Holdings, LLC v. Rich Glob., LLC, 860 F. Supp. 2d 237, 244 (S.D.N.Y. 2012).

The defendants contend that the plaintiff's unjust enrichment and quantum meruit claims fail because the plaintiff did not reasonably expect to be paid for her work for Zip/MH. The defendants point to evidence including a 2007 email from Shoshani to the plaintiff in which Shoshani explained that he could not afford the plaintiff's requested salary. See ECF No. 107-12. The defendants also highlight the communications discussed above in which the plaintiff appears to acknowledge that she was doing at least some work for Zip/MH on a voluntary basis.

On the other hand, the plaintiff testified that she moved to New York on the understanding that she was accepting a job at Zip/MH and would be compensated for her work. Pl.'s Response to Def.'s 56.1 ¶ 18. The conclusion that the plaintiff reasonably expected to be paid for her work is also corroborated by the plaintiff's testimony that she received approximately $21,000

from Zip/MH during her first year of work and that she understood those payments to represent a portion of the wages she was owed. Id. ¶ 19.

Because the question of whether the plaintiff reasonably expected to be paid for her work at Zip/MH hinges on disputed facts and evidence, it would be inappropriate to resolve these claims at the summary judgment stage. Accordingly, the defendants' motion for summary judgment dismissing the unjust enrichment and quantum meruit claims is denied.

### D. Assault Claims

The plaintiff advances three claims that the parties collectively refer to as the "assault claims:" (1) a claim of IIED; (2) a claim alleging civil violations of Sections 130.35, 130.50, and 130.70 of the New York Penal Code, which respectively proscribe rape, criminal sexual acts, and aggravated sexual abuse (see N.Y. Penal Law §§ 130.35, 130.50, 130.70); and (3) a claim alleging violations of the New York City Gender Motivated Violence Protection Act, which affords a civil cause of action to victims of "crime[s] of violence motivated by gender" (see N.Y.C. Admin. Code § 8-904). These claims are each premised on the plaintiff's allegations that Shoshani physically and sexually abused her. As discussed above, the parties vigorously dispute the veracity of these allegations. See Def.'s 56.1 ¶ 28; Pl.'s Response to Def.'s 56.1

¶ 28. The defendants argue that the Court may resolve the question of whether Shoshani assaulted the plaintiff at the summary judgment stage because the plaintiff's allegations are incredible, uncorroborated, and contradictory.

"It is axiomatic that assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Ricks v. O'Hanlon, 07-cv-9849, 2010 WL 245550, at *6 (S.D.N.Y. Jan. 19, 2010) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)); see also Hayes v. N.Y. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). However, "while it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage," the court may discredit a plaintiff's evidence and grant summary judgment "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).

The defendants argue that they are entitled to summary judgment dismissing the plaintiff's assault claims because the sole evidence supporting these claims is her own testimony, which, according to the defendants, is internally inconsistent

and contradicted by the testimony of Shoshani and other witnesses. The defendants also point to three declarations: two from third parties who formerly associated with the plaintiff and essentially contend that the plaintiff has a propensity for extortion and blackmail, and a third from a putative expert who concluded that the plaintiff's claims of psychological trauma are of "questionable reliability." See ECF No. 107-18 at 22.

However, as the plaintiff notes, there is evidence in the record in addition to her own testimony that tends to corroborate her claims, including the testimony of the plaintiff's childhood friend and of Zip/MH's general manager. See, e.g., Pl.'s Response to Def.'s 56.1 ¶ 28. While the defendants have identified certain apparent inconsistencies in the plaintiff's testimony, it is far from clear that the plaintiff's testimony as a whole "is so patently unreliable that it could not be given any weight by a reasonable juror." Domenech v. Parts Auth., Inc., 653 F. App'x 26, 28 (2d Cir. 2016). The question of whether the alleged assaults occurred "inherently involves credibility determinations that should be resolved by a jury," see id., and the defendants are free to highlight any inconsistent testimony for the jury at trial. But it would be inappropriate at the summary judgment stage, on this record, for the Court to "step into the factfinding role and to determine how best to resolve conflicting interpretations about

29

material facts." <u>Yu Zhang v. Sabrina USA Inc.</u>, No. 18-cv-12332,
2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021) ("Although there
is much to suggest that the Plaintiff's self-serving and
contradicted testimony is unreliable, the existence of that
testimony in the record is enough to render summary judgment
improper").[7]

Accordingly, the defendants' motion for summary judgment
dismissing the assault claims is denied.

### IV. The Plaintiff's Motion for Summary Judgment

The defendants advance three counterclaims: (1) abuse of
process; (2) IIED; and (3) conversion of the Nissan 350Z. The
plaintiff moves for summary judgment on each of these claims.[8]

### A. Abuse of Process

It is undisputed that after the plaintiff and Shoshani
broke up, the plaintiff initiated several judicial proceedings

---

[7] Summary judgment is inappropriate even if the declarations submitted by the
defendants were considered. However, the declarations of the two lay
witnesses concern allegations that the plaintiff previously engaged in
blackmail and extortion in circumstances that are irrelevant in this case.
These declarations serve no apparent purpose other than as improper evidence
that the plaintiff acted in conformity with her alleged bad character in the
present circumstances. <u>See</u> Fed. R. Evid. 404(b)(1) ("Evidence of any other .
. . act is not admissible to prove a person's character in order to show that
on a particular occasion the person acted in accordance with the character").
Because the defendants have failed to demonstrate that the declarations are
admissible for any proper purpose, they should not be considered on a motion
for summary judgment. <u>See, e.g.</u>, <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d
Cir. 1997). And the defendants' expert's declaration, even if it were
admissible, does not render the plaintiff's testimony so implausible that no
reasonable jury could find it credible.

[8] Judge Batts previously dismissed the defendants' other counterclaims at the
motion to dismiss stage. <u>See</u> <u>Roelcke II</u>, 2019 WL 10856680, at *8.

involving the defendants, including this lawsuit. It is further
undisputed that in certain of these proceedings, the plaintiff
obtained orders of protection against Shoshani. The defendants
contend this course of action constituted abuse of process.[9]

Under New York law, an abuse of process claim lies against
a party who (1) employs regularly issued legal process to compel
performance or forbearance of some act; (2) with intent to do
harm without excuse or justification; and (3) in order to obtain
a collateral objective that is outside the legitimate ends of
the process. Roelcke II, 2019 WL 10856680, at *5 (citing Curiano
v. Suozzi, 469 N.E.2d 1324, 1326 (N.Y. 1984)). A party advancing
an abuse of process claim must also prove actual or special
damages. See Parkin v. Cornell Univ., 583 N.E.2d 939, 943 (N.Y.
1991)

The plaintiff contends that she is entitled to summary
judgment dismissing this claim for five reasons. First, the
plaintiff argues that the defendants' claim is premised on the
plaintiff's initiation of lawsuits against the defendants, which
cannot satisfy the first element of abuse of process. The
plaintiff is correct that the "overwhelming weight of authority"
provides that "the institution of a civil action by summons and

---

[9] The defendants' claim for abuse of process is premised solely on the
plaintiff's conduct with respect to the judicial proceedings discussed above
(see supra Section I.C.i) and not on any of the administrative proceedings
involving the defendants. See Answer and Counterclaims to Plaintiff's SAC ¶¶
50-54.

complaint is not legally considered process capable of being abused." Manhattan Enter. Grp., LLC v. Higgins, No. 18-cv-6396, 2019 WL 4601524, at *4 (S.D.N.Y. Sept. 22, 2019), aff'd, 816 F. App'x 512 (2d Cir. 2020) (quoting Curiano, 469 N.E.2d at 1326) (collecting cases). Instead, "to qualify as legal process for purposes of an abuse-of-process claim, the court-issued writ must not only direct or demand that the person to whom it is directed shall perform or refrain from doing some prescribed act, but also interfere with one's person or property." Manhattan, 816 F. App'x at 514 (quoting Williams v. Williams, 246 N.E.2d 333, 335 (N.Y. 1969)) (affirming dismissal of abuse of process claim based on allegations that the defendants "filed and prosecuted a series of duplicative, frivolous, and malicious lawsuits aimed at harassing" the plaintiffs).

Accordingly, the defendants' claim for abuse of process is without merit to the extent that it is premised on the initiation of this litigation or the prosecution of the small claims action, which was dismissed without the issuance of relevant process. However, the plaintiff also obtained orders of protection from the New York State Family Court and the Connecticut Superior Court and sought to hold Shoshani in contempt of the New York order of protection. The orders of protection commanded Shoshani to, among other things, refrain from being in physical proximity or communicating with the

plaintiff and to surrender his firearms. ECF No. 100-10 at DEF-0011346-48; ECF No. 100-11 at DEF-0011510. These orders therefore constituted regularly issued process that compelled Shoshani to perform and abstain from certain prescribed acts, satisfying the first element of abuse of process. See, e.g., Dixon v. Roy, No. 41346/07, 2008 WL 4635548, at *4-5 (N.Y. Sup. Ct. 2008) (obtaining a temporary restraining order satisfied the first element of abuse of process); cf. Casa de Meadows Inc. (Cayman Islands) v. Zaman, 908 N.Y.S.2d 628, 632 (App. Div. 2010) (affirming dismissal of abuse of process claim; explaining that "process did not issue" because the "plaintiffs' request for a temporary restraining order was denied.").

Second, the plaintiff argues that the defendants have failed to establish that the plaintiff intended to harm Shoshani without justification and used process in order to obtain an improper collateral objective. However, Shoshani declared and testified that the allegations that resulted in the issuance of the orders of protection—including allegations that Shoshani physically abused, threatened, and stalked the plaintiff—were fabricated by the plaintiff. See, e.g., ECF 104-5 ¶¶ 19, 22, 27 ("Shoshani Aff."); Shoshani Dep. 169:16-171:17. If a jury credits Shoshani's version of events and discredits the plaintiff's, then a jury may also reasonably conclude that the plaintiff had no legitimate justification to seek the orders of

protection because Shoshani did not actually pose a threat to the plaintiff. Moreover, if there were no legitimate justification to seek the orders of protection, then a jury may reasonably conclude that the plaintiff used process to obtain the improper collateral objectives of inflicting economic harm on Shoshani and impeding his ability to carry firearms, which Shoshani represents he sometimes must do in connection with his work. Shoshani Aff. ¶ 25; Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Loc. 1889 AFT AFL-CIO, 343 N.E.2d 278, 283-84 (N.Y. 1975) (the "premediated infliction of economic injury without economic or social excuse or justification is an improper objective which will give rise to a cause of action for abuse of process.").

Third, the plaintiff contends that the defendants cannot prove actual or special damages. However, Shoshani declared that the defendants incurred substantial legal expenses litigating the proceedings initiated by the plaintiff. Shoshani Aff. ¶ 27. These expenses can constitute damages for an abuse of process claim. See, e.g., Parkin, 583 N.E.2d at 943.

Fourth, the plaintiff argues that the defendants claim is barred by the Noerr-Pennington doctrine, which "generally immunizes from liability a party's commencement of a prior court proceeding." T.F.T.F. Capital Corp. v. Marcus Dairy, Inc., 312 F.3d 90, 93 (2d Cir. 2002). However, the Noerr-Pennington

doctrine does not foreclose claims that fall within the "sham exception," which "excludes any abuse of process that bars access to the courts, such as unethical conduct in the setting of the adjudicatory process or the pursuit of baseless, repetitive claims." Shetiwy v. Midland Credit Mgmt., 980 F. Supp. 2d 461, 475 (S.D.N.Y. 2013); Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen, 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004) ("Fraudulent acts are not protected by the Noerr-Pennington doctrine when they occur in the adjudicatory process or where false information is filed with an administrative agency with deceptive intent."). The defendants contend that the plaintiff obtained the orders of protection through false statements and for improper purposes. Accordingly, the Noerr-Pennington doctrine does not bar the defendants' claim on this motion for summary judgment.

Finally, the plaintiff contends that the defendants' claim is untimely. The applicable statute of limitations in New York for intentional torts, including abuse of process, is one year. N.Y. C.P.L.R. § 215(3). Where, as here, the defendants' counterclaim is based on state law, the tolling provisions of N.Y. C.P.L.R. § 203(d) apply. See Mopex, Inc. v. Am. Stock Exchange, LLC, No. 02-cv-1656, 2002 WL 342522, at *7 (S.D.N.Y. Mar. 5, 2002). Section 203(d) provides that the statutes of

limitations for counterclaims are tolled upon the filing of the complaint.

The original complaint in this action was filed on August 10, 2015, making the abuse of process claim timely if it accrued after August 10, 2014. Because the plaintiff did not begin seeking orders of protection until February 10, 2015, the defendants' claim is timely.[10]

Accordingly, the plaintiff's motion for summary judgment dismissing the defendants' counterclaim of abuse of process is denied.

## B. IIED

The defendants contend that the plaintiff intentionally inflicted emotional distress on Shoshani by engaging in a campaign of harassment that included: (1) initiating judicial and administrative proceedings involving the defendants on false pretenses; (2) falsely accusing Shoshani of physical and sexual abuse in this lawsuit and publicly discussing these allegations with media outlets; (3) having allegedly harassing communications with Shoshani's ex-wife and ex-sister-in-law.

---

[10] The plaintiff's argument to the contrary is based on an erroneous interpretation of Section 203(d). The plaintiff relies on the second clause of Section 203(d), which provides that if a counterclaim would otherwise be untimely by the time the complaint is filed, then the counterclaim is not time-barred if it "arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends." However, the claim of abuse of process was timely at the time that the complaint was filed. Accordingly, this provision of Section 203(d) is irrelevant.

Under New York law, intentional infliction of emotional distress has four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. N.Y. Post Co., 612 N.E.2d 699, 702 (N.Y. 1993)). Typically, in order to sustain an IIED claim, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Fischer v. Maloney, 373 N.E.2d 1215, 1217 (N.Y. 1978).

Although the "standard of outrageous conduct is strict, rigorous and difficult to satisfy . . ., that is not the case when there is a deliberate and malicious campaign of harassment or intimidation." Rich v. Fox News Network, LLC, 939 F.3d 112, 123 (2d Cir. 2019) (quoting Scollar v. City of New York, 74 N.Y.S.3d 173, 178 (App. Div. 2018)). In this context, the question is whether the complained of actions "under the totality of the circumstances[] amounted to a deliberate and malicious campaign." Id.

The plaintiff first argues that her conduct was not extreme and outrageous as a matter of law. However, given the disputed evidence in the record, a reasonable jury could conclude that

the plaintiff engaged in a campaign of harassment in which the
plaintiff (1) publicly disseminated fabricated physical and
sexual assault allegations against Shoshani; (2) maliciously
subjected the defendants to judicial and administrative
proceedings based on false pretenses; and (3) made harassing
communications to Shoshani's ex-wife and ex-sister-in-law.[11]
Courts have found that campaigns of harassment involving
similarly outrageous conduct could satisfy the first element of
IIED. See, e.g., 164 Mulberry Street Corp. v. Columbia Univ.,
771 N.Y.S.2d 16, 22-23 (App. Div. 2004) (plaintiff-restaurateurs
stated a claim for IIED based on allegations that the defendant
wrote letters to the plaintiffs falsely accusing the plaintiffs
of having caused severe food poisoning); Flatley v. Hartmann,
525 N.Y.S.2d 637, 638 (App. Div. 1988) (plaintiff stated a claim
for IIED based on allegations that the defendant "made repeated
telephone calls to the plaintiff's house only to hang up as
someone answered"); Green v. Fischbein Olivieri Rozenholc &
Badillo, 507 N.Y.S.2d 148, 152 (App. Div. 1986) (campaign by
landlord who, among other things, brought numerous unfounded
eviction proceedings and other actions against the plaintiff
plausibly constituted extreme and outrageous conduct); see also
Allam v. Meyers, No. 09-cv-10580, 2011 WL 721648 (S.D.N.Y. Feb.

---

[11] The plaintiff vigorously disputes these allegations, but the Court cannot
resolve these issues of fact on this motion for summary judgment.

24, 2011) (explaining that "courts applying New York law have
found the existence of a 'campaign' even absent (a)
'unrelenting' harassment directed at a single plaintiff; and (b)
physical threats").

Next, the plaintiff argues that the defendants' claim of
IIED should be dismissed because it is duplicative of the
defendants' claim for abuse of process. The plaintiffs correctly
note that a "claim for IIED may not be sustainable where the
conduct complained of falls well within the ambit of other tort
liability." Turley v. ISG Lackawanna Inc., 774 F.3d 140, 157 (2d
Cir. 2014); McGrath v. Nassau Health Care Corp., 217 F. Supp. 2d
319, 335 (E.D.N.Y. 2002) ("IIED claims that are duplicative of
other tort claims" should be dismissed). However, the claim for
abuse of process is premised solely on the plaintiff's
initiation of certain judicial proceedings involving Shoshani.
By contrast, the claim of IIED encompasses a broader pattern of
conduct that also includes the initiation of administrative
proceedings, public dissemination of allegedly false claims of
abuse, and allegedly harassing contact with third parties.
Accordingly, the plaintiff's argument that the two claims are
duplicative is without merit.

Finally, the plaintiff advances the same statute of
limitations argument as she did for the abuse of process claim.
However, for the reasons explained above, any intentional tort

counterclaim is timely if the claim accrued within one year
before the complaint was filed. Because the conduct underlying
the defendants' claim of IIED falls within or postdates that
time period, the claim is timely.

Accordingly, the plaintiff's motion for summary judgment
dismissing the defendants' counterclaim of IIED is denied.

### C. Conversion

The defendants contend that the plaintiff committed
conversion of the Nissan 350Z when she refused to return the car
to the Shoshani. Under New York law, "conversion takes place
when someone, intentionally and without authority, assumes or
exercises control over personal property belonging to someone
else, interfering with that person's right of possession."
Dardashtian v. Gitman, No. 17-cv-4327, 2017 WL 6398718, at *7
(S.D.N.Y. Nov. 28, 2017). To maintain a claim for conversion, a
plaintiff must show that: "(1) the property subject to
conversion is a specific identifiable thing; (2) [the] plaintiff
had ownership, possession or control over the property before
its conversion; and (3) [the] defendant exercised an
unauthorized dominion over the thing in question, to the
alteration of its condition or to the exclusion of the
plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541
(S.D.N.Y. 2004). "Where the original possession is lawful, a
conversion does not occur until the defendant refuses to return

the property after demand by the property's rightful owner."
Simpson & Simpson, PLLC v. Lippes Mathias Wexler Friedman LLP,
14 N.Y.S.3d 258, 261 (App. Div. 2015).

The plaintiff argues that she is entitled to summary
judgment dismissing this claim because the plaintiff did not
exercise unauthorized domain over the car. The plaintiff's
argument fails. Although it is undisputed that the plaintiff had
Shoshani's permission to use the car for a certain period time,
the defendants contend that in July and August 2012, Shoshani
demanded that the plaintiff return the car and that the
plaintiff failed to do so. See, e.g., ECF No. 116-14, 116-15,
116-16 (repeated demands by Shoshani that the plaintiff return
the car). Because there is evidence in the record that the
plaintiff failed to return the car to Shoshani after he demanded
that she do so, the defendants' claim for conversion may
proceed.

The plaintiffs also argue that the defendants' claim is
untimely under the applicable three-year statute of limitations.
See N.Y. C.P.L.R. § 214(3). As discussed above with respect to
IIED and abuse of process, a counterclaim arising out of New
York law is not time barred if it was timely as of the date that
the complaint was filed. See N.Y. C.P.L.R. § 203(d). Therefore,
because conversion has a three-year statute of limitations and
the complaint was filed on August 10, 2015, the defendants'

41

counterclaim is not time barred unless it accrued before August 10, 2012.

The parties agree that the earliest date that a claim of conversion could have accrued was August 22, 2012—the day that Shoshani sent the plaintiff the final demand that she return the car. See ECF No. 115 at 22; ECF No. 128 at 3. Therefore, the defendants' claim for conversion is timely.

Accordingly, the plaintiff's motion for summary judgment dismissing the defendants' claim of conversion is denied.

### CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit.

For the foregoing reasons, the defendants' motion for summary judgment is **granted in part and denied in part**. The plaintiff's motion for summary judgment is **denied.**

The Clerk is directed to close Docket Nos. 102 and 131.

**SO ORDERED.**

Dated:     New York, New York
           November 23, 2021

                                   John G. Koeltl
                          United States District Judge